**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|                                                      |     |          |
| ---------------------------------------------------- | --- | -------- |
| **GARCIA GLEN WHITE,**                               | X   |          |
|                                                      | X   |          |
|                                                      | X   |          |
| **Petitioner,**                                      | X   |          |
|                                                      | X   |          |
| **v.**                                               | X   | H-02-1805 |
|                                                      | X   |          |
| **RICK THALER, Director,**                           | X   |          |
| **Texas Department of Criminal**                     | X   |          |
| **Justice, Correctional Institutions Division,**     | X   |          |
|                                                      | X   |          |
| **Respondent,**                                      | X   |          |

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This case is before the Court on Petitioner Garcia Glen White's First Amended Petition for Writ of Habeas Corpus, and Respondent Rick Thaler's Motion for Summary Judgment.  Having carefully considered the Petition, the Summary Judgment Motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and White's Amended Petition for Writ of Habeas Corpus should be DENIED.

I.          <u>Background</u>

      Petitioner Garcia Glen White, currently in the custody of the Texas Department of Criminal Justice ("TDCJ"), filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254.  A brief history of the case is appropriate.

      Between November 29 and December 2, 1989, King Solomon tried to contact his girlfriend, Bonita Edwards.  After trying for several days, Solomon went to the apartment Edwards shared with her twin sixteen year old daughters, Annette and Bernette. When there was no answer at the door,

he asked neighbors if they had seen Bonita, but no one had. After returning later in the day, Solomon spoke to a maintenance man at the apartments who asked the apartment manager to help him open the door to the Edwards' apartment. Solomon saw two bodies lying on the floor. 15 Tr. at 36-46. [1]

Houston Police Department ("HPD") officer Leonard Dawson arrived at the crime scene at about 2:45 pm. He found three dead females inside the apartment. Annette Edwards was lying face down semi-nude with her head on a pillow and a blanket partially covering her body. A towel gagged Bernette and was wrapped around her neck. Bonita was clothed but had blood all over her shirt. All three had multiple stab wounds to the neck and chest and had been dead for several days. There was no sign of forced entry, but the phone was off the hook and the bedroom door had been forced open. Another HPD investigator, Sergeant Brad Rudolph, stated that it appeared that Annette was sexually assaulted. There was blood on the walls, in the bathtub, and in the kitchen sink. *Id.* at 58-110, 146-51; 16 Tr. at 275-307.

The murders went unsolved for almost six years. During an investigation into an unrelated murder in July 1995, Tecumseh Manuel, a close friend of White's, told police that White admitted killing the Edwardses. Police arrested White the following day. 16 Tr. at 185-90.

White initially denied his involvement but, after seeing a portion of Manuel's interview, stated that he was ready to tell the truth. White then gave a videotaped statement implicating himself and Terrence Moore in the murders. According to White, he and Moore went to the apartment to use drugs and have sex with Bonita. They both tried to have sex with her, but Bonita became angry because they would not share the drugs with her. Moore stabbed her. When the girls came out of their bedroom, Moore grabbed one and White grabbed the other. White fondled one

---

[1]         "Tr." refers to the transcript of White's trial.

2

of the girls and ejaculated.  Moore forced his way into the bedroom and stabbed one of the girls.
He then came out and stabbed the other girl, and the two men left.  15 Tr. 162; 16 Tr. 196; SX 55A.

Upon further investigation, police discovered that Moore was killed four months before the
Edwards family was murdered.  16 Tr. at 205-06, 224.  When confronted with this discrepancy,
White gave another statement in which he admitted fabricating the story about Moore and confessed
to killing all three victims.  SX 56A.  Serology and DNA testing revealed that semen recovered from
a bed sheet was consistent with White's DNA, and blood from the same sheet was consistent with
either Annette's or Bernette's DNA.  16 Tr. at 240-41.  White was convicted of capital murder for
the murders of the two girls during the same criminal transaction.

During the penalty phase, the State presented evidence that White committed two other
murders.  White gave a videotaped statement admitting his involvement in one of the murders,
which occurred during the robbery of a convenience store. 19 Tr. at 64-73; SX 98.  A grand jury no-
billed White on the other murder, but when police questioned Tecumseh Manual about the
convenience store robbery-murder, Manuel told them that White admitted his involvement in the
other murder, as well.  19 Tr. at 67.  When confronted, White gave another statement in which he
admitted killing the victim during a fight after they had sex, which he paid for.  SX 116A.

White's mother testified that White was a poor student, but did not have discipline problems
in school.  White got along well with his siblings.  He played football in high school and college,
but a knee injury during his first semester of college ended his football career and he dropped out
of school.  He eventually went to work as a sandblaster.  In March, 1988, he fell and suffered
injuries to his hand, shoulder, and head requiring hospitalization.  After this injury, White began
using drugs.  21 Tr. at 230-49.  White's sister gave similar testimony.  *Id.* at 271-73.

3

Robert Yohman, a clinical neuropsychologist, testified that he conducted a number of tests on White and reviewed relevant records.  He found that White has an IQ of 76, which is below average; he scored low in concentration, speed of thinking, attention span, achievement, memory, and executive functioning; language functioning was within normal limits; White's scores on the Minnesota Multiphasic Personality Inventory ("MMPI") showed that White was not emotionally distressed, depressed, or anxious, and there was no evidence of psychopathology; the MMPI also showed that White was somewhat hostile, inhibited his aggression, was uncomfortable with others, and handled unacceptable feelings through denial and depression, but he is not antisocial, sociopathic, or psychotic.  Yohman also concluded that White's violent episodes occurred while he was intoxicated and that he had no history of violence while sober.  Because he would lack access to drugs in prison, Dr. Yohman concluded that he would not be a future danger.  21 Tr. at 308-47.

Dennis Nelson, a psychologist, also tested White.  He concluded that White has an IQ of 87 and is not emotionally disturbed.  He also concluded that White's violent conduct was related to his drug use and that White would not be dangerous in prison where he would lack access to drugs.  *Id.* at 387-425.

The jury found that White acted deliberately and with the reasonable expectation that the death of a person would result, and that there was a probability that he would commit future criminal acts of violence constituting a continuing threat to society.  The jury also found that the mitigating evidence was not sufficient to warrant a life sentence.  Accordingly, the trial court sentenced White to death.  SH at 322-23.[2]  The Texas Court of Criminal appeals ("TCCA") affirmed White's conviction and sentence, *White v. State*, No. 72,580 (Tex. Crim. App. June 17, 1998), and denied

---

[2]    "SH" refers to the transcript of White's state habeas corpus proceeding.

his application for a writ of habeas corpus, *Ex Parte White*, No. 48,152-01 (Tex. Crim. App. Feb. 21, 2001).

White filed his initial federal petition on April 17, 2001.  On December 31, 2001, White moved to dismiss his petition without prejudice so that he could return to state court and exhaust some of his claims.  On  January 9, 2002, this Court granted that motion.

On May 3, 2002, White again filed a petition for a writ of habeas corpus in this Court. Respondent answered and moved for summary judgment on October 9, 2002.

On May 28, 2003, White moved for an administrative stay to allow him to seek additional testing of DNA evidence.  On July 18, 2003, this Court granted the motion, ordered White to notify the Court within five days of the resolution of DNA testing, and denied without prejudice Respondent's motion for summary judgment.

Following the completion of DNA testing, White filed a successive habeas application in state court.  He raised five claims, including one pertaining to the DNA testing, and one that he was incompetent to waive his *Miranda* rights when he gave his confession.  On May 6, 2009, the TCCA dismissed the application as an abuse of the writ.

On June 24, 2009, White informed this Court that his state court proceedings were complete and requested a scheduling order.  On December 31, 2009, White filed his First Amended Petition. On  September 9, 2010, Respondent answered the First Amended petition and moved for summary judgment.[3]

## II.    Discussion

---

[3]        While not styled as a motion for summary judgment, the answer incorporates by reference the earlier motion for summary judgment, and specifically asks the Court to enter summary judgment in Respondent's favor.

A.      The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'"  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).  The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529

U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'")

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

B.     The Standard for Summary Judgment in Habeas Corpus Cases

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for this Court to resolve the facts in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir.), *cert. denied sub nom Foster v. Epps*, 537 U.S. 1054 (2002); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Emery v. Johnson*, 940 F.Supp.1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998). Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless White shows that an exception to 28 U.S.C. § 2254 applies.

C.    Summary Judgment in the Instant Case

White raises 21 claims for relief. These are addressed below.

1.    Actual Innocence

White's first five claims all assert some variation on the claim that he is actually innocent, either of capital murder, or of the death penalty.[4] In his first claim, White contends that new DNA

---

[4]"Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death. *See Sawyer v. Whitley*, 505 U.S. 333, 335 (1992).

testing shows that an unidentified third party was present at the crime scene.  In his second and fourth claims, he argues that his conduct in prison demonstrates that the jury was wrong about his future dangerousness, and that new research on the effects of drug treatment and recidivism rates of capital offenders would also lead to a "no" answer on future dangerousness.  Third, he argues that new evidence on the effects of cocaine intoxication on the brain would lead a jury to find that he did not act deliberately in killing the girls, thus negating one of the special issues.  In his fifth claim, he contends that this new research on the effects of cocaine intoxication would have led to a "yes"answer on the mitigation special issue.

The Supreme Court has made clear that claims such as these do not state grounds for federal habeas corpus relief.   "[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  This is so because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."  *Id.*  Therefore, White is not entitled to relief on these claims.

White also argues that these claims of actual innocence allow this Court to excuse any procedural defaults and address the merits of such defaulted claims.  The Supreme Court has held that, if there has been a miscarriage of justice, then procedural defaults may be excused.  A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992).

While White speculates that his new evidence would have convinced the jury to find in his favor on the special issues, he does not argue that he is legally ineligible for a death sentence.

9

Therefore, his claims regarding penalty phase evidence do not excuse any procedural default.

To show actual innocence of capital murder,

> [T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986).  More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the evidence now presented.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

While the DNA retesting does show that an unidentified third person was in the apartment at some point, it also unequivocally proves that White was in the apartment.  Moreover, the State's serological expert testified at trial that there was evidence of another DNA donor.  *See* 17 Tr. at 388.  In light of the facts that the DNA retesting clearly proves that White was present, and ejaculated, in the victims' apartment, and that the jury heard evidence that there was a possible third DNA donor, it is not likely that any reasonable juror would have found White not guilty in light of the DNA retesting.  White therefore fails to demonstrate that either his conviction or sentence constitute a fundamental miscarriage of justice.

2.    *Apprendi* Claims

In his next two claims for relief, White argues that the future dangerousness and mitigation special issues violated the rule laid down in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

*Id.* at 490.  The Supreme Court extended the *Apprendi* holding to capital cases in *Ring v. Arizona*, 536 U.S. 584 (2002).

White argues that the Texas special issue requiring the jury to determine whether there is "a probability that the defendant will commit future acts of violence that would constitute a continuing threat to society" violates *Apprendi* because the use of the word "probability" reduces the State's burden of proof to something less than proof beyond a reasonable doubt.  He argues that the mitigation instruction, requiring the jury to determine whether there is sufficient mitigating evidence to warrant a sentence of life imprisonment rather than death violates *Apprendi* because it places the burden of proving the existence of such mitigating evidence on the defendant rather than requiring the State to prove the absence of such mitigating evidence.

Application of the *Apprendi* rule is barred by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion).  In *Teague*, the Supreme Court held that a federal habeas court cannot retroactively apply a new rule of criminal procedure.  The Court explained that

> a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.  To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 301 (emphasis in original).  The AEDPA effectively codified the *Teague* non-retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly established at the time the conviction becomes final."  *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002), *cert. denied*, 537 U.S. 1118 (2003)(citing *Terry Williams v. Taylor*, 529 U.S. 362, 380-81 (2000)).  In *Schriro v. Summerlin*, 542 U.S. 348, 353-54 (2004), the Supreme Court held that *Ring* does not apply retroactively.  White's conviction became final in 1998, 2 years before *Apprendi*.

Therefore, *Apprendi* is not applicable to this case.

      3.     <u>*Penry* Claims</u>

In *Penry v. Johnson*, 532 U.S. 782 (2001), the Supreme Court held that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence." *Id.* at 797 (internal quotation marks, citation and brackets omitted). In his eighth claim for relief, White argues that the instruction on the mitigation special issue violated *Penry* because it is ambiguous on the burden of proof. In his ninth claim, he contends that the instruction, which was modified after the *Penry* decision, violated the *ex post facto* clause of the Constitution, *see* U.S. Const., Art. I, § 9, cl.3; Art. I § 10, cl. 1, because *Penry* was decided after the murders.

      a.     <u>Burden of Proof</u>

"[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005). At a minimum, this lack of controlling precedent on the issue means that this claim is *Teague*-barred.

      b.     <u>*Ex Post Facto* Clause</u>

White next argues that the mitigation special issue, enacted after *Penry* and, thus, after the Edwards murders, imposed on him the obligation of presenting mitigating evidence to avoid a death sentence. He claims that he would have had no such obligation pre-*Penry*.

The *ex post facto* clause prohibits the State from retroactively making punishable an act that was not punishable at the time it was committed, or imposing more severe punishment than was permitted under the law at the time of the act. *See Weaver v. Graham*, 450 U.S. 24, 28 (1981). Plainly, capital murder was a crime when the Edwards murders occurred, and it was punishable by

death.

White argues, however, that the instruction given to the jury, telling them to consider all mitigating evidence, forced him to present evidence of, among other things, his drug usage.  He contends that he would not have had to present such evidence pre-*Penry*.  He is mistaken.

Nothing about the mitigation instruction compelled White to present mitigating evidence. The State bore the burden of proving that White acted deliberately in killing the victims, and that he posed a future danger.  Only if the State proved these two things beyond a reasonable doubt could a death sentence be imposed.  The law also offered White the opportunity to persuade the jury not to impose a death sentence even if the State met its burden of proof.  That opportunity came in the form of the mitigation special issue, allowing White to try to convince the jury that, even though he acted deliberately and was probably a future danger, there was sufficient mitigation to justify a life sentence.  He was not compelled to present any mitigating evidence, but was given the opportunity to do so as an additional hedge against the State's case.

The Texas state habeas court found that the change in the instruction was merely procedural in nature and did not run afoul of the *ex post facto* clause.  It clearly did not impose additional or harsher punishment, criminalize previously lawful conduct, or otherwise disadvantage White. Therefore, the state court's conclusion was not an unreasonable application of Supreme Court precedent and is entitled to deference under the AEDPA.

      4.    <u>Constitutionality of the Special Issues</u>

In his tenth and eleventh claims for relief, White contends that the statutory special issues violate the Eighth and Fourteenth Amendments in numerous ways.  First, he argues that the mitigation special issue unconstitutionally shifts the burden to the defendant to disprove the

13

existence of aggravating factors by asking whether there are "sufficient mitigating circumstances" to warrant a life sentence.  Second, he claims that the special issues fail to guide the jury's discretion as required by *Furman v. Georgia*, 408 U.S. 238 (1972) because they do not clearly define what is mitigating, and evidence presented in mitigation might be double-edged and also considered aggravating.  Third, he argues that the special issues do not allow for meaningful appellate review.  Finally, he argues that the failure to inform the jury that a single holdout juror on any of the special issues will result in a life sentence is unconstitutional.

a.    <u>Burden of Proof</u>

As discussed above, there is no precedent requiring that the statute assign a burden of proof on the mitigation special issue.  Moreover, White's argument is simply wrong as a matter of fact.  Nothing in the mitigation special issue requires him to disprove aggravating evidence.  Rather, it gives him an opportunity to persuade the jury to return a life sentence even after the State has proven the other special issues beyond a reasonable doubt.

b.    <u>Guided Discretion</u>

In *Furman*, the Supreme Court struck down capital sentencing schemes that gave juries unfettered discretion in determining whether to impose a death sentence.  The Court held that the Constitution requires states "to channel the discretion of sentencing juries" so as to avoid arbitrary and capricious imposition of the death penalty.  *See Johnson v. Texas*, 509 U.S. 350 (1993).  This standard requires a state to genuinely narrow the class of defendants eligible for a death sentence, and allow sentencing juries to give individualized consideration to the defendant and the circumstances.  *Id.* at 360-61; *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  In Texas, the first requirement is satisfied by the capital murder statute itself, which requires some aggravating factor

14

(in this case, the murder of more than one victim during the same criminal transaction) to distinguish capital murder from simple murder. The special issues are designed to provide individualized consideration. The Supreme Court has held that the Texas capital sentencing scheme satisfies these requirements. *See*, *e.g.*, *Jurek v. Texas*, 428 U.S. 262 (1976). Moreover, the special issue sufficiently defines mitigating evidence and allows the jury to give full consideration to such evidence. *See Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001).

c.      Meaningful Appellate Review

The Supreme Court has held that there is a difference between the jury's decision whether a defendant is eligible for the death penalty, and its decision whether to impose a death sentence. *Tuilaepa v. California*, 512 U.S. 967 (1994). While the former must follow a process that is rationally reviewable by appellate courts, the latter "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Id.* at 973. Accordingly, "the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for the death penalty." *Id.* at 979-80. In other words, a sentencing jury must operate under guidelines making its decision rationally reviewable as to the decision concerning who is death eligible; however, it is free to exhibit mercy on the basis of mitigating evidence to any member of the death eligible class it chooses.

The Fifth Circuit has held that the unreviewable discretion given to Texas juries in weighing mitigating evidence squarely comports with constitutional requirements:

> It is just this narrowly cabined but unbridled discretion to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit that Texas has bestowed upon the jury. In so doing, Texas followed Supreme Court instructions to the letter.

15

*Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001).  Thus, both Supreme Court and Fifth Circuit precedent make clear that the Constitution does not require *any* appellate review of a sentencing jury's weighing of mitigating evidence.

> d.   Effect of a Single Holdout Juror

In his final challenge to the constitutionality of the Texas capital sentencing statute, White argues that he was denied his rights under the Eighth and Fourteenth Amendments by the failure to inform the jury that a single juror voting "no" on the deliberateness or future dangerousness special issue, or "yes" on the mitigation special issue, would result in a life sentence.  The Supreme Court has rejected the argument that failure to inform the jury of the consequences of a deadlock violates the Eighth Amendment.

> Petitioner's argument . . . appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior.  That contention has no merit.

*Jones v. United States*, 527 U.S. 373, 382 (1999).  The Fifth Circuit has similarly rejected this claim. *See Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993).

> 5.   Equal Protection

In his next three claims for relief, White contends that he was denied his rights under the equal protection clause.

> a.   Race

In his eleventh claim, White argues that he suffered disparate treatment because of his race. White cites studies concluding that black defendants are more likely than white defendants to be sentenced to death, though he cites no evidence showing that race was a factor in his particular case.

As White tacitly acknowledges, the Supreme Court foreclosed this argument more than 20 years ago. In *McClesky v. Kemp,* 481 U.S. 279 (1987), the Court held that a defendant claiming an equal protection violation in a death penalty case must prove that prosecutors acted with a discriminatory purpose in his particular case. White presents no evidence of such discriminatory purpose in his case.

White claims that *McClesky* is no longer good law after *Bush v. Gore*, 531 U.S. 98 (2000). *Bush*, of course, was a voting rights case, not a criminal case. It held that Florida could not count one person's vote while not counting another's in the absence of uniform standards for determining which votes should count. *Id.* at 106. Nothing in *Bush* purports to overrule *McClesky*. *See Coleman v. Quarterman*, 456 F.3d 537, 542-43 (5th Cir. 2006). White is not entitled to relief on this claim.

b.    <u>State Post-Conviction Procedure</u>

In Claim 12, White argues that he was denied equal protection because, under Texas law, death-sentenced defendants have a shorter period of time to file post-conviction applications than do prisoners under other sentences. The state habeas court found that White lacks standing to raise this claim because he filed a timely petition and does not argue that he was harmed by the shorter time period. White's inability to identify any harm he personally suffered as a result of this alleged equal protection violation demonstrates that no relief is warranted.

c.    <u>Geography</u>

In his final equal protection claim, White contends that Harris County seeks the death penalty more frequently than rural Texas counties. The only authority he cites in support of his claim that this violates equal protection is *Bush*. As noted above, *Bush* is irrelevant.

6.    <u>Clemency</u>

In his fourteenth and fifteenth claims, White contends that the Texas clemency process

17

discriminates against African-Americans in violation of the equal protection clause, and violates international law.  White does not assert that he has yet filed a clemency application.  Therefore, any possible harm from these alleged defects in the process is purely hypothetical and will occur, if at all, some time in the future.  These claims are not yet ripe.  *See Texas v. United States*, 523 U.S. 296 (1998); *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987).

       7.     *Batson*

In his sixteenth claim for relief, White contends that the prosecution struck a prospective juror on the basis of race.  *See Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that the equal protection clause bars the use of race-based peremptory jury challenges).  *Batson* laid out a three-step analysis for claims of racially discriminatory jury strikes.  First, the defendant must make a *prima facie* case that there was a racially discriminatory strike.  Second, the prosecutor offers an explanation for the strike.  If the prosecutor offers a race-neutral explanation, then the court must determine if the defendant has shown purposeful discrimination.  *Id.* at 96-98.  There is no dispute that White made his *prima facie* case and that the prosecutor offered a race-neutral explanation.

White contends that prospective juror Joseph Babineaux was dismissed because of his race. The TCCA addressed the claim on White's direct appeal:

> At the hearing, the prosecutor stated he struck prospective juror Babineaux because:  (1) Babineaux would not disclose his personal opinions, (2) he thought the State was trying to trick him into an answer, and (3) he appeared to distrust the prosecutor.  The State further noted that the strike was not racially motivated and that two African-American jurors had already been selected.  [White] responded that he did not note Babineaux "having an uncomfortableness" with the prosecutor.  He further opined the prosecutor questioned Babineaux differently and requested that the trial court consider the trial court's own observations regarding the

> prospective juror.  The trial court accepted the State's reasons as race-neutral and overruled [White]'s *Batson* challenge.
>
> Despite [White]'s assertions to the contrary, we conclude the State's reasons are generally supported by the record.  Furthermore, [White] has shown us nothing in the record indicating the prosecutor's reasons mentioned above were pretexts for intentional discrimination; although he does contend some of the accepted jurors responded similarly to Babineaux and the State did not always ask questions in the same manner.  However, where the State offers neutral reasons for its peremptory strike, we cannot say that the fact that there were acceptable jurors possessing one or more of the objectionable traits is sufficient to establish disparate treatment.  Therefore, in deferring to the trial court's observations, we conclude that the trial court's holding that the State's reasons for excusing Babineaux were race-neutral was not clearly erroneous.

*White v. State*, No. 72,580, slip op. at 9-10 (Tex.Crim.App. June 17, 1998) (footnote and citations omitted).

White reiterates the same arguments here.  Perhaps the most compelling of these is his observation that, while the prosecutor noted Babineaux's statement that he thought the prosecutor was trying to trick him, one of the accepted jurors stated that she thought attorneys were manipulative.  Respondent notes, however, that her statement was a general one about all lawyers, whereas the prosecutor articulated reasons why he thought Babineaux was suspicious of him in particular.  Considering the trial court's superior ability to make credibility determinations, the absence of any evidence of a pattern of striking minority venire members, and the fact that two African-Americans sat on the jury that convicted White and sentenced him to death, the TCCA's conclusion that White failed to prove purposeful discrimination is not an unreasonable determination of the facts, or an unreasonable application of *Batson*.  The TCCA conclusion is therefore entitled to deference.

       8.    *Witherspoon*

In his seventeenth claim for relief, White argues that the prosecution improperly struck jurors based on general opposition to the death penalty.   Three prospective jurors, Mary Raines, Kelly Guthrie, and Beatrice Hamann,  stated in response to *voire dire* questioning that they would want to be 100 percent certain in a death penalty case.  The court granted the State's challenges for cause on the grounds that these jurors would hold the State to a higher burden of proof than is required by law. White now argues that these prospective jurors were never properly questioned to determine if they could follow the law.

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court noted that

> [a] man who opposes the death penalty, no less than one who favors
> it, can make the discretionary judgment entrusted to him by the State
> and can thus obey the oath he takes as a juror.  But a jury from which
> all such men have been excluded cannot perform the task demanded
> of it.

*Id.* at 519.  Accordingly, the Court held that

> a sentence of death cannot be carried out if the jury that imposed or
> recommended it was chosen by excluding veniremen for cause simply
> because they voiced general objections to the death penalty or
> expressed conscientious or religious scruples against its infliction.

*Id.* at 522.   In *Adams v. Texas*, 448 U.S. 38, 45 (1980), the Court clarified that *Witherspoon* established "the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror . . . ."

a.    Raines

White raised his claim concerning juror Raines on direct appeal.  The TCCA found that White did not object to the strike at trial, and therefore failed to preserve the claim.

To preserve a claim for federal review, a defendant must make a specific and timely objection

20

at the time of the allegedly objectionable conduct. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (Texas applies its contemporaneous objection rule 'strictly and regularly' and . . . it is an 'independent and adequate state-law procedural ground sufficient to bar federal court habeas review of federal claims'") (quoting *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995)), *cert. denied*, 528 U.S. 1145 (2000).  Failure to object constitutes a procedural default, which bars federal habeas review unless the petitioner shows cause for the default, and actual prejudice flowing from the alleged constitutional violation, or a miscarriage of justice. *Sykes*, 433 U.S. at 87, 80.  As discussed above, White fails to demonstrate a fundamental miscarriage of justice, nor does he make any showing of cause for this default.

> b.     The Other Jurors

Contrary to White's characterization, the trial court did engage in follow up questioning to determine if the jurors could follow the law.  After defense counsel informed juror Guthrie of the legal burden of proof, Guthrie stated that he could follow the law.  Under additional questioning, however, Guthrie reiterated that, in regard to a death sentence, he would require more than proof beyond a reasonable doubt.  The TCCA held that the trial judge did not abuse her discretion in granting the challenge for cause.

Juror Hamann was asked if she could convict based on the testimony of only one witness, assuming that she believed the witness beyond a reasonable doubt and the witness proved all elements of the crime.  She responded that she would require more proof.  When the State pointed out that she was, in effect, raising the burden of proof, she agreed, but reiterated that she would require additional proof.  The TCCA found that the challenge for cause was proper. *See White v. State*, slip op. at 12-16.

21

The record makes clear that both jurors stated that they would hold the State to a burden of proof higher than the law required.  These statements show that these jurors' ability to perform their duties as jurors were substantially impaired.  The TCCA's conclusion that the challenges for cause were proper is not an unreasonable conclusion, and is entitled to deference.

9.    Right to Counsel

In his eighteenth, nineteenth, and twenty first claims for relief, White argues that he made his confession under questioning that occurred after he asked for an attorney, and thus in violation of his Fifth and Sixth Amendment rights, and that he was not competent to waive his *Miranda* rights.

a.    Fifth Amendment

The TCCA found that the trial court held a hearing on White's motion to suppress his confession.  At this hearing, evidence established that White was validly arrested on July 21, 1995, for an unrelated capital murder that occurred on July 13, 1995.  Police read White his *Miranda* rights at the time of his arrest and each subsequent time they questioned him.

During the investigation of the July 13 murder, police received information from Tecumseh Manuel regarding the Edwards murders and another capital murder occurring in 1989.  Police read White his *Miranda* rights and questioned him about the Edwards murders on July 22, 1995.  White waived his rights.  He initially denied involvement, but admitted limited involvement after being confronted with the information provided by Manuel.  On July 24, 1995, White was appointed counsel for the July 13 murder.

On July 28, after obtaining new information, police again questioned White about the Edwards murders.  White was not yet charged, and did not yet have counsel, in this case.  At the hearing, White testified that, prior to confessing, he said that he had a lawyer and wanted his lawyer

present.  Police denied that White made any such statement or requested a lawyer.  The trial court found that White did not request a lawyer and voluntarily waived his rights.

The TCCA found that White requested counsel at his appearance before a magistrate on the unrelated 1995 murder charge, but did not request the assistance of counsel for purposes of the interrogation in this case.  The TCCA therefore concluded that White never invoked his Fifth Amendment right to counsel.  In the alternative, the TCCA found that any invocation of the right was ambiguous.

White claims that he made a clear request for counsel when he stated, after again receiving his *Miranda* rights:  "Sir, that's the statement I was telling you about right there.  I have a right to a, one . . . I definitely have the right to have a lawyer present."  SX-56-A.  After White's statement, the officer clarified that White was correctly stating his rights as read to him, and asked White if he was willing to waive those rights and discuss one of the other murders.  White agreed to do so.  The context of the statement demonstrates that the TCCA was not unreasonable in finding White's statement ambiguous, at best.

The state habeas court also found that the statement was ambiguous, and also that the officer believed that White was merely clarifying his right before waiving it.  In addition, the habeas court found that White was not yet indicted for the Edwards murders and White was told that his statement concerned only the Edwards murders.  The court therefore concluded that White was informed of, and knowingly and voluntarily waived, his right to counsel.  The officer terminated the interview immediately when White later stated that he did not want to talk any more.

A valid invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  *Davis v.*

23

*United States*, 512 U.S. 452, 459 (1994) (internal quotation marks and citation omitted).  Police need not cease questioning if the suspect's statement is ambiguous or might be understood as "only that the suspect *might* be invoking the right to counsel."  *Id.*  To invoke the right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id.*  In *Davis*, the statement that "maybe I should talk to a lawyer" was insufficient.  Under this standard, the conclusion of the Texas state courts that White's reference to his rights was not a clear request to have counsel present is not an unreasonable interpretation of the facts, or an unreasonable application of Supreme Court precedent.

b. Sixth Amendment

With regard to any Sixth Amendment right to counsel claim, the TCCA correctly noted that the Sixth Amendment right does not attach until a prosecution commences, *i.e.*, "at or after the initiation of adversary judicial proceedings against the defendant."  *United States v. Gouveia*, 467 U.S. 180, 187 (1984).  The right is also offense-specific.  *Texas v. Cobb*, 532 U.S. 162, 168 (2001). The TCCA found that White invoked his Sixth Amendment right to counsel on the 1995 murder, but not the Edwards murders.  *See White v. State*, slip op. at 1-8.

The Texas court was clearly correct in its Sixth Amendment analysis.  White was not yet charged with the Edwards murders, no adversary proceeding had begun against him with regard to the Edwards murders, and his Sixth Amendment right to counsel did not yet attach.

c. Competence to Waive Rights

White also argues that his substance abuse rendered him incompetent to waive his rights.  To constitute a valid waiver of *Miranda* rights, a waiver must be voluntary and knowing.  A waiver is

24

voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver is knowing if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The determination whether a waiver was knowing and voluntary must be made under the totality of the circumstances. *Id.* White cites nothing showing that he was so impaired that he did not understand his rights or the consequences of waiver. This claim is without merit.

10.    Subsequent Change in Law

In his twentieth claim for relief, White contends that a change in Texas evidence law occurring after his trial would have changed his strategy about whether to testify during the penalty phase. While White tries to characterize this as a violation of the Eighth and Fourteenth Amendments, this claim is purely a claim of state law. Nothing in the Eighth or Fourteenth Amendment entitles a petitioner to have changes in state law retroactively applied to his case. If accepted, White's argument would hamstring courts and legislatures by laying down a rule that any change made to existing criminal law or procedure invalidates all previously imposed sentences. No authority supports this radical proposition; indeed, it is contrary to longstanding Fifth Circuit precedent. "The prisoner's contention that the enactment of the new Code and the repeal of the old Code section entitles him to relief from his sentence is palpably without merit." *Colvin v. Estelle*, 506 F.2d 747, 748 (5th Cir. 1975).

## III.  Certificate of Appealability

White has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua*

*sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal

may not be taken without a certificate of appealability having been issued.") A petitioner may obtain

a COA either from the district court or an appellate court, but an appellate court will not consider a

petitioner's request for COA until the district court has denied such a request.  *See Whitehead v.*

*Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997)

("[T]he district court should continue to review COA requests before the court of appeals does.").

"A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue

basis, thereby limiting appellate review to those issues alone."  *Lackey v. Johnson*, 116 F.3d 149, 151

(5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a

constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431

(5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application

involves issues that are debatable among jurists of reason, that another court could resolve the issues

differently, or that the issues are suitable enough to deserve encouragement to proceed further."

*Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme

Court has stated that

> Where a district court has rejected the constitutional claims on the
> merits, the showing required to satisfy § 2253(c) is straightforward:
> The petitioner must demonstrate that reasonable jurists would find the
> district court's assessment of the constitutional claims debatable or
> wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case is a 'proper

consideration in determining whether to issue a [COA], but the severity of the penalty does not in

itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945,

949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of White's claims.  While the issues White raises are clearly important, the Court finds that each of the claims is foreclosed by clear, binding precedent. Therefore, White has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This Court concludes that White is not entitled to a certificate of appealability.

IV.   Order

For the foregoing reasons, it is **ORDERED** as follows:

1.    Respondent Rick Thaler's Motion for Summary Judgment (Docket Entry 39) is
      **GRANTED**;

2.    Petitioner Garcia Glen White's First Amended Petition for Writ of Habeas Corpus
      (Docket Entry 64) is in all respects **DENIED**, and White's Petition is **DISMISSED**;
      and

3.    No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

      It is so **ORDERED.**

      **SIGNED** on this 30th day of September, 2011.


                                        _____
                                              JOHN D. RAINEY
                                        SENIOR U.S. DISTRICT JUDGE

28