LIST OF APPENDICES

1. Response to the State's Motion to Dismiss Subsequent Application for Writ of Habeas Corpus filed in *Ex parte White*, WR-48,192-09.

2. Defendant's Motion to Withdraw Execution Order filed in *State of Texas v. Garcia Glenn White*, cause number 72384701010-F, in Harris County, Texas.

3. Order of Judge Alfred H. Bennett issued October 28, 2022, Johnson v. Lumpkin, 04:19-CV-3047

4. Respondent-Appellant's brief filed in *Johnson v. Lumpkin*, cause no. 23-70002, currently pending before the 5th Circuit Court of Appeals.

5. 5th Circuit scheduling order for oral argument on November 6, 2024 in *Johnson v. Lumpkin*, cause no. 23-70002.

6. *Shinn v. Martinez-Ramirez*, 596 U.S. 366 (2022).

# IN THE 180TH DISTRICT COURT

# HARRIS COUNTY, TEXAS

# AND

# IN THE COURT OF CRIMINAL APPEALS

# AUSTIN, TEXAS

| | | |
|---|---|---|
| Ex parte | § | Trial No.  0723847 |
| | § | |
| **GARCIA GLENN WHITE,** | § | **Writ No. WR-48,152-09** |
| | § | |
| **Applicant** | § | **Scheduled Execution date:** |
| | § | **October 1, 2024** |

## RESPONSE TO THE STATE'S MOTION TO DISMISS

TO THE HONORABLE COURT:

Mr. White, through his attorneys of record, files this response to the State's Motion to Dismiss.

1.     The State is, respectfully, wrong on the law, does not challenge the facts, and invites this Court down a road to error it has already walked to its chagrin. It does this by attempting to undermine the credibility of the affidavits presented by the ONLY PEOPLE WHO KNEW THE APPLICANT WHEN HE WAS A YOUTH. They do not challenge any of these factual assertions or present controverting facts. They also quote from *Ex parte Cathey*, which was overruled when *Briseno* was overruled.  *Ex parte Briseno* is dead. Its progeny, including *Cathey*, are now dead.

*Cathey* was decided in 2014, long before the *Moore v. Texas* decisions, both I and II. In the most recent decision in Mr. Cathey's case, handed down in 2021, the CCA, agreed that factfinders may consider the concept of the "Flynn Effect" in assessing the validity of an IQ test score. *Ex parte Cathey*, WR-55,161-02, at *2 (Tex. Crim. App. Apr. 28, 2021).

2.     With respect the State also does not understand the requirements of the DSM V TR.  The Applicant has met all the criteria. The evidence provided covered all of these.  Deficits were shown in the area of school, daily living, decision making, handling of money, and being able to understand and follow rules, including rules for safety at even simple jobs.  Deficits in the areas of reasoning, problem solving, abstract thinking, judgment, academic learning, and learning from experience were all confirmed in the affidavits provided.

3.     For other examples of where the DSM V TR points out what should be covered as to adaptive deficits, which the Court of Criminal Appeals just adopted, we can quote directly from the AAIDD handbook. "Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support the adaptive deficits limit functioning in one or more activities of daily life such as communication, social participation, and independent living, across multiple environments such as home, school, work, and community."  The evidence we provided covered all of these.

4.      Or consider, also from the DSM V TR, this example: "The conceptual (academic) domain involves competency in language, memory, reading, writing, math reasoning, acquisition of practical knowledge, and problem solving."  Mr. Whites own scores and failures academically point out that he was passed along because he could play football, and for no other reason.

5.      Mr. White has provided affidavits from the people who knew him best before he was twenty-two years old.  The State characterizes the timing of theses affidavits as "suspicious."  The State does not have any facts to counter these affidavits.  Also, the State, in its motion, conveniently ignores not just the impact of Covid on any timeline but also the dysfunction that was clearly present in Mr. White's upbringing and the mistrust of families placed in this situation.  The State chose an execution date which forced the family to have to deal with this <u>now</u>, not on their own time frame.  For the State to complain of this now, or that the affidavits were all notarized on the day his defense team could catch the family together after church, disregards the complicated process of gaining the trust and cooperation of family members who have no reason to place their faith in the system that intends to execute their loved one.

6.      It has taken years to get the family to understand that their deepest shame and fears about their loved one is the one bit of information that could save him from execution.  Had they had any ulterior motives they would have been eager

to give up this information years ago.  It is their very reluctance that should give them additional credibility, not detract from it.

7.     Attached to this response are two affidavits, one supplemental from the doctor who reviewed these items to discuss what he found and why it is glaringly obvious that Mr. White should meet the ID standard.  The second is from an experienced capital mitigation specialist who speaks knowledgably about the impact these types of investigations have on families, and how desperately they try to hide this information from outsiders.  Like deep abuse, it is scarring and considered private.  These are respectfully offered to demonstrate that these circumstances do not detract from the assessment, and that Mr. White is ID.  If this Court wishes to demonstrate this matter further to develop it has only to grant a stay and remand this for factual development to the trial court, as it should whenever a new claim is established.

WHEREFORE, Mr. White, respectfully requests that the Court DENY the State's motion to dismiss, and GRANT Mr. White's motion to withdraw the execution order.   Mr. White also respectfully requests that the Court order appropriate discovery and fact-findings.

Respectfully submitted,

The Law Offices of Patrick F. McCann
700 Louisiana St., Ste. 3950
Houston, TX  77002
Tel: (713) 444-2826

Email: writlawyer@outlook.com

By: _____
    Patrick F. McCann
    State Bar No.: 00792680
    Attorney for Applicant

The Law Office of Julia Bella, PLLC
503 FM 359, Ste. 130
Richmond, TX  77406
Tel: (832) 757-9799
Email: julia@jbellalaw.com

By: _____
    Julia Bella
    State Bar No.: 24035099
    Attorney for Applicant

## CERTFICATE OF SERVICE

The undersigned attorneys do hereby certify that on September 3, 2024, a true and correct copy of the above and foregoing was served on the Harris County District Attorney's Office via the e-filing system in accordance with the Texas Rules of Civil Procedure.

By: _____
    Patrick F. McCann
    Attorney for Applicant

By: _____
    Julia Bella
    Attorney for Applicant

## CERTFICATE OF COMPLIANCE

The undersigned attorneys to hereby certify that the following motion contains approximately 1,059 words and complies with the word limit established by the Texas Rules of Appellate Procedure.  This document was created with Microsoft Word 10 and counsel has relied on the word count function of the software in this certificate of compliance.

By: _____
Patrick F. McCann
Attorney for Applicant


By: _____
Julia Bella
Attorney for Applicant

State of Texas
County of Travis

# AFFIDAVIT

**Affiant:**      Greg Hupp, Ph.D.
**Date:**        September 2, 2024

On this day, the Affiant below appeared before me and sworn and subscribed to the following:

My name is Greg Hupp, Ph.D.  I am a licensed neuropsychologist in Texas.  I am over eighteen and competent to make this affidavit.  I have extensive experience in diagnosing instances of intellectual disability outside of capital cases, both in forensic and other settings, such as disability determinations.  I have doing this for about twenty-five years.

In my experience, one of the most challenging aspects of discussing family history of an individual's mental health or mental disability is that it is often regarded as a shameful thing, and something that one should hide or cover up. It is a condition viewed with fear by many lay people, and they often believe that revealing that information would harm their loved one because it would be used against them.  Peer-reviewed research  has shown that "guilt, ambivalence, disappointment, frustration, anger, shame, and sorrow" are often exhibited by parents (Schild, 1971)[1]. Thus, the attitude of parents may cause hindrance in the process as well as outcome of adaptive functioning in the children with Intellectual Developmental Disorders (IDD aka Intellectual Disabilities ne: mental retardation). The family's reluctance to reveal that information has been well-documented in research, and in fact, the research itself often ignored the needs of this invisible culture (Harkness, 1980)[2].  Often their desire to protect and help makes them extremely reticent in speaking to people outside the family. In terms of evaluating and diagnosing intellectual disabilities among minorities and those of lower socio-economic status, especially among those in involved in the criminal justice system, there have been severe methodological problems. "Most studies reviewed used less than adequate ascertainment methods" in identifying and diagnosing intellectual disabilities among population and have left unanswered questions as to "which offenders have intellectual disabilities" (McBrien, 2003).[3] I have had many experiences that make it plain that it can take years to break down communication

---

[1] Schild. (1971). Parental attitude towards children: a comparative study of parents of normal children and parents of mentally retarded children. *Journal of Community Guidance and Research*, 9, 117–122.

[2] Harkess, S. (1980).  The cultural context of child development. New Directions for Child Development, 8, 7-13.

[3] McBrien, J. (2003), The Intellectually Disabled Offender: Methodological Problems in Identification. Journal of Applied Research in Intellectual Disabilities, 16: 95-105.

barriers to get families to cross barriers of fear, misunderstanding, culture, class, race, and simple lack of trust.

This research has demonstrated that IQ scores for low-functioning individuals of minority race and low socio-economic status, such as Mr. White, are often overestimated. The structural limitations of IQ tests, floor effects, discrepancies between IQ and adaptive functioning, and the influence of outdated norms due to both the Flynn Effect and an outdated edition of the intelligence test, all contribute to this overestimation. Therefore, it my professional position that the IQ score reported by Dr. Averill as part of Mr. White's *Atkins* evaluation was an over-estimation of his true intellectual abilities and lacked a formal assessment of Mr. White's adaptive functioning. The requirements under the provisions of *Moore v. Texas*[4] and the subsequent *Moore II* decision demand a review of Mr. White's intellectual capabilities.

As to Mr. White's adaptive functioning, which is a formal review of his abilities and required to diagnose an intellectual developmental disorder, such a review was never completed. A retrospective review of these capabilities is necessary under the *Moore* decisions and is required to determine whether or not an individual has an IDD.

Intellectual retardation is not something that changes or improves or suddenly disappears.  If one was showing signs of problems in early childhood and then later tests as subnormal, that is not a recent occurrence.  The fact that we have new tests and methods determining deficits does not mean we take leave of the common sense notion that if someone is suffering from deficits as a child, they probably had disability as a child.  IDD is a status that does not change.

I swear the foregoing is true and correct.

Affiant: _Gregory Scott Hupp_____

Greg Hupp, Ph.D.
Psychologist – Texas License No. 31593
5900 Balcones Dr., Ste. 13846
Austin, Texas 78731
Ph (512) 893-6337


Sworn to and subscribed before me this _2nd__ day of ____September___, 20_24__.

_Diana Sabina Dumitrescu_____

Notary Public
My Commission Expires: ___07/26/2027_____

DIANA SABINA DUMITRESCU
Notary Public - State of Florida
Commission # HH 426458
Expires on July 26, 2027

---

[4] Moore v. Texas, 137 U.S. 1039 (2017).

Notarized remotely online using communication technology via Proof.

Affidavit

State of Texas

County of Harris

On this day, the Affiant below appeared before me and sworn and subscribed to the following:

My name is Nicole VanToorn.  I am a licensed investigator and mitigation specialist in the State of Texas.  I am over eighteen and competent to make this affidavit.  I have extensive experience in compiling social history information for intellectually disabled defendants in capital cases.  I have been involved in these investigations in the capital arena since 1998.

Much of the information needed to determine an individual's ability to function in our society is learned through collateral witness interviews. These witnesses hold relevant knowledge gained through observation and experiences shared with the individual. They can speak to that person's ability, or inability, to perform tasks necessary to live independently and function generally throughout life. However, the level of difficulty encountered in actually gathering this information can be great, for a variety of reasons.

Almost without exception, those facing capital murder charges were raised in a dysfunctional family.   It can take an extreme event to motivate a collateral witness to finally be forthcoming and share the most important details previously hidden from investigators considered intrusive, strangers to the family. Thus, it is not surprising when the announcement of an execution date is the catalyst for family members or other relevant witnesses with sensitive information to reluctantly come forward and at long last share honest answers to previously asked questions.

I swear the foregoing is true and correct.

Affiant:

Date:   9/2/24

Notary Public: 

PATRICIA ANN NOWAK
My Notary ID # 126607126
Expires March 29, 2026

Cause No. 72384701010

| EX PARTE | § | IN THE DISTRICT COURT OF |
|----------|---|--------------------------|
|          | § |                          |
|          | § | HARRIS COUNTY, TEXAS     |
|          | § |                          |
| GARCIA GLEN WHITE | § | 180TH DISTRICT |

## DEFENDANT'S MOTION TO WITHDRAW EXECUTION ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, GARCIA GLEN WHITE, by and through undersigned counsel, and respectfully moves this Court to withdraw its Execution Order setting a date of execution for October 1st, 2024. In support of this motion, Defendant states as follows:

### I. INTRODUCTION

Garcia Glen White was convicted on July 23, 1996 on two counts of capital murder and sentenced to death. On June 25, 2024, the Court signed an order directing that Mr. White be executed on October 1, 2024. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability." *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726 (1972). The irreversible nature of the death penalty demands the highest standard of proof and the availability of all possible evidence to avoid a miscarriage of justice. Mr. White now stands before this Court asking it to exercise its jurisdiction to aid in the administration of justice.

### II. THE COURT'S AUTHORITY

The Texas Code of Criminal Procedure Article 43.141(d) authorizes the convicting court to "modify or withdraw the order of the court setting a date for execution in a death penalty case

if the court determines that additional proceedings are necessary on …a subsequent…application for a writ of habeas corpus filed under Article 11.071; or…a motion for forensic testing of DNA evidence submitted under Chapter 64. TEX. CODE CRIM. PROC. Art. 43.141(d). "[S]ubsection (d) authorizes the trial court to modify or withdraw an order setting a date for execution if additional proceedings are necessary." *In re State ex rel. Risinger*, 479 S.W.3d 250, 257 (Tex. Crim. App. 2015) (J. Newell concurring). Mr. White filed a subsequent application for a writ of habeas corpus with the convicting court on August 26, 2024. If this Court finds that additional proceedings, such as an evidentiary hearing and/or briefing are necessary, it may withdraw or modify its execution order.

"In addition to express grants of power conferred by constitution, statute, or common law, courts have inherent and implied powers that provide a much broader foundation upon which to act." *Risinger*, at 262. The inherent powers of a court are those it calls upon to aid in *exercising its jurisdiction*, in the administration of justice, and in the preservation of its independence and integrity. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979). It may also be that a trial court could withdraw a warrant of execution "in the interest of justice." See, *Ex parte Henderson*, 246 S.W.3d 690, 692, no. 1 (Tex. Crim. App. 2007). The issue is "at least unsettled." *Risinger,* at 262.

Once jurisdiction is established, there are several instances which have previously prompted the withdrawal of a death warrant: 1) new evidence that significantly impacts a sentence (*See Ex parte Henderson,* 384 S.W.3d 833 (Tex. Crim. App. 2012); 2) new legal claims (*See In re State ex rel. Risinger*, 479 S.W.3d 250 (Tex. Crim. App. 2015); 3) questions about competence. (*Staley v. State*, 420 S.W.3d 785 (Tex. Crim. App. 2013); 4) a subsequent application for writ of habeas corpus (TEX. CODE CRIM. PROC. Art. 43.141(d)); 5) ongoing clemency petitions, if the

Texas Board of Pardons and Parole recommends a pardon (TEX. CODE CRIM. PROC. Art. 48.01; *State ex rel. Holmes v. Honorable Court of Appeals for the Third District*, 885 S.W.2d 389 (Tex. Crim. App. 1994)); and 6) new evidence of intellectual disability. (*Mays v. State*, 686 S.W.3d 764 (Tex. Crim. App. 2024).

Mr. White's newly filed subsequent application for writ of habeas corpus under 11.071 gives this Court special jurisdiction to grant this motion.  When a conviction has been affirmed on appeal, the trial court has special jurisdiction to find facts in a habeas corpus setting. *State v. Patrick*, 86 S.W.3d 592, 595 (Tex. Crim. App. 2002). Once a court establishes post-conviction jurisdiction, it can take actions implied by its jurisdictional purpose in furtherance of another explicitly granted purpose. *Id.*  An order withdrawing the execution order would allow this Court the time needed for additional fact finding and/or an evidentiary hearing on the issues raised in Mr. White's subsequent writ.

### III.   GROUNDS TO WITHDRAW THE ORDER

Mr. White has filed a subsequent writ with three new claims that require additional fact finding by the trial court and because the issues that Mr. White raises have not yet been settled by the Courts.

#### 1.   New Evidence of Intellectual Disability

The law provides that a subsequent habeas applicant can proceed with an *Atkins* claim if they can show, by clear and convincing evidence, that no rational factfinder would fail to recognize their intellectual disability. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007).  In *Moore I* and *Moore II*, the U.S. Supreme Court ruled that the Court of Criminal Appeals had used outdated and inappropriate standards to assess Moore's intellectual disability, inconsistent with the medical standards established by *Atkins*. *Id.*   The *Moore* cases

underscore the evolving understanding of intellectual disability in the context of capital punishment by emphasizing the need for clinically accurate assessments and demanding adherence to contemporary medical standards. *Moore v. Texas*, 581 U.S. ___ (2017); *Moore v. Texas*, 586 U.S. ___ (2019).  The Court of Criminal Appeals now requires that courts use contemporary medical standards to evaluate intellectual disability claims.

The standard for intellectual disability adapts as science and medical understanding grows. After *Moore*, the standard was based on the DSM-5, published in 2013. *Id.* Criteria included subaverage intellectual functioning and significant limitations on adaptive skills– both manifest before age 21– and a relationship between those limitations and the intellectual impairment. See *Petetan v. State*, 622 S.W.3d 321, 325 (Tex. Crim. App. 2021). However, the latest publication of the DSM-5-TR (published in 2022) has since shed its 'relationship' requirement. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 33.  In 2024, Randall Mays claimed relief from his death sentence on grounds of intellectual disability. *Mays v. State,* 686 S.W.3d 764, 767 (Tex. Crim. App. 2024).  The Court agreed that Mays met the DSM-5-TR standards for an *Atkins* claim and granted relief, reforming his sentence to life imprisonment without parole. *Id.*

Mr. White has a documented and verifiable history of intellectual disability that traces back to adolescence. He struggled throughout school, lagging noticeably behind his peers, and displayed several early indicators associated with having an intellectual disability. This deficit was substantially aggravated by an extensive history of head injuries sustained through sports and other accidents, as well as chronic drug use.  (Exhibits C – J)  For a long time, Mr. White's family has been reluctant to provide information and affidavits.  Some of them mistrust the criminal justice system and all who are involved in it.  Some were isolated due to the COVID-19 pandemic, and

some had a misguided fear that providing this information would somehow harm Mr. White's case. Through the efforts of a mitigation specialist, Mr. White's family members have become open to providing critical information for adaptive deficit evaluation. (Exhibit B)

Mr. White's claim of intellectual disability has not been reviewed by a court under the current legal standards, particularly the decisions in *Moore v. Texas I* (2017) and *Moore v. Texas II* (2019), *Petetan v. State*, and *Mays v. State*. Mr. White's prior evaluations were conducted using standards from the DSM-IV published in 1994. A neuropsychologist, Dr. Greg Hupp, has now reviewed the prior evaluation of Mr. White and the new affidavits describing Mr. White's adaptive deficits. Dr. Hupp has evaluated Mr. White's claim using the most current scientific standards and has accounted for the "Flynn Effect." In his professional opinion, Mr. White *would* meet the criteria for a diagnosis of intellectual disability under the criteria set forth in the DSM-V-TR. (Exhibit A) Mr. White's claim of intellectual disability is both material and corroborated, and therefore calls for a legitimate examination of his capacity.

### 2. New Evidence That Would Influence Punishment

Mr. White raises two issues in his subsequent writ related to new evidence that would have changed the jury's answers to the special issues and led to a different punishment. The first of these two claims raised the issue of DNA evidence unavailable at Mr. White's 1996 trial. The second raised the issue of mitigating evidence of mental illness/psychosis induced by his heavy cocaine use.

### A. DNA Evidence

In 2004, DNA testing of a blanket used to cover the bodies of the complainants revealed the presence of male DNA belonging to two contributors. The DNA evidence was not available to Mr. White at the time of his trial. Mr. White's trial counsel has stated that if this evidence had

been available to him, he would have adjusted his trial strategy as detailed in his affidavit. (Exhibit K)

Mr. White raised the issue of DNA as one of newly discovered scientific evidence in his fifth subsequent writ. The Court did not accept this claim for review.   On July 16, 2024, the U.S. Supreme Court granted a stay of execution to Ruben Gutierrez. (Exhibit L) A federal district court has now found that Texas has established a substantive right to bring a subsequent habeas petition for a person convicted of the death penalty when that person can show "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury...." *Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 909 (S.D. Tex. 2021), citing Tex. Code Crim. Proc. art. 11.071 § 5(a)(3).  Essentially, Mr. Gutierrez argues that the federal due process clause requires the Courts to consider newly discovered scientific evidence as it relates to punishment. The U.S. Supreme Court has granted a stay to resolve the issue of Mr. Gutierrez's standing to bring this claim.  (Exhibit L)  The merits of Mr. Gutierrez's claim have not been rejected by the 5th Circuit.

Mr. White brings a very similar argument although in a different posture.  The resolution of Mr. Gutierrez's case may have a profound impact on the way Mr. White's issues are ultimately resolved.

### B.  Cocaine Psychosis

Mr. White received a prior stay of execution in 2015.  The Court of Criminal Appeals in *Ex parte White* addressed whether Article 11.073 applied to newly discovered scientific evidence affecting only the punishment stage of trial. *Ex parte White*, 506 S.W.3d 39 (Tex. Crim. App. 2016).  The evidence in question was newly discovered scientific evidence of the effect of cocaine

on brain function in heavy users.  Mr. White argued that evidence of cocaine addiction leading to temporary psychosis was powerful mitigating evidence that would have led jurors to answer the special issues differently.

The CCA that the plain meaning of "conviction" should be applied, meaning that the newly discovered evidence must be applicable to guilt/innocence and opining that complaints about this limitation should be directed at the Legislature as the appropriate body to change the statutory language. *Ex parte White* at 52.  In a concurring opinion written by Judge Richardson and joined by Judges Newell Hervey, members of the CCA stated that, "[a]rticle 11.073 should have been written to apply to both the guilt and punishment phases of a trial—at least a death penalty trial." *White* at 52 (concurrence). (Exhibit M)

Mr. White has argued in his subsequent writ that the CCA has the obligation to act when the legislature has failed in its duties, but counsel for Mr. White anticipates that legislative change will be forthcoming.  In 2021, Representative Joe Moody of El Paso introduced a bill amending article 11.073 to apply to punishment evidence, H.B. 275.   (Exhibit N) It did not pass. Representative Moody introduced a second version of the bill in the 2023 legislative session. (Exhibit O)  It made further progress, but the Court's call for clarity has, so far, gone unanswered.

However, Representative Moody's office intends that a similar bill will be introduced at this legislative session and maintains that the issue "is still very much alive."  (Exhibit P) New bills are set to be pre-filed on November 1, 2024.  It would be an ironic miscarriage of justice if Mr. White were not benefitted by the changes to the statute inspired by his case.

## CONCLUSION AND PRAYER

Mr. White stands before this Court with grave legal issues that merit this Court's protection. Under the statute and the case law, this Court has the power to rescind its own orders. This Court has valid reasons for doing so in Mr. White's case. We pray this Court grant the motion and rescind its prior execution order.

WHEREFORE, Defendant respectfully requests that this Court stay the execution to allow time for a thorough examination of new evidence in the interest of justice.

Respectfully submitted,

The Law Offices of Patrick F. McCann
700 Louisiana St., Ste. 3950
Houston, TX 77002
Tel: (713) 444-2826
Email: writlawyer@outlook.com

By: _____
Patrick F. McCann
State Bar No.: 00792680
Attorney for Applicant


The Law Office of Julia Bella, PLLC
503 FM 359, Ste. 130
Richmond, TX 77406
Tel: (832) 757-9799
Email: julia@jbellalaw.com

By: _____
Julia Bella
State Bar No.: 24035099
Attorney for Applicant

CERTFICATE OF SERVICE

The undersigned attorneys do hereby certify that on August 27, 2024, a true and correct copy of the above and foregoing was served on the Harris County District Attorney's Office via the e-filing system in accordance with the Texas Rules of Civil Procedure.

By: _____
Patrick F. McCann
Attorney for Applicant

By: _____
Julia Bella
Attorney for Applicant

# EXHIBIT A

State of Texas
County of Travis

# AFFIDAVIT

**Affiant:**   Greg Hupp, Ph.D.
**Date:**   August 11, 2024

I, Greg Hupp, being duly sworn, depose and say:

## 1. Introduction and Credentials:

I am a licensed psychologist, specializing in neuropsychology. I have 25 years of experience working with individuals with varying levels of cognitive functioning, including those classified as low-functioning. My expertise includes administering and interpreting intelligence quotient (IQ) tests, formal assessments of adaptive functioning, academic achievement, and comprehensive formal battery neuropsychological tests. I have authored publications on cognitive assessment and intellectual development and traumatic brain injuries in children. I am a qualified mental health expert in the State District Court level in Texas and several other states, at the Federal District Court level, and at the Tribal District Court level. I have testified as a qualified expert witness on numerous occasions in these courts for both the defense and State. I most often serve in the capacity as a Court-appointed mental health expert in several jurisdictions in Texas, Arizona, Ohio, and Washington State for the purposes of advising the court on matters of competency to stand trial and the mental state of defendants at the time of the offense. I have been formally trained in the administration and advanced interpretation of intelligence tests and several formal neuropsychological testing batteries and am a qualified neuropsychologist with additional training in aviation-specific topics per the criteria set forth by the Federal Aviation Administration.

## 2. Purpose of Affidavit:

The purpose of this affidavit is to provide an informed opinion regarding the intellectual capacity of defendant Glen Garcia White, specifically as to how intelligence quotient (IQ) scores are overestimated in individuals with low cognitive functioning, including a discussion on the impact of the Flynn Effect on these assessments. This affidavit is based on my professional experience, relevant academic literature, and established principles in cognitive assessment.

## 3. Relevant Background:

Garcia Glen White was convicted in July 1996 for the December 1989 capital murder of two sixteen-year old sisters in Cause Number 723847 in the 180th Judicial District of Harris County, Texas. Mr. White was sentenced to death.

In his appeal, Mr. White requested relief of this sentence on the grounds that he has an IQ of 78 and that his trial counsel failed to discover or present this information to the jury. Such failure deprived Mr. White of the effective assistance of counsel and that new information regarding Mr. White's borderline intellectual disability may have provided essential information to the mitigation of this sentence.

More specifically, as a mental health expert specialized in the development, administration, and interpretation of intelligence tests, there are several areas of concern regarding that intelligence testing that would have significantly impacted Mr. White's score, and thus, his designation as an individual of low intellectual capacity. Such conditions may have resulted in a determination of an Intellectual Disability at the time of the actual testing in 2008, thus making Mr. White initially ineligible for the death penalty under the provisions of *Adkins v. Virginia*[1] and subsequently under the provisions of *Moore v. Texas*[2].

During his developmental period, there was evidence that Mr. White experienced significant adaptive deficits in his communication and verbal comprehension, demonstrated significant academic deficits and was only able to advance based on social promotion because of his football skills, which became evident during his one year of college on a football scholarship during which he failed every course in which he was enrolled. There was also evidence that Mr. White experienced repeated head trauma, with at one instance of extended loss of consciousness during a possible drowning episode, due, at least in part, to his many years of playing football, both formally and informally, in a position known to incur an excessive number of high-speed cranial impacts.

Evidence presented during testimony was that Mr. White was tested by clinical psychologist Patricia M. Averill, Ph.D. on July 24, 2008, when Mr. White was 45 years of age. Dr. Averill administered a standardized comprehensive intelligence test, the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), and a measure of academic achievement, the Wide Range Achievement Test, Revision (WRAT-R), the Mini Mental Status Exam, and a clinical interview. On the WAIS-III, Mr. White obtained a Full Scale Intelligence Quotient (FSIQ) standard score of 78, which placed him at the 7th percentile. It is standard practice, which was followed by Dr. Averill, to list a statistical range of scores based on standard errors of measurement given a 95% confidence interval of the test itself. An intelligence score is as estimation of the measure of true intellectual ability and not a determinate score due to inherent  internal consistency errors of a test of human abilities, which can fluctuate somewhat due to various environment and iatrogenic (aka individual) factors. In fact, Dr. Averill commented that Mr. White's "Full Scale IQ may not be the most accurate reflection of his current intellection [sic] functioning."

---

[1] Atkins v. Virginia, 536 U.S. 304 (2002).

[2] Moore v. Texas, 137 U.S. 1039 (2017).

Dr. Averill further wrote that "Mr. White is functioning within the Borderline range of intelligence. Based on his WRAT4 achievement scores and his reported poor grades in school it is doubtful that he has ever functioned at a higher level." It was further written that "Levels of intellectual functioning are on a continuum, with borderline intellectual functioning being just above mild mental retardation (now known as an Intellectual Disability)" and that individuals such as Mr. White "experience difficulties in many domains." As to those "many domains," one's performance collectively is known as "adaptive functioning" and are typically identified as to one's ability to function effectively and independently in social domains, with communication, maintenance of personal hygiene, adherence to basic rules of safety in the home and community, and occupationally such as performing tasks typical of independent daily living with limited or no support. Dr. Averill did not administer a formal measure of adaptive functioning as part of Mr. White's testing but commented that Mr. White "was not able to maintain housing for his family, nor was he able to manage his own finances" but was able to "compensate for other intellectual difficulties" through his interpersonal skills despite his "very low score on the Comprehension subtest, which assesses one's understanding of social mores."[3]

**4. IQ Testing and Low Functioning Individuals:**

IQ tests are designed to assess cognitive abilities across several domains, such as verbal comprehension, working memory, perceptual reasoning, and processing speed. However, when applied to individuals with low cognitive functioning, several factors can lead to an overestimation of their cognitive abilities.

a. Test Structure and Norming Issues:

IQ tests are typically normed on a general population sample that includes individuals with a wide range of cognitive abilities. However, this norming process may not adequately represent individuals at the lower end of the cognitive spectrum. Consequently, the psychometric properties of these tests, including their reliability and validity, may be compromised when used with low-functioning populations. This can lead to an overestimation of IQ scores, as the tests may not accurately capture the cognitive limitations of these individuals.

b. Floor Effects:

Many IQ tests have a minimum score, known as the "floor," which can present a significant limitation when assessing individuals with severe cognitive impairments. If an individual's true cognitive abilities fall below this floor, the test cannot accurately measure their functioning, often resulting in a score that overestimates their actual abilities.[4]

---

[3] Psychological Evaluation report. (12/30/2008). Patricia M. Averill, Ph.D., Clinical Psychologist. Houston, Texas.

[4] Whitaker, Simon. (2010). Error in the estimation of intellectual ability in the low range using the WISC-IV and WAIS-III. *Personality and Individual Differences*, 48(5), 517-521.

c. Adaptive Functioning Discrepancies:

There is often a notable discrepancy between IQ scores and adaptive functioning in low-functioning individuals. For example, an individual might obtain a higher IQ score than expected but still struggle with basic life skills, such as communication, self-care, and social interaction. This discrepancy highlights the limitations of using IQ scores as the sole measure of cognitive ability in these populations. The provisions of *Moore v. Texas* stipulate that a standardized measure to assess one's adaptive functioning must be used in accordance with the evaluator's standards of practice in order to diagnose the presence of an intellectual disability as identified by *Atkins v. Virginia*. To my knowledge based on the court transcripts and subsequent appeals, Mr. White has never been administer nor evaluated on a standardized measure of adaptive functioning.

d. Test Anxiety and Performance Issues:

Low-functioning individuals may experience significant anxiety during testing, leading to inconsistent or rushed responses. This can artificially inflate their IQ scores, as their performance under test conditions may not reflect their true cognitive capacity. Based on the available sources of information, Mr. White's emotional state was not assessed at the time of his intelligence testing.

**4. The Flynn Effect and Its Implications:**

The Flynn Effect refers to the observed phenomenon that IQ scores have been increasing over time, typically by about three points per decade. While this trend reflects changes in environmental factors, such as improved nutrition, education, and access to information, it also introduces complexities when interpreting IQ scores in low-functioning individuals.

The Flynn Effect means that older IQ tests may overestimate an individual's cognitive abilities when compared to more current norms. This is particularly relevant for low-functioning individuals, where even small increases in scores due to outdated norms can result in significant overestimations of their abilities, sometimes up to 20 points. Furthermore, the Flynn Effect primarily impacts the general population's scores, and its effect on those with low cognitive functioning is less well understood, potentially leading to misleading assessments.[5]

Mr. White was tested using the WAIS-III, which had been published in 1997. At the time he was tested, an updated edition of that intelligence test was being released on the market. The Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) was based on a modified theoretical construct of intelligence compared to the WAIS-III and earlier versions of the test. Research between the two editions suggests that "more weight" should be given to

---

[5] Kanaya, T., Scullin, M. H., & Ceci, S. J. (2003). The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnoses. *American Psychologist, 58*(10), 778–790.

the FSIQ obtained by the WAIS-IV that is "considered more valid, reliable, and consistent" with the test publisher's theoretical model.[6]

## 5. Conclusion:

Based on the factors discussed above, it is my professional opinion that IQ scores for low-functioning individuals, such as Mr. White, are often overestimated. The structural limitations of IQ tests, floor effects, discrepancies between IQ and adaptive functioning, and the influence of outdated norms due to both the Flynn Effect and an outdated edition of the intelligence test, all contribute to this overestimation. Therefore, the IQ score reported by Dr. Averill as part of Mr. White's *Atkins* evaluation was likely an over-estimation of his true intellectual abilities and lacked a formal assessment of Mr. White's adaptive functioning as is now required under the *Moore* decision required in the diagnosis of an Intellectual Disability.

I have examined the scores for Flynn effect and determined that the stated IQ score of 78 is overstated. Even contemporary commentary by the evaluating psychologist included concerns that this score was likely inflated and that Mr. White would likely never score higher. Conservatively, research indicates that a Flynn-adjusted score would be 75, and would more likely be much lower than that, placing Mr. White's IQ score within the range of an intellectual disability. Even a conservatively Flynn-adjusted score of 75 would be within the +/- 7 statistical band for the standard error of measurement on the WAIS-III; possibly placing his IQ score at 68.

The test itself appears to have given higher scores that were justified based upon the research, so I am leaning towards the side of a conservative view. Adaptive deficits in school, in his scores on the ACT, and failing grades were clearly present during his developmental period. The family history provided by the mitigation specialist, based on her long work with them through the COVID pandemic to the present to overcome their shame and fear to discuss Mr. White's problems in daily living and employment, showed significant adaptive difficulties early on despite the apparent social promotion due to Mr. White's football skills. Additionally, the multiple and frequent head trauma during his formative years was very likely harmful to his brain development.

Based on the contemporary concerns expressed by the evaluator during Mr. White's IQ testing regarding the over-estimation of the derived IQ score, evidence of adaptive deficits during his developmental period, and history of multiple head traumas during his developmental period, it is my professional opinion, to a high degree of psychological certainty, that Mr. White would meet the new criteria under the Diagnostic and Statistical Manual – Fifth Edition, Text Revision (DSM-5-TR) and the *Moore* cases for a diagnosis of an Intellectual Developmental Disorder (Intellectual Disability).

---

[6] Taub, Gordon and Benson, Nicholas. (2013). Matters of Consequence: An Empirical Investigation of the WAIS-III and WAIS-IV and Implications for Addressing the Atkins Intelligence Criterion. *Journal of Forensic Psychology Practice*, 13, 27-48.

Garcia Glen White                        **AFFIDAVIT**                        Page 6 of 6

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


*Gregory Scott Hupp*
Greg Hupp, Ph.D.
Psychologist – Texas License No. 31593
5900 Balcones Dr., Ste. 13846
Austin, Texas 78731
Ph (512) 893-6337


Sworn to and subscribed before me this _____12th_____ day of _____August_____, 20__24__.

*ali R abdelkarim*
Notary Public
My Commission Expires: _____12/26/2025_____

ALI R ABDELKARIM
Notary Public - State of Florida
Commission # HH 270681
Expires on December 26, 2025

Notarized remotely online using communication technology via Proof.
Florida   Broward County   Online Notary

# EXHIBIT B

Affidavit of: Gina T Vitale, LMSW

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

1.      My name is Gina T. Vitale. I am a master level social worker duly licensed to practice in the state of Texas since 1997. I am a member of the National Association of Social Workers, the National Association of Sentencing Advocates and Mitigation Specialists, and the National Association of Public Defenders.

2.      I have been an independent contractor providing mitigation investigations and sentencing advocacy throughout the United States since 1999. I have experience working on capital and non-capital cases in both state and federal jurisdictions. I have served as a faculty member in numerous CLE-approved training seminars sponsored by the Texas Defender Service, Texas Criminal Defense Lawyers Association, the Montgomery County Bar Association, and the Texas State Bar Association.  I am over 18 and am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

3.      I was originally appointed to assist in the defense of Mr. Garcia Glen White on April 18, 2018. My work included reviewing trial transcripts and psychological reports, attempting to obtain historical records of Mr. White's childhood, and meeting with family members, friends, teachers, coaches and acquaintances.

4.      Families are typically reluctant to reveal any history which may be painful or embarrassing during the initial phase of the investigation, and are careful not to say anything that they fear might reflect negatively on the defendant. Rapport building with the client and their family is critical to uncovering a thorough and accurate history. However, depending on the level of built-up defenses and mistrust for the system, this can be a lengthy process.

5.      In person interviews are critical to relationship building with clients and their families. The inability to meet with family during the pandemic significantly hampered my ability to gain the trust of Mr. White's family.

6.      Early on in the investigative process, it became clear that Mr. White's family was protective of his image. Initial interviews yielded only the most positive information about Mr. White's character. While I believe that descriptions of his character were true, they did not paint the full picture of Mr. White's history, and reports of his academic successes were wholly inaccurate.

7.      During initial interviews, family members reported that Mr. White passed all of his classes and graduated at the top of his class. Report cards documenting his grades and class standing clearly indicate the opposite.

8.      Mr. White is one of seven children, two half-brothers, and more than ten cousins. Other than Mr. White, only one cousin attended college. Mr. White's college career, despite being short-lived and academically unsuccessful, understandably served as the foundation for the family's unwavering view of him as 'the smart one.'

9.      It was only through lengthy interviews with the family that their trust increased. However, their instinct to protect their loved one remained strong. It took an extensive knowledge of adaptive deficits and carefully crafted questions to uncover detailed descriptions of how Mr. White truthfully interacted with his environment, his family, and his community.

10.     Throughout his childhood and adolescence, Mr. White was surrounded by positive supports including consistent household rules, a large extended family and friend network, and attentive coaches. These supports allowed Glen to mask his deficits and function sufficiently within his community.  Because Glen was able to get by without drawing negative attention, his deficits were never recognized as such by friends, teachers and coaches.

I swear the forgoing is true and correct.

_____
Affiant (Signature)

Gina T Vitale, LMSW
_____
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 21 day

August

of _____ 20 24

NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

AARTI SIDDOTAM
My Notary ID # 132224074
Expires October 24, 2027

My commission expires

October 24th, 2027

EXHIBIT C

# GARCIA GLEN WHITE ADAPTIVE DEFICITS CHART

| CONCEPTUAL DOMAIN<br>LANGUAGE; READING AND WRITING, MONEY, TIME AND NUMBER CONCEPTS | | |
|---|---|---|
| Area of Adaptive Functioning | Data | Source |
| **Vocabulary**:<br>Richness/consistency of expression<br>Organized and coherent vs rambling and disjointed<br>Expressive/Receptive Language | Chose video statement over written @ police dept<br>(due to difficulty writing)<br><br>Glen had a very difficult time spelling words correctly | Transcripts<br><br><br>Interview w/Monica Garrett |
| Limited vocabulary and understanding of legal terminology | Glen White appears before the judge during a motions hearing. When asked about a letter he wrote, he states "yes, dismissed." His attorney and the Judge have to clarify that he means he wants to withdraw the letter | Hearing Transcript |
| Inability to express himself clearly.<br><br>Rambling and disjointed speech | Q: Did you tell Sgt Rudolph or do you recall telling him specifically that you wanted a lawyer present?<br>A: I don't remember telling him nothing<br>Q: okay<br>A: Realizing he wanted to talk to me I think that's the time I know of at the time I asked if I could lay on the floor. I was tired. I don't want to talk to you no more. | Hearing Transcript |
| Inability to express himself clearly<br><br>Rambling and disjointed speech | Q: At any point during the conversation with them did you tell them that you had an attorney?<br>A: I told them I had an attorney. I didn't want to say that | Hearing Transcript |

| | | |
|---|---|---|
| | Q: How did you tell them that? What did you say? A: I just told them when he came up and asked me how I was doing, then they did make another statement, they said, "We are going to go back into this room back here and talk." They said they was going…We are going to go back into this room here and talk, Okay?" and then when they said that, I said, "Well, I want to have my attorney here. I have a lawyer." | |
| **Time:** Analog and digital? AM/PM concepts Seasonal changes (daylight savings, holidays) Time zones | Glen never wore a watch He never had to tell time because he maintained the same schedule as a large group of friends. He left for school with them and came home with them | Family Interviews |
| **Numerical:** Basic mathematics Multi digit? Able to calculate sentence/probation/release | Glen depended on others for help with any mathematics Glen had difficulty adding anything more than single digit numbers | Family interviews |
| **Literature:** Reading materials Written communication Job announcement/application | Issues answering questions on rehab paperwork | HRC records |
| **Educational Achievement:** Diploma or GED SPED Vocational Training Dropout Behavior/absences Retention | Glen depended on his sister and friends to help with homework. Throughout Jr. High and HS she would write out answers and he would copy them into | Interview w/Monica Garrett |

| General knowledge | his own handwriting | |
|---|---|---|
| Learning difficulties | It was difficult for Glen to catch on to things. His grades remained poor despite help | Trial Transcript (Monica Garrett) |
| Learning difficulties | Glen would have been held back without help<br><br>Glen still passed even when his grades were bad<br><br>Glen needed 1:1 help to complete his homework<br><br>Monica would look at the work and break it down for him so that it was easier | Family Interviews |
| Poor reading comprehension | As recently as a few years ago, Glen would call his son and daughter in law for help with his Bible group homework.<br><br>Glen would read the questions to his daughter in law and she would explain what the question meant. Glen would tell her what he thought and she would help him come up with the words to express his thoughts | Family Interviews |
| Poor school performance | 1976-77: Glen attends 8th grade at Fleming Middle School<br>His grades are C's, D's and F's other than B in PE | School Transcript |
| Poor school performance | 1977-78: Glen attends "C9th" grade at Fleming Middle School<br>His grades are C's, D's F's except B in PE | School Transcript |

|  | F and B in Woodworking<br>Glen fails English and has to take summer school<br><br>Glen receives 'Good' and 'Excellent' marks in conduct and has limited absences |  |
|---|---|---|
| Poor school performance | 1978-79: Glen  attends 10th grade at Wheatley High School<br>His grades are C's, D's and F's except a B in one of three HPE semesters and one of two Reading Lab semesters<br>Glen receives a C in Developmental Reading<br><br>Conduct marks are 'Good', and he has only 6 absences | School Transcript |
| Poor school performance | 1979-80: Glen  attends 11th grade at Wheatley High School<br>Glen receives A's in PE, an A & B in cooking, a C in AB Eng, a D in Eng, and a B & C in History<br><br>Attendance is only for recorded for four of the six sessions<br>Conduct is 'Excellent' and he has 10 absences | School Transcript |
| Poor school performance | 1980-81: GGW attends 12th grade at Wheatley High School<br>HIs grades are a B in cooking, F in Woodworking, and C's and D's in all other courses | School Transcript |
| Poor school performance | 3/12/81: Glen's class rank is 290 of 301<br>GPA 1.?535 | School Transcript |

| Poor school performance | Glen "Did not do well academically" at college | Trial Transcript (Robert Yohman) |
|---|---|---|
| Poor school performance | Glen's "Achievement Scores in the low avg to mildly impaired range." | Trial Transcript (Robert Yohman) |
| Poor school performance | Glen "Achieved C's and D's got passed along within the system; probably never did achieve more than a reading, writing arithmetic level above low average to borderline, maybe even into the mildly impaired range." | Trial Transcript (Robert Yohman) |
| Poor school performance | Glen struggled to complete his homework. He just didn't get it | Family Interviews |
| **Executive Functioning:** Concrete approach to Problem Solving Abstract thinking Cognitive Flexibility Planning/Strategizing Priority Setting | Bender "Confirms that there is some sort of organic influence here in terms of neurological functioning. The errors have to do with planning and problem solving." | Trial Testimony (Dennis Nelson) |
| Cognitive deficits | Glen scored "particularly low in concentration, speed of thinking, attention span" | Trial Transcript (Robert Yohman) |
| Poor executive functioning | Glen scores were "fairly deficient on most tasks related to (executive functioning)" | Trial Transcript (Robert Yohman) |
| Cognitive deficits | Scores on cognitive tests showed "fairly low level defenses, and pretty much rigid." | Trial Transcript (Robert Yohman) |

| | Glen is confused by questions on cross and easily led by the prosecutor's questions. He frequently looks to lawyers for help | Hearing Transcript |
|---|---|---|
| **SOCIAL DOMAIN**<br>Interpersonal skills, social responsibility, self esteem, gullibility, naivete, follows rules/obeys laws, avoids victimization, and social problem solving | | |
| **Interpersonal Skills:**<br>Friends (ages)<br>Social isolation (bullying)<br>Fights/aggression<br>Dating<br>Fitting In<br>Social Cues<br>Emotion/Behavior Regulation | Glen possesses "Limited Social Skills" | (Trial Transcript (Robert Yohman) |
| Inequality in dating relationships | DeShonda "ran him" | Family Interviews |
| **Self-Esteem:**<br>Fear of rejection by peers<br>Victimized | People sometimes teased him about his size<br><br>Glen cried easily<br><br>Glen got his feelings hurt easily | Family Interviews |
| **Rule Following:**<br>Games/leisure (age appropriate?)<br>Offense history<br>Comprehension/anticipation of consequences<br>Impulse control<br>Substance abuse (age) | Glen played games with family- Monopoly, Spades, etc- but he always lost. He would cry because he couldn't win. His family could not understand how he lost even at simple games like go fish and pitty pat. Even when he cheated he lost<br><br>Glen's substance. abuse got bad after his accident at work when he didn't have a football or work schedule to follow. | Family Interviews |

| | | |
|---|---|---|
| | Glen would go and do the very thing you told him not to do | |
| **Social Responsibility:** Behavior (school and home) Social conventions/expectations Supports self (parents/spouse) | Glen"s favorite tv shows were Good Times, Jackson 5 and Tom and Jerry<br><br>Rather than coming home after school, Glen would stay and practice football. He would stay until someone kicked him out. | Family Interview |
| **Gullibility/Naivete/ Vulnerability:** Taken advantage of Poor Judgment Butt of Jokes Victimized by peers Easily cheated Follower Comprehends Risk | Glen repeatedly speaks with police seemingly unaware of potential risk to himself<br><br>On a school field trip to a. Battleship, everyone was pretending to jump off. Back at school, on a dare, Glen jumped off of the balcony into a courtyard below | Family Interviews<br><br>Transcripts of Police Interrogations |
| Naivete | Glen didn't have street smarts. He would go along with others | Family Interview |
| Poor comprehension of risk | Glen was shot after leaving the community center one night. Two groups had gotten into it and someone was badly beaten. When Glen decided to leave, his friends all said don't go because they didn't know what might kick off outside. Glen said he wasn't worried and left. He was shot by a group who came back to retaliate | Family/Friend Interviews |
| **Social Problem Solving:** Insight into motive/thinking of others Insight into own behaviors | Glen tells Officer Miller that he doesn't mind talking about the Williams case because he's "already been found | Statement to police |

| Reciprocity<br>Avoiding problematic situations<br>Anticipating consequences | innocent on that case." | |
|---|---|---|
| Poor insight | Glen didn't think ahead. He would do something and think about it later | Family Interviews |
| Poor insight into motive of others | Glen doesn't believe that his friend would have ratted him out. The detectives have to play him the video | Statement to police |
| Poor insight | Glen would take whatever you said and not question it | Family Interviews |

| **PRACTICAL DOMAIN**<br>Activities of Daily Living, occupational skills, use of money, health care, travel/transportation, adherence to schedule/routines, use of communication (telephone, email) | | |
|---|---|---|
| **ADL's:**<br>Developmental milestones<br>Dressing self<br>Hygiene<br>Cooking<br>Cleaning<br>Home maintenance<br>Planning- daily activities<br>Childcare<br>Shopping | Glen was able to do chores (cook and clean), but he had to be taught how. His mom was very strict | Family Interviews |
| **Occupational Skills:**<br>Employment<br>Job applications<br>Equipment operations<br>Schedule/Routine- punctuality | Glen worked as cook and doing landscaping before his 1995 arrest<br>Glen worked with is father painting houses and at his mechanic's shop<br>Glen worked cleaning windows<br>Glen worked at KFC and Whataburger<br><br>Glen was badly injured in an accident at work. Glen was at the top of a forty foot ladder washing windows.  The | Trial Transcript<br><br>Family Interviews |

| | ladder slipped and he fell to the ground. A Coworker was supposed to be at the bottom holding the ladder. It is unclear whether Glen told him to go do something else or if the man left on his own. | |
|---|---|---|
| **Safety and Health:**<br>Medications<br>MD appointments<br>Medical history<br>Substance Abuse<br>Nutrition | Glen lit a  firecracker in a vehicle gas tank. It exploded and burned his hand. Glen's brother yelled,  "you so stupid, stupid, stupid."<br><br>Glen did not apply for worker's compensation after his accident and did not attend follow up medical appointments as directed | Family Interviews |
| **Travel & Transportation:**<br>Maps<br>Public transport<br>DL<br>Vehicles<br>Circumstances of long distance travel | Glen never owned a car. Coworkers drove him home from work<br><br>Glen never got a driver's license<br><br>Glen took the family car out without permission once. Glen ran the car into an apartment building because he "forgot to turn" | Family Interviews |
| **Money Concepts:**<br>Values money<br>Sums/balances/percentages<br>Bank Accounts<br>Budgeting | Glen never had an apartment of his own. He lived with various friends and family | Family Interviews |
| Limited ability to maintain finances and budgeting | When in a relationship, his girlfriend handled all the financial issues.<br><br>Glen turned his paycheck over to her, and she managed the bills | Family/Friend Interviews |

|  | Glen was unable to maintain bank account | Family/Friend Interviews |
|---|---|---|
| **Communication:**<br>Telephone<br>Email<br>Keyboarding<br>Social Media | Glen never memorized phone numbers. If he needed to talk to someone he would go to their house. | Family/Friend Interviews |

# EXHIBIT D

Affidavit of: Monica Garrett

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Monica Garrett I am over the age of eighteen years old and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my older brother. I am eleven months younger than my brother. Even though I'm younger, I always helped Glen with his homework. Glen always struggled in school, and I helped him with his homework every day. Glen needed one on one help to understand and he got that from me at home. I made him do his homework, but I had to break it down so that stuff was easier to understand. He didn't understand certain things and it was hard for him to do the work. Math and spelling were particularly hard for Glen. Adding more than single digit numbers was difficult for Glen and he had trouble understanding and spelling compound words. Glen was a class clown. When he didn't know the answer, he would make jokes to take everyone's mind off what the teacher was asking. Glen cried when he didn't understand or when I'd make him repeat what I just showed him. The classes Glen did best in were woodworking, metal work and home economics. He liked things he could do with his hands.

Glen was quick to cry. If he told you something and you didn't believe him, he would cry, and he would cry whenever he lost at a game. We played lots of games at home, like Spades and Monopoly. Glen lost every single time. Glen even lost at simple games like go fish. Sometimes he would cheat, and he would still lose.

Glen always wanted to make people smile. He would do anything to get you to smile. He didn't ever get into fights or arguments. He was always giving.

Glen never had to worry about money for lunch at school. I had the money and if he needed anything, he would come to me.

Glen walked to and from school every day with a bunch of friends. He never walked home by himself. Even when it wasn't football season, if his friends played other sports, Glen would stay at school as late as he had to until he could walk home with his friends. The coaches knew him and would let him help out with small stuff while he waited.

At Fleming middle school, the buildings were set around courtyards. Each one was at least a story high with a floor of cement. One day, kids were daring Glen to jump, and he did. He jumped right over the railing into the courtyard. He sprained both of his feet.

Once Glen got injured and couldn't play football at Lubbock Christian College, he had to come home. Glen couldn't have made it without the support of coaches and other players.

I swear the forgoing is true and correct.

_____
Affiant (Signature)

Monica Garrett
_____
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this _11th_ day
of _April_ 20 _25_

_____
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

EXHIBIT E

Affidavit of: Lizzie White

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Lizzie White, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my son. I have seven children and he is my third.

Glen always struggled in school and got bad grades, but with help from my daughter he did better.

Glen had the same group of friends from elementary all the way up through high school. They all went to the same schools and lived in the same neighborhood. They did everything together and looked out for each other, so Glen couldn't have gotten into too much trouble.

One time, when I was visiting my family in Louisiana, Glen decided to take my car. Glen had no idea how to drive. He went a couple blocks to pick up a friend and didn't even make it three blocks before he ran the car into the side of an apartment complex. When I asked him what happened, he said he forgot to turn. I can't imagine what made him think to take that car knowing he couldn't drive. The police picked him up and I had to go and get him.

Another time we were visiting Louisiana, Glen set off a firecracker in a gas tank. The explosion knocked him out and his cousins had to carry him back to the house. We had to take him to the hospital to get looked at.

When Glen came back from Lubbock, he was working for Clean America. He had an accident at work and fell when the ladder he was on slipped. He stayed at the hospital for a while. He hurt his arm and his leg and he had to get stitches in his head because his head was caught between the concrete and the ladder.

I swear the forgoing is true and correct.

_Lizzie M. White_
Affiant (Signature)

_Lizzie White_
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this _15th_ day of _August_ 20 _21_.

_Rodolfo C. Vargas_
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

# EXHIBIT F

Affidavit of: Angela ~~Drain~~ *SWANSON    AAS*

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Angela Drain, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my older brother.

Glen always had a hard time with his school work, and my sister had to help him. He had trouble understanding the concepts and would cry easily when he got frustrated.

During summers, Glen and his friends played neighborhood football. They never had any pads or helmets, but played just as hard as they did during the school year.

Glen and his friends knew each other all of their lives. They had the same routine every day, so he didn't have to think too much about schedules. His life revolved around school and football.

When Glen was older, I got him a job working at Whataburger with me. He also worked at KFC.

Glen didn't ever memorize telephone numbers. All of his friends lived within a few blocks and if he wanted something he would just walk over and talk to them.

I swear the forgoing is true and correct.

_____          *Angela Swanson*
Affiant (Signature)                                       Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this _11th_ day of _____ 20__

_____
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10130041

My commission expires

EXHIBIT G

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HARRIS

ON THIS DAY, THE AFFIANT BELOW DID APPEAR BEFORE ME TO SWEAR AND SUBSCRIBE TO THE TRUTH OF THE FOLLOWING:

My name is Ray Manuel. I live in ~~Humble~~ *Spring (19)* Texas. I am over eighteen and of sound mind. I first met Glenn in Elementary School. Glenn was one year ahead. My brother Tecumsah was in the same grade as Glenn and they both played defensive end.

Glenn was the kindest person I knew. When Glenn lived with my family, Glenn would walk my mother to the bus stop and then wait for her and walk her back home. Glenn would also meet her after she'd been out drinking and walk her home so that nobody messed with her. Glenn did more around the house than me and Tecumsah did. Glenn cleaned all the time. When my mom was on her death bed, she asked when she would see her son again. I thought she meant me at first, but she said she wanted to see Glenn.

Glenn was a good worker. He always did labor type jobs. He worked as a dishwasher at the Houston Club, worked for a car wash, and worked at Wendy's. When we was done high school, we got work at Clean America where they did window ~~washing.~~ *REPAIR (RM)*

Glenn got hurt on the job when no one was holding his ladder. Glenn was on a 40 ft. ladder and Mo Stevenson was supposed to be holding the bottom. I remembers that Glenn's head hit the pavement and he had several stitches on the right side of his head.

I do not recall if Glenn repeated any grades. We all had trouble picking up on things and I was probably in some of those special classes too. Glenn struggled in school and did not get good grades.

The Fleming and Wheatley coaches were really rough. Some coaches wouldn't hesitate to hit the players if they didn't follow instructions immediately or

sufficiently. The coaches encouraged players to be as rough and tough as possible. With the coaches' support, the team slogan became "knock their dick in the dirt."

On what were considered light days, the players did not wear helmets, but they still played like it was a game. We got our bells rung near every darn day in those days. In addition to football at school, Glenn and me played in a neighborhood league. When playing neighborhood games, we wore no protective gear. Sometimes the neighborhood games were rougher than the school games because of neighborhood rivalries. It wasn't uncommon for someone's finger or shoulder to get knocked out of socket during a neighborhood game. You just popped it back in and kept on going. I recalls Glenn getting knocked out during one football game. They had to carry him to the side. Once they'd looked him over they put him back in the game.

Glenn never had his own apartment. He always lived with somebody who would cook for him and pay bills and such. He lived with my family, a girlfriend, then with me when I was living on his own.

I was around Glenn when he was using drugs, but when my daughter was born I had to make changes. I told Glenn I didn't want my daughter around any negative influences and told Glenn he would have to make a choice. He chose the drugs, and we parted ways.

I have visited Glenn and we started corresponding many years ago. He has returned to that sweet guy I knew before he was on drugs. I had a heart attack a few years back and I have been diagnosed with prostate cancer. I got no reason to lie.

I swear this is all true and correct.

Affiant: _Benny Manuel_

Date: _8/20/2024_

Notary for Texas: _Rudolf J. Vargas_

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

EXHIBIT H

Affidavit of: Alfred White Jr.

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Alfred White Jr., I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my younger brother. I am the oldest child and Glen is six years younger than me.

When we were in Louisiana visiting our grandmother, Glen and some of the cousins were out shooting off firecrackers. Glen was near an old gas tank and I told him not to pop the firecrackers near there. Glen lit it anyway and when it didn't go off at first, he got close to see what was wrong. That's when it went off and the flame shot out of the tank and knocked him back. Glen had trouble thinking ahead of what the consequences might be to his behavior. He wouldn't see the consequences until after.

Glen never had a car or driver's license and never had his own apartment or home.

Glen stayed with my wife and I for about six months. I have been down the same road as him, and I got him into recovery twice. He really wanted to change, but it's so hard once the drugs have a hold of you.

I have been in contact with Glen the whole time he's been locked up. We write to each other and he writes to my kids. He tries to use his situation to teach them. Glen is a source of comfort for all my family. He doesn't worry about his own situation; he just tries to make us feel good.

I swear the forgoing is true and correct.

_____          _____
Affiant (Signature)                                          Affiant (Print Name)
AlFred J White

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 21st day of April 20 22

_____
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10199841

# EXHIBIT I

Affidavit of: Howard Gordon

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Howard Gordon, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

I have known Garcia Glen White since we were six or seven years old. We went to the same school and were in the same grade from elementary through high school. He is my oldest friend. Glen stayed at my house all the time and we would sleep in the same bed. One of us with our feet one way and the other with his feet opposite.

Glen and I played football together at Fleming Middle School and Wheatley High School. They type of football we played was very competitive and very physical. Glen was a tough guy on the football field. Some people would shy away from contact, but not Glen. He was tough. We got hurt all the time playing football. Glen lost consciousness at least once on the football field, but the message we got was to suck it up and be a man. As we got older, I remember Glen complaining about headaches from all the hits he took in football.

In school, being there to play the game was the most important thing. If you got an F, you couldn't play the game on Friday. Coaches would do whatever they had to to make sure you would be eligible to play, and the teachers went along with it. Coaches would go to the players' teachers and ask what work needed to be done. The coaches would take all the work and then go find another student to complete it. Players were passed to the next class or the next grade all the time. It didn't matter what their grades were. That's just part of football. We gotta win not matter what. One time I got five F's and an F- on my report card and I still made the team and still went on to the next grade.

Glen really struggled in class. Everybody helped him with his homework. One of our friends used to do his homework for him and Glen would turn it in. It was all about being eligible to play.

Glen was a good enough player that the scouts who came to watch him play gave him a bus ticket and asked him to come play at Lubbock Christian College. I don't think he even lasted a whole semester. He came back home quick after he got hurt.

Glen was a big guy with dark skin and looked really intimidating, but he was the biggest whimp you'd ever find. Glen was easily influenced when we were growing up. If I said something was going to be that way, he would go along with it.

Glen would take any dare that someone gave him. Glen thought it was funny, but I remember telling him, that's not funny. You're going to hurt yourself.

Glen did all sorts of foolishness. As kids we used to go to the Fonde Rec Center to play basketball. They had a court where the professionals like Clyde Drexler all played and

another section for amateurs and the kids. We went one day and Glen just walked over to play with the pro's. We tried to tell him that wasn't allowed, but he went on over there anyway.

After Glen got hurt on the job, he didn't have any structure in his life. I could see him changing, and when I saw the guys he was hanging out with, I knew that no good would come of it. I talked to Glen about his addiction. I could tell he was embarrassed and ashamed, but he was like family to me and I wanted to help him. I told him that I would get him into the substance abuse program through my job by telling them we were half-brothers. Glen agreed, but it took a couple of days and when I went back to get him, he was with all of his so-called friends and they said he didn't want to talk to me. Glen was too easily influenced by them and didn't speak up for himself.

It's still hard for me to believe that Glen is in this situation. Until he got hooked on the drugs, there was nothing in him that would ever have done this. I still think about those days and talk about Glen all the time. My kids can't believe that they've never met someone who was such a big part of my life. I keep in contact with Glen even though it's hard for us. Talking about the old days is emotional, but Glen will always be family to me.

I swear the forgoing is true and correct.

*Howard Gordon*

Howard Gordon (Aug 22, 2024 20:16 CDT)

Affiant (Signature)

_____

Affiant (Print Name)


SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 23rd day of August 2024

*Patricia Ann Nowak*

NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires



PATRICIA ANN NOWAK
My Notary ID # 126607126
Expires March 29, 2026

EXHIBIT J

Affidavit of: Effron Williams

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Effron Williams, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my cousin. I am only three months older than Glen and we grew up together.

I played football, but was on the JV team while Glen was on the Varsity team. Glen was a star in football at our school. In addition to playing football in school, we played neighborhood football. When we played neighborhood football, we played without any pads or helmets. But we played just as hard as if we were, it was hard knocks.

I remember as Glen got older, he would complain about headaches. It might have been from football, but he got other knocks too. When we were about twelve, and swimming in the neighborhood pool, Glen did a flip into the pool trying to show off. He hit the back of his head on the side of the pool and sunk to the bottom. I'm pretty sure he lost consciousness because we rushed in to get him and pull him out. He lay on the side of the pool for a good while before he was able to get up. Another time, we were at our grandparents' in Louisiana. Our uncle worked on cars and there were parts all over the property. We were setting off fireworks in a field where there was a gas tank that had been pulled out of a car. Glen set a firecracker off right at the mouth of the gas tank. It went off like a bomb and blew him backwards. I was standing behind him but it blew him all the way back behind me. I took off running and screaming, but I'm pretty sure it knocked him out 'cause my other cousins had to carry him to the house.

When Glen was with Shonda, his kids' mother, she was in charge of his money. She took any money Glen made. Shonda and her mother even got Glen's tax refund one year. He never could figure out how to get it back.

Glen was always a follower instead of a leader. There was a guy in the neighborhood who was a year younger than Glen who got Glen to do all sorts of stuff for him. Other guys in the neighborhood knew to avoid him and not get involved, but he had Glen to do a lot of stuff he shouldn't have been doing.

I swear the forgoing is true and correct.

_____          _____
Affiant (Signature)                                          Affiant (Print Name)

of _Augest 23_ 20 _24_

_[signature]_

NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires 

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10169841

# EXHIBIT K

**BRIAN BENKEN**
Lawyer
1545 Heights Blvd., Suite 900
Houston, Texas 77008
(office) 713-223-4051
(fax)    713-223-4052
Brian@Benkenlaw.com

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF HARRIS | § | |

### AFFIDAVIT OF BRIAN BENKEN

Before me, the undersigned authority, personally appeared Brian Benken, who, being by

me duly sworn, deposed as follows:

"My name is Brian Benken. I was the appointed trial attorney for Mr. White in his capital case
out of Harris County.  We did not have sophisticated DNA testing at the time of Mr. White's
case.  I had given a prior affidavit in this case for a prior petition. I stand by that affidavit but I do
not believe I fully addressed the issue of how I would have made use of the presence of a third
party male's DNA at the tragic death scene in this case to help my client avoid death.

First, I would have insisted that the sample, now still available, be run through the Combined
Offender DNA Information System [CODIS] for a potential match.  Then I would have asked the
HPD investigator Todd Miller if he had run to ground the other suspects who undoubtedly visited
this apartment and crack den.  Then I would have argued that the presence of another party made
it clear that we simply did not know what had happened, and likely never would.  I would have
sought a plea to a lesser included offense at every opportunity to avoid the dangers of exactly
what happened...a huge black man portrayed as a raving monster to a mostly white jury.  That is
exactly how the prosecutor portrayed him, and to find out years later that there was another party
or even a potentially exculpatory witness to rebut Officer Miller or put my client's actions in
perspective is frustrating.

Glenn has never gotten a fair shake on this matter. I believe that Miller tricked an apparently
simple man into not insisting on a lawyer being present, and I fully believe that the existence of
new evidence could have raised reasonable doubt about the death penalty.  In our system, the jury
must have it proven to them that the person merits death versus life in prison.  Glenn has been a
model prisoner and has proven he has never ever been a danger inside.  He even saved an old
inmate's life named Gary Jackson up on the old row back in the 90's before they moved to

Polunsky. This man should not be executed now when there is so much we do not know.

BRIAN BENKEN

SWORN TO AND SUBSCRIBED before me on the 21 day of AUGUST , 2024.

My commission expires: _03-20-2026_

Notary Public in and for the State of Texas



CHRISTIAN WENDENBURG
Notary Public, State of Texas
Comm. Expires 03-20-2026
Notary ID 12413352-5

# EXHIBIT L

(ORDER LIST:  603 U.S.)

TUESDAY, JULY 16, 2024

ORDER IN PENDING CASE

23-7809      GUTIERREZ, RUBEN V. SAENZ, LUIS, ET AL.
23A1160

       The application for stay of execution of sentence of death
presented to Justice Alito and by him referred to the Court is
granted pending the disposition of the petition for a writ of
certiorari.  Should the petition for a writ of certiorari be
denied, this stay shall terminate automatically.  In the event
the petition for a writ of certiorari is granted, the stay shall
terminate upon the sending down of the judgment of this Court.

# EXHIBIT M



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-48,152-08

### Ex parte GARCIA GLEN WHITE, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 723847 IN THE 180ᵀᴴ JUDICIAL DISTRICT COURT
### HARRIS COUNTY

RICHARDSON, J., filed a concurring opinion in which HERVEY and NEWELL, JJ., joined.

### CONCURRING OPINION

I agree with the Court's interpretation of the statutory language in question. It would seem that the plain language of Article 11.073 restricts the meaning of the phrase, "would not have been convicted," to apply only to the verdict of guilt and not to the assessment of punishment. This is consistent with the Court's interpretation of this exact phrase in *Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011). And, as noted by the majority, *Gutierrez* was decided two years before Article 11.073 was enacted. The Legislature was aware of how the phrase, "would not have been convicted," would be interpreted by this Court. Had the Legislature intended Article 11.073 to apply to punishment, it could have explicitly said so. Therefore, I join the majority.

White Concurring Opinion — 2

However, this is a harsh result, particularly in a death penalty case where the jury is often asked to evaluate expert scientific testimony and scientific evidence in assessing whether the death penalty is the proper punishment.  The points made by the dissenting opinion are valid.  In my opinion, Article 11.073 should have been written to apply to both the guilt and punishment  phases of a trial—at least a death penalty trial.


FILED:      November 2, 2016

PUBLISH

EXHIBIT N

87R3224 AJZ-D

By: Moody, Thompson of Harris, Collier,       H.B. No. 275

    Leach, Murr, et al.

## A BILL TO BE ENTITLED

### AN ACT

relating to an application for a writ of habeas corpus based on certain relevant scientific evidence that was not available at the applicant's trial.

    BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

    SECTION 1.  Article 11.073(b), Code of Criminal Procedure, is amended to read as follows:

    (b)  A court may grant a convicted person relief on an application for a writ of habeas corpus if:

        (1)  the convicted person files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:

        (A)  relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

        (B)  the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of

H.B. No. 275

the application; and

(2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted or would have received a different punishment.

SECTION 2.  Article 11.073, Code of Criminal Procedure, as amended by this Act, applies only to an application for a writ of habeas corpus filed on or after the effective date of this Act.  An application filed before the effective date of this Act is governed by the law in effect when the application was filed, and the former law is continued in effect for that purpose.

SECTION 3.  This Act takes effect December 1, 2021.

# EXHIBIT O

88R11979 AJZ-D

By: Moody                                                    H.B. No. 205


                        A BILL TO BE ENTITLED

                              AN ACT

relating to an application for a writ of habeas corpus based on

certain relevant scientific evidence that was not available at the

applicant's trial.

       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

       SECTION 1.  Article 11.073(b), Code of Criminal Procedure, is

amended to read as follows:

       (b)  A court may grant a convicted person relief on an

application for a writ of habeas corpus if:

             (1)  the convicted person files an application, in the

manner provided by Article 11.07, 11.071, or 11.072, containing

specific facts indicating that:

                   (A)  relevant scientific evidence is currently

available and was not available at the time of the convicted

person's trial because the evidence was not ascertainable through

the exercise of reasonable diligence by the convicted person before

the date of or during the convicted person's trial; and

                   (B)  the scientific evidence would be admissible

under the Texas Rules of Evidence at a trial held on the date of

H.B. No. 205

the application; and

   (2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted or would have received a different punishment.

  SECTION 2. Article 11.073, Code of Criminal Procedure, as amended by this Act, applies only to an application for a writ of habeas corpus filed on or after the effective date of this Act. An application filed before the effective date of this Act is governed by the law in effect when the application was filed, and the former law is continued in effect for that purpose.

  SECTION 3. This Act takes effect December 1, 2023.

# EXHIBIT P

## Re: HB 205 (88th Leg. Session)

Julia Bella <Julia@jbellalaw.com>

Tue 8/27/2024 11:56 AM

To:Ellic Sahualla <Ellic.Sahualla@house.texas.gov>
Cc:Amy Hernandez <Amy.Hernandez@house.texas.gov>;Patrick F McCann (Other) <writlawyer@outlook.com>

Thank you for your response.   This issue is critical to our client.

Sincerely,

Julia Bella
Attorney at Law

The Law Office of Julia Bella, PLLC
503 FM 359, Ste. 130
Richmond, Texas 77406
Tel: (832) 757-9799
Fax: (832) 201-9926

This e-mail may contain legally privileged and/or confidential information. Any use, dissemination, distribution, or reproduction of this message or its attachments, if any, by anyone except the intended recipient(s) is prohibited. If you received this communication in error, please notify the sender immediately by reply e-mail and then delete this message from your system.

**From:** Ellic Sahualla <Ellic.Sahualla@house.texas.gov>
**Sent:** Tuesday, August 27, 2024 11:53 AM
**To:** Julia Bella <Julia@jbellalaw.com>
**Cc:** Amy Hernandez <Amy.Hernandez@house.texas.gov>
**Subject:** Re: HB 205 (88th Leg. Session)

Good morning. That is when pre-filing happens, and yes, I expect that either our office or another (if we give it to another member) will file it as soon as filing opens up. The issue is still very much alive.

Ellic

On Aug 27, 2024, at 10:25 AM, Julia Bella <Julia@jbellalaw.com> wrote:

Some people who received this message don't often get email from julia@jbellalaw.com. Learn why this is important

Good morning, Mr. Sahualla,

I am an attorney in Houston, Texas and I am working on a post-conviction writ of habeas corpus involving newly discovered scientific evidence under 11.073.  I know that Representative Moody has introduced legislation in each of the past two sessions to amend 11.073 to include punishment evidence, H.B. 275 (2021) and H.B. 205 (2023).

I have two questions - 1) Am I correct in thinking that pre-filing of bills for 2025's legislative session will begin on November 1, 2024?  2) Do you know if Representative Moody intends to introduce a bill similar to HB 205 again this year?  If so, will it be pre-filed?

I appreciate any response or time that you can provide.

Sincerely,

Julia Bella
Attorney at Law

The Law Office of Julia Bella, PLLC
503 FM 359, Ste. 130
Richmond, Texas 77406
Tel: (832) 757-9799
Fax: (832) 201-9926

This e-mail may contain legally privileged and/or confidential information. Any use, dissemination, distribution, or reproduction of this message or its attachments, if any, by anyone except the intended recipient(s) is prohibited. If you received this communication in error, please notify the sender immediately by reply e-mail and then delete this message from your system.

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DEXTER JOHNSON, §
§
      Petitioner, §
§    CIVIL ACTION NO. 4:19-CV-3047
VS. §
§
BOBBY LUMPKIN, §
§
      Respondent. §

<u>**MEMORAMDUM AND ORDER**</u>

The Court of Appeals for the Fifth Circuit has authorized Dexter Johnson, an inmate on Texas' death row, to file a successive federal habeas corpus petition. Johnson wants to litigate a single issue: whether he is intellectually disabled and thus exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). The strict limitations on federal review contained in the Anti-Terrorism and Effective Death Penalty Act pose a barrier to federal consideration of Johnson's successive petition. This Court must determine under AEDPA's rigorous standards whether it may consider Johnson's successive petition.

This Court held an evidentiary hearing in March 2022. The parties have submitted significant post-hearing briefing. The Court must now decide (1) whether Johnson has complied with AEDPA's successive-petition requirements and (2) whether Johnson has sought federal relief in a timely manner. For the reasons discussed below, the Court finds that successive proceedings are appropriate in this case.

**I.    BACKGROUND**

Johnson murdered 23-year-old Maria "Sally" Aparece during a robbery on June 18, 2006. The Court has already provided a lengthy factual recitation of Johnson's crime. The Court will incorporate that background by reference. (Docket Entry No. 18 at 1-13); *see also Johnson v.*

*Stephens*, 617 F. App'x 293 (5th Cir. 2015); *Johnson v. Stephens*, 4:11-cv 2466, Docket Entry No. 84 at 1-4; *Johnson v. State*, 2010 WL 359018, at *1 (Tex. Crim. App. 2010).

## A.   Intellectual Disability and the Law

Well before Johnson's trial, the Supreme Court decided that the Eighth Amendment's "evolving standards of decency" meant that "death is not a suitable punishment for [an intellectually disabled] criminal." *Atkins*, 536 U.S. at 321.[1]  The Supreme Court, however, "did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within *Atkins*' compass." *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (quotation omitted); *see also Moore v. Quarterman*, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he *Atkins* Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").   Courts and legislatures came to apply the framework established by professional psychological organizations.  An inmate must make three showings before being entitled to a diagnosis of intellectual disability: (1) significantly subaverage intellectual functioning, manifested by an IQ of about 70 or below; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18. *See Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006).   How courts applied those diagnostic criteria have set the course for the matters now at issue.

Many of the issues in this case stem from a judicial gloss that the Texas court placed over the *Atkins* inquiry between 2004 and 2017.  The Texas Court of Criminal Appeals crafted "seven evidentiary factors" which became known as the "*Briseno* factors" to aid in deciding whether an inmate had adaptive deficits. *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).   These

---

[1]      "Intellectual disability" is the diagnostic term now used for what used to be called mental retardation. *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

factors did not rely on any professional psychological paradigm, but on "lay perceptions of intellectual disability." *Moore v. Texas*, 137 S. Ct. 1039, 1051 (2017) (*Moore I*). The seven factors which "factfinders could focus upon . . . in weighing evidence as indicative of intellectual disability" were:

1. Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was intellectually disabled at that time, and, if so, act in accordance with that determination?

2. Has the person formulated plans and carried them through or is his conduct impulsive?

3. Does his conduct show leadership or does it show that he is led around by others?

4. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

5. Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

6. Can the person hide facts or lie effectively in his own or others' interests?

7. Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Brownlow v. State*, 2020 WL 718026, at *10 (Tex. Crim. App. 2020) (relying on *Briseno*, 135 S.W.3d at 8-9). Texas courts generally applied these "stereotypes of the intellectually disabled" to limit the scope of *Atkins* relief. *Moore I*, 137 S. Ct. at 1052.

### B. Trial Testimony

Even though Johnson did not qualify for a diagnosis of intellectual disability under the professional standards at place during trial, psychological testimony played an important part in the penalty phase. The defense relied on a mental-health expert, Dr. Dale R. Watson, to present evidence of Johnson's low intelligence. Dr. Watson's testing indicated that Johnson had a low

level of intellectual functioning, around the equivalent of a ten-year-old. Tr. Vol. 31 at 167, 171-72.[2] Johnson's expert considered him to be in the borderline range for intellectual disability. Tr. Vol. 31 at 178, 205. Because his IQ was higher that the cutoff in place at that time for a diagnosis of intellectual disability, Johnson's expert did not assess whether he suffered from adaptive deficits. Tr. Vol. 31 at 263. Trial testimony, therefore, established that Johnson did not meet the diagnostic criteria for *Atkins*' first prong, but did not provide extensive insight about the other prongs.

On June 28, 2007, Johnson was sentenced to death. That same day, the trial court appointed Patrick F. McCann to represent Johnson in state habeas corpus proceedings. Mr. McCann is an experienced capital attorney, having practiced criminal law for over twenty-five years in trial, appellate, and post-conviction cases. (Docket Entry No. 60 at 98-104). Mr. McCann brought with him deep knowledge and experience in dealing with mental-health issues. (Docket Entry No. 60 at 106-07). Mr. McCann's representation has become a core concern in deciding whether Johnson can litigate an *Atkins* claim.

Johnson did not raise any claim relating to intellectual disability on direct appeal or state habeas review. On June 28, 2011, Mr. McCann filed a federal petition on Johnson's behalf. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 1.[3] Johnson's federal petition did not raise any issue relating to his intellectual functioning.

---

[2]     Dr. Watson assessed Johnson's IQ through two tests: the Stanford Binet Intelligence Scale, Fifth edition, and the Wechsler Adult Intelligence Scale, Third edition (WAIS-III). 31 RR 196. Applying a standard error of measurement and a principle called the Flynn Effect, Dr. Watson opined that Johnson's IQ was somewhere between 74 and 88. 31 RR 204. Dr. Watson testified that Johnson did not have obvious deficits in adaptive behavior. 31 RR 206. Dr. Watson testified that Johnson was not intellectually disabled. 31 RR 20.

[3]     The Honorable United States District Judge Gray H. Miller presided over Johnson's initial habeas action.

4

## C. Developments in *Atkins* Jurisprudence

Changes in how both the courts and the mental-health profession view intellectual disability have shaped the extent to which Johnson's low intelligence has mattered. Revised psychological standards governing intellectual disability would eventually enhance Johnson's ability to raise a successful *Atkins* claim. On May 18, 2013, the American Psychological Association revised its diagnostic manual, the Diagnostic and Statistical Manual of Mental Disorders (DSM-V). The DSM-V significantly altered how clinicians viewed the relationship between IQ scores and intellectual disability. The DSM-V "recogniz[ed] that an individual with an IQ score over 70 may still qualify as intellectually disabled." *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020). Thus, "[t]he latest DSM-5 manual changed the diagnostic framework for intellectual disability. Higher IQ scores no longer bar a diagnosis of an intellectual disability." *In re Johnson*, 935 F.3d 284, 292 (5th Cir. 2019).

Shortly after its publication, the Supreme Court addressed the DSM-V in *Hall v. Florida*, 572 U.S. 701 (2014). *Hall* explicitly held that the *Atkins* determination must be "informed by the medical community's diagnostic framework." 572 U.S. at 721. In *Hall*, the Supreme Court relied on the DSM-V to recognize that, while not "unhelpful," IQ scores are not the only consideration in an *Atkins* inquiry. *Id.* at 723. The DSM-V repudiated previous over-reliance on IQ test scores. *See id.* at 721-22. Simply put, the Supreme Court followed the mental-health profession in recognizing that "intellectual disability is a condition, not a number." *Id.* In subsequent cases, the Supreme Court would continue to emphasize the importance of relying on current standards developed by professional mental-health organizations. *See Brumfield v. Cain*, 576 U.S. 305, 308 (2015).

The Supreme Court's reliance on the DSM-V did not initially change Texas' use of the *Briseno* factors. As the Supreme Court brought *Atkins* jurisprudence in sync with the medical community, the Texas courts continued to apply the judge-made *Briseno* factors. *See Ex Parte Moore*, 470 S.W.3d 481, 486 (Tex. Crim. App. 2015) (refusing to adopt a recommendation that habeas relief be granted when the lower court relied on the DSM-V); *Ex parte Cathey*, 451 S.W.3d 1, 10 (Tex. Crim. App. 2014) (mentioning, but not relying on, the DSM-V standards). Finally in 2017, Texas' approach to *Atkins* cases came to a head when the Supreme Court threw out the *Briseno* standards in *Moore I*.

On remand in *Moore I* in 2018, the Court of Criminal Appeals finally "conclude[d] that the DSM-5 should control [its] approach to resolving the issue of intellectual disability." *Ex parte Moore*, 548 S.W.3d 552, 560 (Tex. Crim. App. 2018). Even then, the Court of Criminal Appeals supplanted its *Briseno* factors with additional non-psychological factors. The Supreme Court subsequently had to rectify Texas' failure to adhere closely enough to the psychological profession's standards. *See Moore v. Texas*, ___ U.S. ___, 139 S. Ct. 666 (2019) (*Moore II*).

### D. The Response to the DSM-V by Mr. McCann and Johnson's Current Attorneys

When the DSM-V issued, Johnson's federal petition was still pending.[4] Mr. McCann knew about the DSM-V and knew it could change the way mental-health professionals evaluated Johnson. While developments in the law and in psychology which would favor Johnson were occurring, Mr. McCann did not have Johnson reevaluated under the DSM-V standards or otherwise investigate the possibility of raising an *Atkins* claim.

---

[4] On August 19, 2013, the Court denied Johnson's initial federal petition. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 19.

6

Mr. McCann only began an investigation into *Atkins* relief after the State of Texas set Johnson's execution for May 2, 2019. Mr. McCann filed a successive state habeas application raising an *Atkins* claim as Johnson's execution date approached. *Ex parte Johnson*, 2019 WL 1915204 (Tex. Crim. App. 2019). Mr. McCann also filed a federal motion to proceed *ex parte* in a request for funds to develop an *Atkins* claim. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 75. Mr. McCann based these filings on a psychological evaluation performed by Dr. Greg Hupp less than a month before Johnson's execution date. Using the DSM-V standard, Dr. Hupp diagnosed Johnson with intellectual disability.

New attorneys eventually began representing Johnson in federal court. Johnson's new attorneys arranged for an evaluation by another expert, Dr. Daniel A. Martell. Dr. Martell confirmed the diagnosis of intellectual disability. Johnson's new attorneys brought an *Atkins* claim before the Fifth Circuit. The Fifth Circuit stayed Johnson's execution. The Fifth Circuit also authorized Johnson to file a successive federal petition.

On August 15, 2019, Johnson filed his successive habeas petition in this Court. (Docket Entry No. 1). Johnson amended his successive petition on November 12, 2019 (Docket Entry No. 8) and moved for an evidentiary hearing, (Docket Entry No. 9). Johnson supports his successive habeas petition with the following evidence indicating that he may be entitled to *Atkins* relief:

- An affidavit from Dr. Greg Hupp. On April 4, 2019, Dr. Hupp administered a WAIS-IV IQ test which resulted in an IQ of 70. Dr. Hupp also assessed lay testimony and the results of testing to decide that Johnson suffers from adaptive deficits. With that testing, Dr. Hupp concluded that Johnson "meets the DSM-5 criteria as a person with an **intellectual disability, mild**." (Docket Entry No. 1, Exhibit 2) (emphasis added).

- A forensic neuropsychological report by Dr. Daniel A. Martell. Dr. Martell found that Johnson qualified for a diagnosis of intellectual disability. In particular, Dr. Martell opined that Johnson suffered mild to moderate impairments in his adaptive deficits. (Docket Entry No. 1, Exhibit 1). Dr.

7

Martell avers that it "is it clear that Dexter Johnson meets the criteria for a diagnosis of Intellectual Disability." (Docket Entry No. 1, Exhibit 1).

· An affidavit from Dr. Dale G. Watson, the defense expert at trial. Dr. Watson states that his test results at the time of trial "would not automatically preclude a diagnosis of Intellectual Disability" under the DSM-V standards. (Docket Entry No. 1, Exhibit 3).

· Declarations from family members and others to show adaptive deficits. (Docket Entry No. 1, Exhibit 3).

Taken together, Johnson's argument and evidence provide the basis for a viable *Atkins* claim.

## II.    The Evidentiary Hearing and Subsequent Briefing

The Court held an evidentiary hearing on March 31, 2022. (Docket Entry No. 60).[5] The hearing had two discrete purposes: "(1) decide whether Johnson is entitled to proceed with his successive petition and (2) examine the timeliness of Johnson's successive petition." (Docket Entry No. 18 at 1). Only Mr. McCann testified at the hearing. The Court, however, received substantial evidence from the parties, including depositions from other attorneys who had represented Johnson. The parties have each filed post-hearing briefing. (Docket Entry No. 63, 64).

Respondent's post-hearing briefing approaches the evidentiary hearing testimony with a focus on the decisions Mr. McCann made. Respondent urges that "[t]he only unanswered question of the Court at this point is whether an *Atkins* claim was functionally unavailable Johnson during the pendency of his initial federal habeas proceedings because McCann was ineffective." (Docket

---

[5]    The Supreme Court recently explained that, under section 2254(e)(2), a court improperly holds an evidentiary hearing or considers new evidence to determine whether cause and prejudice exist to overcome procedural default "if the newly developed evidence never would 'entitle the prisoner to federal habeas relief.'" *Shinn v. Ramirez,* —— U.S. ——, 142 S Ct. 1718, 1739 (2022). Respondent has not pointed to any authority extending *Ramirez* to the reasons for which this Court held a limited evidentiary hearing.

Entry No. 64 at 20).[6] Respondent urges the Court to find that Mr. McCann weighed the possibility of raising an *Atkins* claim but felt hobbled by Texas' *Briseno* jurisprudence. Respondent's arguments ask the Court to defer heavily to strategic decisions made by Mr. McCann.

Johnson's briefing also focuses on Mr. McCann's testimony, but does so by contrasting his representation against developments in psychology, changes in the law, and decisions he made in other cases. From his hearing testimony, Mr. McCann was clearly aware that the DSM-V's publication breathed life into an otherwise tepid *Atkins* claim. Mr. McCann was familiar with Texas and federal *Atkins* jurisprudence. Mr. McCann, however, withheld an *Atkins* claim while other cases challenged Texas' *Briseno* standard. Johnson argues that Mr. McCann's failure to raise an *Atkins* claim was negligent or incompetent.

The Court must now decide if Johnson's *Atkins* claim was available before he filed it and whether he filed it too late. The core issues before the Court are simple. The psychological profession changed its understanding of intellectual disability in a manner which transformed a previously weak *Atkins* claim into a potential exemption from execution. The Supreme Court soon thereafter made those standards the law of the land. The testimony in the evidentiary hearing was clear—Mr. McCann knew he could develop a viable *Atkins* claim. Prognosticating that the state courts would not follow the Supreme Court's direction in *Atkins* jurisprudence, Mr. McCann

---

[6]    Aside from addressing the testimony and evidence from the hearing, Respondent's post-hearing brief spends a significant amount of time taking issue with various legal matters which the Court has previously resolved, both in the first instance and in a motion for rehearing. For example, Respondent disputes whether equitable exceptions exist to section 2244(d), whether a district court can apply law the circuit court has created in its threshold successiveness review, and whether the Court should apply circuit law which considers some *Atkins* claims previously unavailable until the publication date of the DSM-V. (Docket Entry No. 64 at 8-14, 19). To the extent Respondent disagrees with earlier legal decisions, an appeal is the proper vehicle for challenging decisions already made by the Court (and in some instances, reconfirmed on reconsideration). This Court's concern is whether the evidence in the hearing will allow Johnson's petition to proceed toward adjudication.

withheld raising it. The question is whether Johnson may now litigate his *Atkins* claim under AEDPA's successive petition standards.

## III.    Successive Federal Review

In 2019, Johnson moved in the Fifth Circuit for leave to file a successive federal habeas petition. AEDPA imposes restrictions on a prisoner's ability to file a second or successive habeas petition. *See* 28 U.S.C. § 2244. An inmate must first receive permission from a circuit court before a district court may consider successive habeas claims.

Johnson's pleadings in the Fifth Circuit relied on section 2244(b)(2)(A) which required three showings: (1) the claim was not presented in a prior petition; (2) the inmate relied on a new rule of constitutional law that the Supreme Court had made retroactive; and (3) he made a prima facie showing that his claim had merit. Respondent conceded that Johnson had not presented his *Atkins* claim in a previous petition. *See In re Johnson*, 935 F.3d 284, 292 (5th Cir. 2019). Relying on *In re Cathey*, 857 F.3d 221 (2017), the Fifth Circuit found that the DSM-V's "significant change . . . in the medical methodology for evaluating the relevant disabilities and . . . courts' recognition of those changes" made Johnson's *Atkins* claim previously unavailable to him. *Johnson*, 935 F.3d at 292-93.[7] Primarily based on Dr. Martell's report, the Fifth Circuit found that Johnson made a

---

[7]       Respondent continues to advance a theory that law created in a circuit court's review under 28 U.S.C. § 2244(b)(3)(c)—which Respondent terms the "authorization context" (Docket Entry No. 64 at 16 n.10)—does not apply to the district courts. Respondent faults this Court for following law created in "the Fifth Circuit's nonappealable determinations in the prima facie context." (Docket Entry No. 64 at 8). Respondent has not supported this theory with any precedent. True, federal law requires the district court to consider *de novo* the facts and the application of those facts to the law. Respondent, however, does not cite any precedent which gives district courts authority to write their own law independent of the Fifth Circuit jurisprudence in section 2244(b) cases. Respondent has not provided any reason for this Court to ignore the Fifth Circuit's interpretation of the law, regardless of whether it was created in the "authorization context" or after plenary habeas review.

prima facie showing that his claim has merit. *Johnson*, 935 F.3d at 294. The Fifth Circuit authorized Johnson's petition to proceed and stayed Johnson's execution.

Johnson then filed an amended petition in this Court. (Docket Entry No. 8). The Fifth Circuit's authorization of successive proceedings "is tentative" and this Court "must dismiss" Johnson's successive petition "without reaching the merits, if the court finds that the movant has not satisfied the § 2244(b)(2) requirements." *In re Swearingen*, 556 F.3d 344, 349 (5th Cir. 2009).

This Court must determine if the pending petition conclusively meets AEDPA's second or successive petition requirements. Johnson may only proceed on his federal petition if he relies on (1) a new rule that (2) the Supreme Court has made retroactive and which (3) was not previously available to him. *See Tyler v. Cain*, 533 U.S. 656, 662 (2001).

### A. A New, Retroactive Rule

Successive federal habeas proceedings in this instance depend on Johnson meeting AEDPA's requirement that he rely on "a new rule of constitutional law, made retroactive . . . ." 28 U.S.C. § 2244(b)(2)(A). Respondent's briefing muddies this Court's inquiry by characterizing Johnson's argument to be that the DSM-V, or possibly its application in later cases, created a new rule of constitutional law. (Docket Entry No. 64 at 12-14, 18). In essence, Respondent characterizes Johnson's argument as "rely[ing] on the DSM-V as the operative 'new rule of constitutional law' [that] giv[es] rise to his *Atkins* claim." (Docket Entry No. 64 at 12).[8]

---

[8] Respondent argues that "Johnson either relies on an old rule that was made retroactive—*Atkins*—and was thus previously available or he relies on new rules [in the *Moore* cases] that have never been made retroactive by the Supreme Court[.]" (Docket Entry No. 64 at 20). "*Atkins* in a generic sense [is] a rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court . . . ." *In re Johnson*, 935 F.3d 284, 293 (5th Cir. 2019). However, a "new rule" generally is one that was "not dictated by precedent existing at the time the defendant's conviction became final." *Gilmore v. Taylor*, 508 U.S. 333, 340 (1993); *see also* Brian R. Means, Federal Habeas Manual, § 27:6 (2021 Edition). Respondent argues that successive proceedings would be inappropriate because *Atkins* was not "new" in this context because it arose before Johnson's conviction.

Johnson, however, never argues that the DSM-V itself amounts to a new rule of constitutional law. Johnson clearly argues that "'*Atkins* created a new rule of constitutional law . . . made retroactive to cases on collateral review by the Supreme Court.'" (Docket Entry No. 63 at 8) (quoting *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014)).

*Atkins* unquestionably created a new rule of constitutional law. *See In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019); *Johnson*, 935 F.3d at 292; *Cathey*, 857 F.3d at 228. *Atkins* was made retroactive on federal habeas review. *See Bell v. Cockrell*, 310 F.3d 330, 332 (5th Cir. 2002). While *Atkins* is generally considered retroactive, the question in this case is whether *Atkins* should be retroactive *as to Johnson*. For reasons similar to those discussed herein under the "previously unavailable" inquiry, the circumstances are such that the DSM-V "removed a clear barrier to [Johnson's] claim, making *Atkins* available to him for the first time." *Soliz*, 938 F.3d at 203; *see also Cathey*, 857 F.3d at 228. Under Fifth Circuit law, Johnson has met AEDPA's requirement that he relies on a new rule that the Supreme Court has made retroactive.

## B.    Previously Unavailable

Johnson must show that *Atkins* was "previously unavailable" to him. 28 U.S.C. § 2244(b)(2)(A). AEDPA itself does not define that phrase. The phrase contains two components: a question of timing (simply put, previous to what?) and a question of accessibility (in other words, what does it mean to be unavailable?). Considering both those factors, Johnson has shown that he could not have raised an *Atkins* claim during his initial habeas proceedings.

### 1.    Previously/Futility

AEDPA itself does not set out when a claim could have been raised "previously."[9] Soon after AEDPA's enactment, courts generally agreed that the term focuses on when "the first federal

---

[9]    AEDPA uses the same phrase when allowing a federal evidentiary hearing if the petitioner failed to develop the factual basis of his claim in state court so long as the petitioner's claim relies on "a new rule of constitutional law,

habeas application was filed." *In re Medina*, 109 F.3d 1556, 1566 (11th Cir. 1997); *see also Mathis v. Thaler*, 616 F.3d 461, 467 (5th Cir. 2010) ("The issue before us is whether Mathis has demonstrated that his *Atkins* claim was "previously unavailable" at the time he filed his first federal habeas application."); *Rodriguez v. Superintendent, Bay State Correctional Center*, 139 F.3d 270, 274 (1st Cir. 1998) ("The time frame of the applicant's previous habeas petition provides the coign of vantage from which we assess whether a rule of constitutional law was 'previously unavailable.'"). *Atkins* was the law of the land, and technically available as a ground for relief to petitioners, when Johnson filed his federal petition in 2011. Under a strict reading of section 2244(b), any inmate who filed a federal petition after 2002 would have to include an *Atkins* claim in his initial petition or forever forfeit his right to bring the claim.

Johnson argues that, despite the theoretical existence of *Atkins* as a ground for relief, it only became a viable claim after the DSM-V's publication in 2013. (Docket Entry No. 63 at 8). Johnson's argument comports with Fifth Circuit law. The Fifth Circuit eschews a "strict rule" regarding when a claim was available to an inmate and recognizes "a gray area of previous unavailability [of a new constitutional rule] despite technical availability." *Cathey*, 857 F.3d at 229-30. In other words, the Fifth Circuit has read a *futility* exception into section 2244(b)(2)(A).[10] This exception includes a "rebuttable presumption that a new rule of constitutional law was previously available if published by the time a district court ruled on a petitioner's initial habeas

---

made retroactive to cases on collateral review by the United States Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(e)(2)(A)(i). The courts have not provided a definition of that phrase beyond the text of the statute. *See* Brian R. Means, Postconviction Remedies § 22:8 (June 2021 update) ("The statute does not indicate what the establishment of the new, retroactively-made rule must be 'previous' to."). AEDPA also uses the phrase in the comparable provision for federal prisoners. *See* 28 U.S.C. § 2255(h).

[10]     Respondent argues that "there is no futility exception in § 2244(b)(2)(A)," but does not explain away the Fifth Circuit cases which have recognized that judicially created exception other than to say that they do not apply to a district court. (Docket Entry No. 64 at 13).

petition," which can be overcome by presenting "cogent arguments that [the claim] was previously unavailable" during the initial habeas proceedings. *Cathey*, 857 F.3d at 229; *see also Muñoz v. United States*, 28 F.4th 973, 977 (9th Cir. 2022) ("Under this approach, the prisoner seeking to file a second or successive request for habeas relief must show that the real-world circumstances that he faced prevented him, as a practical matter, from asserting his claim based on a new rule of law in his initial habeas proceeding.").

Thus, when circumstances arise—such as changes in the methodology for assessing intellectual disability under DSM-V—which remove a clear barrier to raising a claim, the Fifth Circuit asks when a new rule has functionally been made "available to [the inmate] for the first time." *Soliz*, 938 F.3d at 203 (describing the Fifth Circuit's action in *Johnson*); *see also Milam*, 838 F. App'x at 799 (citing *Johnson*, 935 F.3d at 293). In the specific context of *Atkins* cases, the Fifth Circuit has recognized that both the "significant changes in medical methodology for evaluating relevant disabilities" and the "courts' recognition of those changes" may make a claim available for the first time. *Milam*, 838 F. App'x at 799 (quoting *Johnson*, 935 F.3d at 294); *see also In re Halprin*, 788 F. App'x 941, 944 (5th Cir. 2019).

Applying a futility exception in its preliminary review under section 2244(b), the Fifth Circuit recognized that the *Atkins* claim "had previously been unavailable because under earlier medical understandings of intellectual disability relevant to Johnson's condition" and thus any "*Atkins* claim would have been futile." *Soliz*, 938 F.3d at 203 (relying on *Johnson*). This Court agrees that, because earlier psychological standards made *Atkins* relief inapplicable to Johnson, raising an *Atkins* claim would have been futile until the DSM-V issued.[11] The Court, therefore,

---

[11]     While arguing that no "futility exception to the successiveness-bar exist[s]," Respondent says that "raising an *Atkins* claim on Johnson's behalf would have been entirely futile until at least *Moore I*." (Docket Entry No. 64 at 17).

finds that Johnson could not have raised his claim previously; that is, he could not have raised it when he filed his federal petition.

### 2.    Unavailability/Feasibility

The futility of raising an *Atkins* claim ended for Johnson when the DSM-V was published on May 18, 2013. Johnson was then still litigating his first federal habeas petition. The evidentiary hearing testimony established that Mr. McCann was aware that the DSM-V was published and that it would make a difference to Johnson. Mr. McCann, however, did not file any *Atkins* claim on Johnson's behalf between that point and when a final judgment issued months later. Johnson's case requires considering whether a claim can still be unavailable when it comes into existence midstream in the federal habeas process.

AEDPA itself does not spell out when a claim has been "unavailable." The Fifth Circuit reads into the "previously unavailable" phrase a functional concern for when it was "'feasible to amend [the inmate's] pending petition to include the new claim.'" *In re Wood*, 648 F. App'x 388, 391 (5th Cir. 2016) (quoting *In re Everett*, 797 F.3d 1282, 1288 (11th Cir. 2015)); *see also Cathey*, 857 F.3d at 233.[12] The Court must decide whether it would have been *feasible* for Johnson to litigate an *Atkins* claim during his on-going federal action.

As a general rule, federal habeas practice does not sanction adding new claims late in the adjudicative process. The habeas rules encourage inmates to "specify all [available] grounds for relief" in their original habeas petition and to "state the facts supporting each ground." Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. A habeas petition "may be amended . . . as provided in the rules of procedure applicable to civil actions." 28 U.S.C.

---

[12]    Other circuits have also rejected a "mechanistic test" when assessing previous unavailability. *In re Hill*, 113 F.3d 181, 183 (11th Cir. 1997); *see also Muñoz v. United States*, 28 F.4th 973, 977 (9th Cir. 2022); *Davis v. Norris*, 423 F.3d 868, 879 (8th Cir. 2005).

§ 2242. Federal Rule of Civil Procedure 15 provides that "leave to amend shall be freely given when justice so requires." Under the applicable federal rules, "pleadings may be amended once as a 'matter of course,' i.e., without seeking court leave" before "a responsive pleading is served[.]" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (citing Fed. Rule Civ. Proc. 15(a)). After that point, leave to amend is by no means automatic and a district court has discretion whether to allow amendment. *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981).

A federal court will consider various factors in deciding whether to permit amendment in a case such as this one, both after Respondent files an answer and occurring late in the adjudicative process. A court may disallow amendment for various reasons including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).[13]

When the DSM-V issued, the parties were still briefing a motion Johnson had filed to amend his petition on other grounds. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 14. That attempted amendment came late in the habeas process—"almost two years after Mr. Johnson filed his initial federal habeas petition, nearly fifteen months after the State filed its answer, and nearly ten months after Mr. Johnson replied." (Docket Entry No. 63 at 18-19). Three months later the Court entered a Memorandum and Order denying habeas relief on all but one claim. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 19. The Court also denied Johnson's request to amend his petition. The Court gave several reasons for denying amendment. Amendment at that

---

[13]     Habeas amendments raising claims involving the same "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading" will "relate back to the date of the original pleading." *Mayle v. Felix*, 545 U.S. 644, 656 (2005). Without the "common core of operative facts," however, a court may be discouraged from allowing amendment. *Id.* at 664.

late stage "would needlessly insert delay into the habeas process," "high procedural obstructions" including exhaustion existed to "federal habeas review and relief," and Johnson's proposed claims were inadequately developed. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 19 at 14-15.

Those same problems would have doomed any effort to add an *Atkins* claim. Johnson had not exhausted any *Atkins* issue. An *Atkins* claim requires serious consideration of numerous factual issues. Federal habeas practice has long given the state courts the right to adjudicate claims in the first instance. It would have run contrary to AEDPA's stated concern for efficiency to pause federal review, possibly for years, when the other claims in Johnson's petition were ripe for adjudication.

Johnson could not have amended his petition to include a claim based on *Atkins*. Given the totality of the circumstances in this case, and particularly how late in the proceedings in which an *Atkins* claim based on the DSM-V arose, the Court finds that it would not have been feasible for Johnson to try amending his petition. Thus, the Court finds that Johnson has shown that his *Atkins* claim was unavailable.

3.     Deficient Representation Exception to Section 2244

In addition to its interpretation of the phrase "previously unavailable," the Fifth Circuit has recognized that an extra-statutory exception to the AEDPA language may exist when a petitioner's "representation in the initial federal habeas proceedings was so deficient as to render the *Atkins* claim functionally unavailable." *Wood*, 648 F. App'x at 392. Johnson argues that Mr. McCann's representation made his *Atkins* claim "functionally unavailable" to him. (Docket Entry No. 16 at 8). With the Court's decision above, it is not necessary to consider Mr. McCann's representation in the section 2244(b)(2) inquiry. If it would have been futile to raise an *Atkins* claim before the DSM-V came out, and it was not feasible to add it to the on-going proceedings, then concerns

17

about Mr. McCann's representation dissipate in the section 2244(b)(2) review. The Court observes, however, that the discussion that follows below concerning AEDPA's limitation period applies with full force to Mr. McCann's representation immediately after the DSM-V issued.

### C. Conclusion of Successiveness Review

Under AEDPA's second-gatekeeper review, the Court finds that the Johnson relies on a new, retroactive rule that was previously unavailable to him. The Court, therefore, can adjudicate Johnson's successive petition.

## IV. Limitations Period

The question of timeliness is separate from the authorization of successive proceedings. Section 2244(d) created a strict timetable which inmates must comply with when filing for federal habeas relief. The relevant subsections create a series of trigger dates from which an inmate has a year to file his federal petition. 28 U.S.C. § 2244(d)(1).

Johnson filed his *Atkins* claim on August 15, 2019, several years after the DSM-V issued. Under any scenario,[14] he filed his federal petition late. Strict application of AEDPA's statutory language would bar federal consideration of his *Atkins* claim.

### A. Equitable Tolling Standard

In recognition of AEDPA's harsh consequences, the Supreme Court has held that equitable tolling may forgive noncompliance with the timeliness provision. *See Holland v. Florida*, 560 U.S. 631, 634 (2010). "To establish his entitlement to equitable tolling, a petitioner must 'sho[w] (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing.'" *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir.

---

[14] The Fifth Circuit has not yet decided whether to measure an inmate's compliance with the limitations period from the publication of the DMS-V or from *Moore I*. *See In re Jones*, 998 F.3d 187, 190 (5th Cir. 2021); *Milam*, 838 F. App'x at 798; *Sparks*, 939 F.3d at 632.

2012) (quoting *Holland*, 560 U.S. at 649). Johnson asks this Court to find equitable tolling under one of three theories: (1) actual innocence, (2) abandonment, or (3) ineffective representation.

### B. Actual Innocence of the Death Penalty

Johnson argues that "[t]his Court may exercise [the] equitable exception to the statute of limitations because Mr. Johnson's intellectual disability renders him innocent of the death penalty." (Docket Entry No. 66 at 21). Johnson relies on *McQuiggin v. Perkins*, 569 U.S. 383 (2013), in which the Supreme Court held that a credible showing of actual innocence can overcome the habeas statute of limitations. The briefing, however, is still insufficient to allow equitable tolling on that basis for two reasons.

First, the *McQuiggin* case only approached equitable tolling from the question of an inmate's innocence of the underlying crime. *See McQuiggin*, 569 U.S. at 399 (basing its exception to the limitations period on showing "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Claims of innocence in sentencing invoke far different concerns than the execution of one innocent of the crime. *See Schlup*, 513 U.S. at 324-27 ("Claims of actual innocence pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty."). To date, the Fifth Circuit has avoided the question of whether actual innocence of the death penalty may forgive a procedural bar. *See Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014). Johnson has not cited any precedent extending *McQuiggin* to allow equitable tolling for questions involving sentencing.

Second, the record at this point is insufficient to find that Johnson is actually innocent of his death sentence. Even if *McQuiggin* jurisprudence allows for intellectual disability to be make an inmate actually innocent of the death penalty, the evidence before the Court is still insufficient

to find that Johnson warrants protection under *Atkins*. As a prima facie matter, Johnson appears to have a strong *Atkins* claim available to him. But Johnson's evidence has not yet been tested in adversarial proceedings. It would be premature to find Johnson actually innocent of his death sentence before full review of his *Atkins* claim. The Court, therefore, reserves the question of whether actual innocence overcomes the procedural bar until further proceedings shed greater light on his *Atkins* claim.

### C.   Abandonment

Johnson next suggests that the Court should find that Mr. McCann had abandoned him. Johnson alleges that Mr. McCann did not make choices based on any plan, but instead just neglected Johnson's case. Johnson's abandonment argument depends on finding that Mr. McCann was not credible when he explained why he did not advance an *Atkins* claim before 2019.

The Court, however, finds that Mr. McCann was a credible witness whose account was believable. From his testimony, it is apparent that Mr. McCann made choices based on his own assessment of the law and Johnson's own circumstances. Mr. McCann never ceased litigating on Johnson's behalf. He just did not litigate an *Atkins* claim until the eve of an execution date.

### D.   Deficient Representation

Equitable tolling depends on Mr. McCann's representation. Johnson argues that "Mr. McCann's chosen course of litigation was objectively unreasonable to the point that it constituted egregious professional misconduct." (Docket Entry No. 63 at 2). In other words, equitable tolling is warranted because Mr. McCann "claimed to deliberately choose not to raise a claim that would have resulted in relief" for Johnson. (Docket Entry No. 63 at 3).

Among other possible circumstances, the Supreme Court has said that "at least sometimes, professional misconduct . . . could nonetheless amount to egregious behavior and create an

20

extraordinary circumstance that warrants equitable tolling." *Holland*, 560 U.S. at 651. The Supreme Court has recognized that, while a "garden variety claim of misconduct" by counsel does not warrant equitable tolling, "far more serious instances of attorney conduct may." *Id.* at 651-52; *see also Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) ("[M]ere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified.")). "Tolling based on counsel's failure to satisfy AEDPA's statute of limitations is available only for '"serious instances of attorney misconduct.'" *Christeson v. Roper*, 574 U.S. 373, 378 (2015) (quoting *Holland*, 560 U.S. at 651-52). The Court must decide whether Mr. McCann's representation provides a basis for equitable tolling because he withheld claims from federal review and failed to litigate zealously for Johnson, as he had for other inmates.

Mr. McCann's evidentiary hearing testimony demonstrated that he has a rich understanding of *Atkins* law and mental-health issues in capital cases. The Court was left with little doubt that Mr. McCann had kept abreast of changes in both the psychological understanding of intellectual disability and the legal responses to those changes. (Docket Entry No. 60 at 51-61). Mr. McCann used that knowledge to pursue *Atkins* relief in other cases. For instance, in early 2014 Mr. McCann began litigating an *Atkins* claim based on the DSM-V in behalf of another client, Texas death-row inmate Bobby Moore. (Docket Entry No. 60 at 105). Through litigation which resulted in two trips to the Supreme Court, Bobby Moore's case caused the Texas state courts to bring their *Atkins* jurisprudence in line with the DSM-V and federal law. *See Ex parte Moore*, 548 S.W.3d 552, 555 (Tex. Crim. App. 2018) (resulting in *Moore I*); *Ex parte Moore*, 470 S.W.3d 481, 484 (Tex. Crim. App. 2015) (resulting in *Moore II*).

But Mr. McCann did not have Johnson evaluated under the new DSM-V standards or raise an *Atkins* claim on Johnson's behalf until 2019. In the evidentiary hearing Mr. McCann testified

21

that he did not raise an *Atkin* claim after the DSM-V issued because of "a whole bunch of decisions that come together." (Docket Entry No. 60 at 114). Mr. McCann provided two main reasons for withholding an *Atkins* claim. Mr. McCann explained that "the primary thing" was that he focused on litigating a different claim for which he had received a Certificate of Appealability rather than investigating whether Johnson was eligible for a diagnosis of intellectual deficiency. (Docket Entry No. 60 at 134). Mr. McCann, however, repeatedly emphasized that his decision also came about because capital litigators "were still struggling with the *Briseno* standard." (Docket Entry No. 60 at 114). Mr. McCann feared that raising an *Atkins* claim in state court—as AEDPA's exhaustion doctrine required him to do in the first instance—would result in a decision by the state courts which would eventually result in unfavorable federal review. Mr. McCann testified that he felt impaired in this case by what he saw as inalterable Texas law. Respondent argues that Mr. McCann engaged in strategic decision making to which courts must defer. The Court must decide if these decisions may forgive strict compliance with AEDPA's limitations period.

Several features of Mr. McCann's decision-making cause concern in this case. **First**, Mr. McCann formulated a strategy which, while ostensibly based on anxiety about the deference afforded claims, operated to withhold them from federal court. Federal courts have long worried that inmates may engage in "sandbagging" by holding back claims until a more-favorable forum becomes available. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Federal habeas procedure has strongly criticized "a strategy of piecemeal attacks on [an inmate's] conviction." *Galtieri v. Wainwright*, 582 F.2d 348, 358 (5th Cir. 1978). Capital attorneys absolutely should not withhold viable claims when an avenue of federal relief exists. *See In re Sparks*, 944 F.3d 572, 574 (5th Cir. 2019) (Jones, J., specially concurring) ("It is hard to envision competent counsel's having sat on a potentially meritorious exclusion from capital punishment until the eve of execution.").

Federal review cannot countenance any decision—however strategic it may seem—formed with the intent of withholding potentially viable claims from an initial federal habeas petition.

**Second**, Mr. McCann believed that exhausting an *Atkins* claim in state court would be futile at best, and possibly fatal to any hope of federal relief. Yet the Supreme Court has been wary of forgiving an inmate's trepidation at exhaustion when state law was unfavorable to him. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982) ("If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid."). The Supreme Court has found that unfavorable state law does not forgive exhaustion even when the disputed claim "was unacceptable to that particular court at that particular time." *Id.* at n. 35 (citations and quotation marks omitted).

**Third**, concerns about AEDPA's exhaustion and deferential provisions came at a cost: running afoul of the stringent one-year limitations period. Mr. McCann said that he was waiting for the Court of Criminal Appeals to change its state-law interpretation of *Atkins* which would then trigger "a new factual basis or a new legal basis and essentially you'd have one year from the time of either." (Docket Entry No. 60 at 140). Yet the Fifth Circuit has not treated Texas' eventual compliance with the DSM-V as a new trigger date for the limitations period. *Milam*, 838 F. App'x at 798; *Sparks*, 939 F.3d at 632. It is unclear how any change in a state court's application of settled federal law would create a basis for successive proceedings under section 2244.

**Fourth**, Mr. McCann feared that a trip through the state courts would result in a decision which, when later considered by the federal courts under the AEDPA's deferential review, would doom any federal *Atkins* claim. Mr. McCann based this fear on Texas' use of the *Briseno* factors—

23

or ones similar to them after *Moore I*. Even though the Fifth Circuit had formerly "held that *Briseno* is a constitutionally permissible interpretation and application of *Atkin*," *Matamoros v. Stephens*, 783 F.3d 212, 218 (5th Cir. 2015), that changed when the Supreme Court expressly rejected the *Briseno* factors in 2017.[15] After *Moore I*, the federal courts gave no deference to the *Briseno* factors. *See In re Cathey*, 857 F.3d 221, 235 (5th Cir. 2017).

Accordingly, Mr. McCann's strategy does not hold water after *Moore I*. Mr. McCann expressed confidence that the Court of Criminal Appeals would replace *Briseno* with another standard based on lay biases rather than expert diagnostic standards. (Docket Entry No. 60 at 84). But that would not matter in federal court. Whether or not Texas courts applied *Briseno* or another other judge-made standard, federal law (now based on the DSM-V) would guide federal review.[16] The Court cannot endorse decisions based on the fear of a standard that the federal courts would never honor.

**Fifth**, Mr. McCann based his decision on his own subjective beliefs about the viability of an *Atkins* claim without seeking an expert assessment of that claim's strength. Since the beginning of his representation, Mr. McCann believed that Johnson was intellectually disabled. (Docket Entry No. 60 at 138). Mr. McCann knew about changes in the DSM-V but did not immediately seek an expert evaluation of Johnson for intellectual disability.

---

[15] It is worth noting that the *Moore* case never reached the federal habeas stage. The Supreme Court took the case up from the Texas state courts. Even if AEDPA theoretically posed a threat to federal habeas review, the Supreme Court erased Texas' *Briseno* jurisprudence on review from the state habeas courts.

[16] Johnson argues that, while the Court of Criminal Appeals again denied relief to that one inmate after *Moore I*, the Court of Criminal Appeals recognized that *Briseno* was no longer the law and repeatedly expressed a willingness to apply the correct law. Johnson provides an extensive summary of cases in which the Court of Criminal Appeals appears to have followed the dictates of *Moore I*. (Docket Entry No. 63 at 5-7). While Johnson's briefing on this point may prove that Mr. McCann was incorrect in his assessment of how Texas cases would proceed, it still somewhat misses the mark. Once the Supreme Court decided *Moore I*, it was the law of the land. A federal court's review at that point was not on the sufficiency of any state-judge-made standard—it was whether an inmate could show that the state-court decision was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). Federal courts would not defer to decisions departing from federal law.

Time has shown that the DSM-V transformed a weak *Atkins* claim into a viable ground for relief. Mr. McCann testified that the DSM-V did not have any effect on a Texas inmate's ability to raise an *Atkins* claim because *Briseno* was still good law. (Docket Entry No. 60 at 138). Mr. McCann explained that the publication of the DSM-V was "pretty much no help" because the *Briseno* standards were still in place. (Docket Entry No. 60 at 139). Mr. McCann particularly worried that the "aggravating factors" in Johnson's case would doom him under the *Briseno* paradigm. (Docket Entry No. 60 at 73). Mr. McCann explained: "So as far as bad facts, he had some pretty bad facts to overcome and under the *Briseno* standard, he would not have made [an intellectual disability] claim." (Docket Entry No. 60 at 73). Mr. McCann was specifically concerned because Johnson "was more or less in charge, which shows leadership," he "hid the vehicle," he "was the shooter," and was involved in "an extraneous killing." (Docket Entry No. 60 at 139).

The seven *Briseno* factors did not necessarily look at aggravating facts or contain factors explicitly covered by Mr. McCann's concerns. *Briseno* attempted to lay aside "any heinousness or gruesomeness" of the crime. *Williams v. State*, 270 S.W.3d 112, 114 (Tex. Crim. App. 2008). Mr. McCann possibly referred to *Briseno*'s focus on whether an offender's conduct "show[ed] leadership," exhibited an ability to "formulate[] plans," or "require[d] forethought, planning, and complex execution of purpose." *Id.*

Still, *Briseno* was never meant to replace professional standards, but to be weighed with (or against) them. The Court of Criminal Appeals did not craft the *Briseno* standards as "a substitute or alternative definition of [intellectual disability]," but only as additional factors which a court "'might also' take into consideration." *Chester v. Thaler*, 666 F.3d 340, 355 n.5 (5th Cir. 2011) (Dennis, J., dissenting); *see also Briseno*, 135 S.W.3d at 8. The Court of Criminal Appeals

"did not make consideration of any or all of [the *Briseno* factors] mandatory," but rather expressed that "they reflected [its] concern that the [professional] guideline should not be considered in isolation, but rather in the context of the concerns expressed by the Supreme Court in *Atkins*." *Ex parte Sosa*, 364 S.W.3d 889, 892 (Tex. Crim. App. 2012). An attorney could not make a fair assessment of how the *Briseno* factors would weigh in that calculus without knowing how the professional factors would weigh in also. Concerns about *Briseno* were only one piece of an underdeveloped picture of how Texas courts would view Johnson's intellectual functioning.

Mr. McCann testified that he knew raising an *Atkins* claim on Johnson's behalf would require more investigation. (Docket Entry No. 60 at 66-67). Mr. McCann still relied on his own subjective assessment of Johnson's intellectual functioning and how it would factor into a legal analysis. Despite his familiarity with *Atkins* law, Mr. McCann lacks the education and training to diagnose intellectual disability. Testing finally performed in 2019 reveals a much stronger *Atkins* claim than anticipated by the trial evidence. There is no reason to believe that testing performed at any point after the DSM-V issued would have resulted in a similarly strong *Atkins* claim.

Accordingly, Mr. McCann formulated strategy while only knowing half of the equation. Any valid strategy involving Johnson's intellectual functioning must rest on scientific inquiry and a full understanding of the evidentiary landscape, not conjecture.

**Finally**, Mr. McCann aggressively challenged the *Briseno* standard for one of his clients— Bobby Moore. Mr. McCann participated in litigation which, through two trips to the Supreme Court and repeated efforts in the Court of Criminal Appeals, finally expunged Texas law of its reliance on improper factors in *Atkins* cases. Mr. McCann deserves commendation for his efforts in the *Moore* case which served to realign Texas' precedent with federal law.

Notwithstanding his advocacy on behalf of Bobby Moore, the difference in how Mr. McCann handled the two cases is extraordinary. Mr. McCann did not file an *Atkins* claim on Johnson's behalf out of fear that the Court of Criminal Appeals would not relinquish the *Briseno* standards. (Docket Entry No. 60 at 115-16). In Johnson's case, Mr. McCann decided that AEDPA deference created "a rigged game for [his] client," so he "thought the better option would be to see if we could find some way under a new standard or to get a new standard." (Docket Entry No. 60 at 142). Mr. McCann testified: "to me, if I couldn't get a fair standard of review, then none of this was going to help because I'd be litigating it in a state court where I was likely to get an adverse finding." (Docket Entry No. 60 at 124).

But Mr. McCann did nothing in this case but wait for a new standard to emerge. While he aggressively fought against the *Briseno* standard in *Moore*, Mr. McCann felt hobbled by the *Briseno* standard in Johnson's case. Zealously litigating an *Atkins* claim on Johnson's behalf (especially after *Moore I*) could have ended in the same result as in *Moore*. Without rendering an opinion on the strength of the *Atkins* claim in either case, the Court observes that both Moore and Johnson have similar cases for *Atkins* relief. Moore relied on an IQ "score of 74, adjusted for the standard error of measurement, [which] yields a range of 69 to 79." *Moore I*, 137 S. Ct. at 1049. Johnson alleges his "IQ score was a 70, squarely in the range of intellectual disability." (Docket Entry No. 1 at 14). Moore relied on "affidavits and . . . testimony from Moore's family members, former counsel, and a number of court-appointed mental-health experts. The evidence revealed that Moore had significant mental and social difficulties beginning at an early age." *Moore I*, 137 S. Ct. at 1045. Johnson relies on similar material, culminating in an expert's opinion that he "functions adaptively in the range of Intellectual Disability." (Docket Entry No. 1 at 28). On their face, the case for *Atkins* relief seems similar for both Johnson and Moore. A comparison between

the two cases begs the question of it could have been Johnson's case, not Moore's, in which the Supreme Court ended Texas' use of the *Briseno* standard.

Mr. McCann knew that the DSM-V had probably created a viable claim for Johnson. He successfully litigated *Atkins* claims in state court based on the DSM-V for other inmates. But he did not raise a claim on Johnson's behalf in federal or state court. Mr. McCann's representation was an impediment to filing which, until removed, precluded Johnson from advancing an *Atkins* claim. Mr. McCann's "choice not to litigate a meritorious claim on behalf of his death sentence client . . . had the functional effect of forfeiting any federal review of Mr. Johnson's *Atkins* claim." (Docket Entry No. 63 at 2). Mr. McCann's representation amounts to an extraordinary circumstance that warrants equitable tolling in this case.

### E. Diligence

To merit equitable tolling, Johnson must also have shown diligence. The Supreme Court has instructed that "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Holland*, 560 U.S. at 653 (quotation omitted). Mr. McCann represented Johnson throughout the whole period when he should have filed his *Atkins* claim. Despite that representation, "petitioners seeking to establish due diligence must exercise diligence even when they receive inadequate legal representation." *Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012). "The act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition." *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (Sotomayor, J.).

Johnson has made a prima facie showing that he is intellectually disabled. Respondent contends that Johnson, apparently despite his low IQ and possible intellectual deficiency, should have recognized that a potential *Atkins* claim existed, discerned the probable impact of AEDPA's limitations period, and encouraged Mr. McCann to litigate more zealously. (Docket Entry No. 64 at 52-54). Respondent cites no law which places that burden on a potentially intellectually disabled client. With his level of functioning as described in the exhibits to his federal petition, it is unreasonable to expect that Johnson could litigate an *Atkins* claim on his own, much less one based on the distinctions brought by changes in the law and the DSM-V.

Johnson's attorneys sought leave to file a successive federal petition soon after their appointment. Under the fact-dependent circumstances of this case, the Court finds that Johnson has shown the requisite diligence to merit equitable tolling.

### F.      Conclusion of Equitable Tolling

Attorneys representing capital defendants face a challenging task, particularly once they reach federal habeas corpus review. At that point, the presumption of innocence has long dissipated. Capital inmates come to federal court after unsuccessful attempts at state court review which will haunt them throughout AEDPA's federal habeas process. With limited exceptions, federal courts will heavily defer to the state court's earlier rejection of their claims. Federal review largely eschews any new factual development. Overarching principles of comity, federalism, and finality of judgments tip the scales away from the inmate's favor. The task of capital habeas practitioners is formidable.

Capital habeas practitioners—like all attorneys—must make tactical decisions which will place their client's interests before the courts in the most favorable light. Complex and interweaving procedural doctrines—such as the federal exhaustion doctrine and AEDPA's

deferential review scheme—force attorneys to plan the most effective manner in which to present viable claims. The fact that federal claims must first pass through state court—and do so in a manner which alters the prism through which federal courts consider claims—may influence how an attorney chooses to present his claims.

Capital defense attorneys know that later stages of review may place their decisions under a microscope. Courts try to judge an attorney's decisions without the harsh, but illuminating, light of hindsight. Still, decisions made in the moment may not hold up over time. When weighing the various factors which play into litigation strategy, an attorney bears an overarching ethical duty to leave no potentially meritorious claim aside, to preserve a client's right to raise any claim which may provide relief. In capital litigation, those litigation decisions may be ones of life or death.

As it stood under the then-governing psychological standards, Johnson did not have a viable *Atkins* argument at trial. That changed when the DSM-V manual changed the diagnostic framework for intellectual disability on May 18, 2013. This development happened at a disadvantageous time for Johnson—he had already finished state post-conviction review and his federal habeas proceedings neared completion. Mr. McCann made decisions that would nearly close the door to federal review. Those were difficult decisions, decisions which have come to cloud other zealous efforts Mr. McCann has made on behalf of Johnson. Mr. McCann has acted on Johnson's behalf in a way that has required the courts to examine many important issues. The weight of those good decisions, however, cannot sink the potentially meritorious claim Johnson advances in his successive petition. In fact, the contrast between Mr. McCann's admirable representation in *Moore* which forced Texas into compliance with Supreme Court standards stands in contrast to his inaction in this case. Courts cannot countenance any litigation strategy based on withholding grounds for relief.

A zealous attorney should have brought Johnson's *Atkins* claim to the federal courts many years ago. Johnson's claim deserves to be heard. The Court finds that Johnson has shown that equitable tolling should forgive his failure to comply with the technical temporal requirements of AEDPA.

## V.    CONCLUSION

For the reasons discussed above, the Court finds that Johnson has complied with AEDPA's requirements for the consideration of his federal habeas corpus petition. The Court **DENIES** Respondent's Renewed Motion to Dismiss. (Docket Entry No. 64).

The Court **ORDERS** the parties to submit a joint proposed scheduling order for the continued litigation of his case within **twenty-one (21) days** from the entry of this Order.

SIGNED on _____ OCT 2 8 2022 _____ at Houston, Texas.

_____
ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE

No. 23-70002

I<small>N THE</small>

# United States Court of Appeals for the Fifth Circuit

DEXTER JOHNSON,

*Petitioner–Appellee*

v.

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent–Appellant.*

On Certified Interlocutory Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:19-cv-3047

## BRIEF OF RESPONDENT–APPELLANT

ANGELA COLMENERO
Provisional Attorney General of
Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GWENDOLYN VINDELL*
Assistant Attorney General
State Bar No. 24088591
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
gwendolyn.vindell2@oag.texas.gov

*Counsel for Respondent–Appellant*

# CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1., respondent, as a governmental party, need not furnish a certificate of interested persons.

s/ Gwendolyn S. Vindell
GWENDOLYN S. VINDELL
Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

This permissive interlocutory appeal implicates fundamental and dispositive questions of comity, finality of judgment, and the interests of justice which have not been authoritatively decided. In a series of preliminary, prima facie rulings beginning in 2017, this Court has permitted capital petitioners to take a second bite at the habeas apple under a judicially created exception to the general prohibition against successive petitions embodied in 28 U.S.C. § 2244(b). Believing itself bound by this Court's decisions in those threshold proceedings, the district court here granted significant evidentiary development before ultimately holding that it had jurisdiction over a successive intellectual disability claim raised more than seventeen years after *Atkins v. Virginia* was decided.

The district court also found that the claim was not barred by the one-year statute of limitations because the petitioner was entitled to equitable tolling based on a seasoned postconviction capital attorney's strategic decision about when to raise what he believed to be a futile claim under then-existing law. In so holding, the district court has justified a second extraordinary intrusion into a long-final conviction and

sentence and "needlessly prolong[ed] federal habeas proceedings." *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1739 (2022).

Because of the importance of these issues, and their complexity, the Director believes that oral argument would significantly aid the Court in analyzing them.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF CONTENTS ......................................................................iv

TABLE OF AUTHORITIES...................................................................vi

INTRODUCTION...................................................................................1

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED ...........................................................................2

STATEMENT OF THE CASE ...............................................................2

I.     Conviction and Initial Postconviction Proceedings ........................2

II.    Post-judgment and Last-minute Litigation....................................4

III.   Authorization Proceedings.............................................................6

IV.   Second Gateway Proceedings........................................................9

SUMMARY OF THE ARGUMENT ......................................................15

STANDARD OF REVIEW....................................................................17

ARGUMENT ........................................................................................18

I.     Courts Are Prohibited from Reading Extra-Statutory Exceptions into § 2244(b)(2)(A)........................................................................18

     A.    The law on the second gateway successiveness inquiry. .....18

     B.    Under the plain text of the statute, Johnson's *Atkins* claim is successive. ..........................................................................21

     C.    This Circuit reads an extra-statutory exception into § 2244(b)(2)(A). .................................................................27

D. Courts are prohibited from judicially amending a statute. . 37

II. An Attorney's Intentional, Strategic Decisions Can Never be Extraordinary Circumstances Warranting Equitable Tolling. ..... 45

III. A Prima Facie Showing of Intellectual Disability Does Not Exempt a Petitioner from Diligently Pursuing his Rights. ........................ 54

CONCLUSION ........................................................................... 56

CERTIFICATE OF SERVICE ................................................... 58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 59

ELECTRONIC CASE FILING CERTIFICATIONS ............................... 60

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ..................................................... 1

*Banister v. Davis*, 140 S. Ct. 1698 (2020) ......................................... 25, 39

*Bates v. United States*, 522 U.S. 23 (1997) .................................................. 29

*Black v. Davis*, 902 F.3d 541 (5th Cir. 2018) ......................................... 40

*Bowles v. Russell*, 551 U.S. 205 (2007) ...................................................... 42

*Brumfield v. Cain*, 576 U.S. 305 (2015) ..................................................... 23

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) ......................................... 56

*Christeson v. Roper*, 574 U.S. 373 (2015)................................................... 47

*Clark v. Martinez*, 543 U.S. 371 (2005)...................................................... 36

*Coleman v. Johnson*, 184 F.3d 398 (5th Cir. 1999) ............................... 46

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)......................... 31, 42

*Corley v. United States*, 566 U.S. 303 (2009) ......................................... 35

*Cousin v. Lensing*, 310 F.3d 843 (5th Cir. 2002) ............................. 47, 53

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) .......................... 32

*Dodd v. United States*, 545 U.S. 353 (2005)................................. 26, 31, 43

*Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004) ......................................... 55

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................. 29

*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).......................... 4

*Ex parte Moore*, 548 S.W.3d 552 (Tex. Crim. App. 2018) ........................ 4

*Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. 2002) ..................................... 46

*Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999) ...................................45

*Flores v. Quarterman*, 467 F.3d 484 (5th Cir. 2006) .......................46, 47

*Fulks v. Watson*, 4 F.4th 586 (7th Cir. 2021).........................................24

*Gray-Bey v. United States*, 209 F.3d 986 (7th Cir. 2000) ......................34

*Hall v. Florida*, 572 U.S. 701 (2014) .........................................23, 28, 33

*Hardemon v. Quarterman*, 516 F.3d 272 (5th Cir. 2008) ......................35

*Hardy v. Quarterman*, 577 F.3d 596 (5th Cir. 2009).......................46, 54

*Harrington v. Richter*, 562 U.S. 86 (2011) .............................................49

*Harris v. Hutchinson*, 209 F.3d 325 (4th Cir. 2000)..............................47

*Henderson v. Thaler*, 626 F.3d 773 (5th Cir. 2010) ...............................55

*Hernandez v. Results Staffing, Inc.*, 907 F.3d 354 (5th Cir. 2018).........17

*Hibbs v. Winn*, 542 U.S. 88 (2004) .........................................................36

*Holland v. Florida*, 560 U.S. 631 (2010).......................................*passim*

*In re (Michael) Johnson*, 322 F.3d 881 (5th Cir. 2003)..........................40

*In re Bower*, 612 F. App'x 748 (5th Cir. 2015) ......................................43

*In re Bowles*, 935 F.3d 1210 (11th Cir. 2019) ...............................*passim*

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) ...................................*passim*

*In re Edwards*, 865 F.3d 197 (5th Cir. 2017).........................................35

*In re Graham*, 61 F.4th 433 (4th Cir. 2023) ..........................................34

*In re Halprin*, 788 F. App'x 941 (5th Cir. 2019) ..............................10, 29

*In re Lewis*, 484 F.3d 793 (5th Cir. 2007) ..............................................55

*In re Magwood*, 113 F.3d 1544 (11th Cir. 1997) ....................................44

*In re Milam*, 838 F. App'x 796 (5th Cir. 2020).........................................10

*In re Morris*, 328 F.3d 739 (5th Cir. 2003)..............................................38

*In re Payne*, 722 F. App'x 534 (6th Cir. 2018)........................................24

*In re Richardson*, 802 F. App'x 750 (4th Cir. 2020)...............................23

*In re Soliz*, 938 F.3d 200 (5th Cir. 2019)................................................27

*In re Sparks*, 939 F.3d 630 (5th Cir. 2019) ............................................25

*In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) ..............................19, 40

*In re Webster*, 605 F.3d 256 (5th Cir. 2010)....................................26, 29

*In re Wilson*, 442 F.3d 872 (5th Cir. 2006).......................................47, 54

*In re Wood*, 648 F. App'x 388 (5th Cir. 2016) ..................................11, 36

*Jackson v. Davis*, 933 F.3d 408 (5th Cir. 2019) ...............................45, 46

*Johnston v. Mitchell*, 871 F.3d 52 (1st Cir. 2017)..................................50

*Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). .....................................51

*Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351 (11th Cir. 2007) .......40, 41

*King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991) ...................................34

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) .........................................50

*Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000) ..............................47

*Lawrence v. Florida*, 549 U.S. 327 (2007)..............................................47

*Lowe v. Knipp*, No. 07cv2232-LAB (CAB), 2013 WL 4525401 (S.D. Cal.
   Aug. 2, 2013) ......................................................................................53

*Mabbs v. Gipson*, No. 2:13-cv-0550-JAM-GGH, 2014 WL 4098501 (E.D.
   Cal. Aug. 18, 2014)..............................................................................53

*Manning v. Epps*, 688 F.3d 177 (5th Cir. 2012) .....................................54

*Maples v. Thomas*, 565 U.S. 266 (2012) .......................................... 46, 51

*Martinez v. Martinez*, No. SACV 10-540 DOC(CW), 2011 WL 672557
  (C.D. Cal. Jan. 4, 2011) .......................................................... 52

*Martinez v. Mukasey*, 519 F.3d 532 (5th Cir. 2008) ...................... 30, 31

*Martinez v. Ryan*, 566 U.S. 1 (2012) ................................................ 43, 48

*Mathis v. Thaler*, 616 F.3d 461 (5th Cir. 2010) ........................... 7, 19, 22

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .......................................... 42

*Moody v. Lumpkin*, 70 F.4th 884 (5th Cir. 2023) ........................... 44, 48

*Moore v. Dretke*, 369 F.3d 844 (5th Cir. 2004) ..................................... 20

*Moore v. Texas*, 139 S. Ct. 666 (2019) ................................................ 4, 5

*Moore v. Texas*, 581 U.S. 1 (2017) ..................................................... 4, 33

*Overdam v. Tex. A&M Univ.*, 43 F.4th 522 (5th Cir. 2022) ................... 17

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) ...................................... 45, 46

*Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001) ........ 38, 39

*Sandvik v. United States*, 177 F.3d 1269 (11th Cir. 1999) .................... 47

*Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022) ........................ 41, 42

*Shoop v. Hill*, 139 S. Ct. 504 (2019) ..................................................... 23

*Smith v. Murray*, 477 U.S. 527 (1986) ....................................... 50, 51, 53

*Smith v. Robbins*, 528 U.S. 259 (2000) ................................................. 50

*Strickland v. Washington*, 466 U.S. 668 (1986)................... 49, 51, 52, 53

*Taliani v. Chrans*, 189 F.3d 597 (7th Cir. 1999) ................................... 47

*Tyler v. Cain*, 533 U.S. 656 (2001) ................................................ *passim*

*United States v. Fulton*, 780 F.3d 683 (5th Cir. 2015)........................... 44

*United States v. Marcello*, 212 F.3d 1005 (7th Cir. 2000) ...................... 47

*United States v. Riggs*, 314 F.3d 796 (5th Cir. 2002) ............................ 48

*Weathers v. Davis*, 915 F.3d 1025 (5th Cir. 2019) .................................. 25

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) ................................... 24

**Statutes**

28 U.S.C. § 1292(b) ............................................................. 2, 14, 17

28 U.S.C. § 2244(b) ................................................................... *passim*

28 U.S.C. § 2244(b)(1) ....................................................................... 39

28 U.S.C. § 2244(b)(2) ................................................ 19, 38, 39, 44

28 U.S.C. § 2244(b)(2)(b)(ii) .................................................... 19, 26

28 U.S.C. § 2244(b)(2)(A) ........................................................ *passim*

28 U.S.C. § 2244(b)(2)(B) .............................................................. 19

28 U.S.C. § 2244(b)(3) .................................................................. 18

28 U.S.C. § 2244(b)(3)(C) .............................................................. 19

28 U.S.C. § 2244(b)(3)(D) .............................................................. 40

28 U.S.C. § 2244(b)(3)(E), app ............................................... 37, 40

28 U.S.C. § 2244(d) ....................................................................... 47

28 U.S.C. § 2244(d)(1) .................................................................. 47

28 U.S.C. § 2254(d) ................................................................ 23, 25

28 U.S.C. § 2254(e)(1) .................................................................. 55

28 U.S.C. § 2254(e)(2) .................................................................. 41

28 U.S.C. §§ 2244(b)(4), 2254 .................................................... 2, 38

28 U.S.C. § 2255(h)(2) .................................................................. 24

Tex. Code Crim. Proc. art. 11.071 § 5(a)(3) .............................. 55

## INTRODUCTION

Dexter Johnson is a death-sentenced Texas state inmate seeking federal habeas relief in the court below. Johnson's August 2019 execution was stayed when he received authorization from this Court to file a successive federal petition raising a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002). *In re Johnson*, 935 F.3d 284, 287 (5th Cir. 2019). Johnson filed that successive petition in the lower court in November 2019. After an evidentiary hearing, the district court held that Johnson's petition was neither successive nor untimely. ROA.1070. On the former, the district court followed this Court's non-appealable, tentative prima facie rulings recognizing a judicially created exception—namely, a futility exception—to 28 U.S.C. § 2244(b)(2)(A). On the latter, the court found Johnson's petition was timely under novel interpretations of equitable tolling principles, i.e., that 1) an attorney's strategic decisions about when to raise a claim constitute extraordinary circumstances, and 2) a petitioner's prima facie showing of intellectual disability obviates the diligence requirement. Each of these errors requires reversal.

## JURISDICTIONAL STATEMENT

This appeal arises from an interlocutory order entered by the district court on October 28, 2022. The district court had jurisdiction

under 28 U.S.C. §§ 2244(b)(4), 2254. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(b).

## ISSUES PRESENTED

1.  Whether there can be judicially created exceptions to the general prohibition against second or successive petitions found in 28 U.S.C. § 2244(b)(2)(A)?

2.  Whether an attorney's intentional, strategic decisions to not raise a claim he deemed meritless can ever constitute extraordinary circumstances sufficient for equitable tolling?

3.  Whether a prima facie showing of intellectual disability exempts a petitioner from the diligence requirement of equitable tolling?

## STATEMENT OF THE CASE

## I.  Conviction and Initial Postconviction Proceedings

Johnson was convicted and sentenced to death for the 2006 rape, kidnapping, and murder of Maria Aparece. *Johnson v. State*, No. AP-75,749, 2010 WL 359018, at *1 (Tex. Crim. App. Jan. 27, 2010); *see also* ROA.464. At trial, Johnson was determined not to be intellectually disabled. *See* ROA.464 & n.2 (defense expert determined Johnson's IQ

was between 74 and 88 and Johnson did not have obvious deficits in adaptive behavior). His conviction and sentence were affirmed on direct appeal. *Johnson*, 2010 WL 359018, at *1. The Court of Criminal Appeals (CCA) also denied state habeas relief. *Ex parte Johnson*, No. WR-73,600-01, 2010 WL 2617804, at *1 (Tex. Crim. App. June 30, 2010).

Johnson then filed his first federal habeas petition in June 2011. *See* ROA.465. While Johnson's initial petition was pending, the American Psychiatric Association issued the Fifth Edition of the Diagnostic and Statistical Manual (DSM-V). *See* ROA.467. The DSM-V "significantly altered the manner in which clinicians view the relationship between IQ scores and intellectual disability." ROA.467. Johnson did not raise an *Atkins* claim then or at any time "during the pendency of Johnson's initial petition." ROA.467.

On August 13, 2013—three months after the publication of the DSM-V—the district court denied all but one of Johnson's habeas claims. ROA.469. The court then denied Johnson's remaining claim on June 25, 2014 and entered final judgment. ROA.470. Johnson unsuccessfully appealed the lower court's denials of relief. *Johnson v. Stephens*, 617 F. App'x 293 (5th Cir. 2015).

3

## II.    Post-judgment and Last-minute Litigation

In March 2017, the Supreme Court decided *Moore v. Texas*, 581 U.S.
1 (2017) (*Moore I*), reversing the CCA's reliance on the factors
enumerated in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).
This reversal did not prompt Johnson to raise an *Atkins* claim in state or
federal court. Instead, in June 2017, Johnson returned to federal district
court to pursue a "novel avenue[] of relief." *See* ROA.470, 486. "Johnson
specifically asked to reopen the judgment because the Court had
allegedly been incorrect in denying leave to amend" the petition with new
ineffective-assistance claims. ROA.470. The court denied Johnson's
motion for a new trial, and Johnson unsuccessfully appealed that as well.
*Johnson v. Davis*, 746 F. App'x 375 (5th Cir. 2018), *cert. denied*, 139 S.
Ct. 1375 (2019).

In June 2018—while the appeal of the district court's denial of the
motion for a new trial remained pending—the CCA issued its post-
vacatur decision in *Ex parte Moore*, 548 S.W.3d 552 (Tex. Crim. App.
2018). This decision was also overturned by the Supreme Court in *Moore
v. Texas*, 139 S. Ct. 666, 672 (2019) (*Moore II*), in February 2019.

On December 6, 2018—shortly before the Supreme Court decided *Moore II*—Johnson's execution date was set for May 2, 2019. ROA.470. Not long after, Johnson, acting *pro se*, moved for the appointment of new counsel, i.e., the Northern District of Texas Capital Habeas Unit (CHU). ROA.471. The CHU was appointed as co-counsel with the specific duty to identify potentially meritorious ineffective-assistance claims. ROA.471. Up until that point, long-time capital postconviction defense attorney Patrick McCann had represented Johnson in all state and federal habeas proceedings.

Instead of complying with the duties outlined by the district court, however, the CHU sought to terminate McCann's representation of Johnson. ROA.472. Meanwhile, McCann had been investigating an *Atkins* claim, including securing a mental health expert who opined that Johnson was intellectually disabled, and he ultimately filed a subsequent state habeas application raising an *Atkins* claim. *Ex parte Johnson*, No. WR-73,600-02, 2019 WL 1915204, at *1 (Tex. Crim. App. Apr. 29, 2019). That application was dismissed by the CCA as abusive. *Id*. The district court nonetheless stayed Johnson's execution. ROA.472. McCann then withdrew from Johnson's case. ROA.472.

Johnson was again scheduled to be executed on August 15, 2019. ROA.472. Johnson, now represented solely by the CHU, filed a motion for relief from judgment, premised primarily on McCann's representation as both state and federal habeas counsel. ROA.473. The court denied Johnson's post-judgment motion, ROA.473, and this Court affirmed, *Johnson*, 935 F.3d at 287.

## III. Authorization Proceedings

When he appealed the denial of the post-judgment motion, Johnson also sought authorization from this Court to file a successive *Atkins* claim under 28 U.S.C. § 2244(b)(2)(A). *Johnson*, 935 F.3d at 287. To obtain authorization under that provision, Johnson needed to show that his *Atkins* claim "relie[d] on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable[.]" § 2244(b)(2)(A). Of course, *Atkins* was, as this Court recognized, "decided long before Johnson even committed his crimes." *Johnson*, 935 F.3d at 292.

But two years prior to Johnson seeking authorization, this Court had decided *Cathey*, a case in which another capital habeas petitioner sought authorization to raise a successive *Atkins* claim. *In re Cathey*, 857

6

F.3d 221, 223 (5th Cir. 2017). In that case, the petitioner did not include

an *Atkins* claim in his first federal habeas petition even though *Atkins*

was decided two years before he initiated federal habeas proceedings. *Id*.

Cathey nonetheless argued that *Atkins* was "previously unavailable" in

part because his did not have a viable claim of intellectual disability until

the Flynn Effect[1] became widely used in 2005. *Id*. at 227–32. This Court

agreed, holding that "[a]t th[at] preliminary stage," Cathey had

presented "sufficiently 'cogent argument[s]' that *Atkins* was previously

unavailable at the time of his first petition and its disposition." *Id*. at 230

(quoting *Mathis v. Thaler*, 616 F.3d 461, 473 (5th Cir. 2010)). The Court

thus allowed Cathey to pass through the first gateway. *Id*. at 241.

What *Cathey* "precedentially determined" then is "that it is correct

to equate legal availability with changes in the standards for psychiatric

evaluation of the key intellectual disability factual issues raised by

*Atkins*." *Johnson*, 935 F.3d at 294. Indeed, the *Cathey* decision "open[]ed

---

[1]    "The Flynn Effect 'is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn Effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized.'" *Cathey*, 857 F.3d at 227.

the door for Johnson," *id*., who sought authorization to file a successive
*Atkins* claim under the auspice of the DSM-V, a manual published to
provide clinicians with diagnostic guidance. *Id*. at 293. The DSM-V,
"which changed the focus from specific IQ scores to clinical judgment,"
was published in 2013 while Johnson's initial federal habeas proceedings
were still pending. *Id*. Bound by *Cathey*, the Court authorized Johnson
to file his successive *Atkins* claim because, like Cathey, Johnson was
"presented . . . with reasons that an *Atkins* claim is possibly meritorious
when it had not previously been." *Id*. at 294. In so holding, the Court
acknowledged that *Cathey* "did not separately analyze whether it was
enough that *Atkins* in a generic sense" met the successiveness statute
"even though it was not so clearly retroactive in its application to
Cathey." *Id*. at 293. But the Court accepted that *Cathey* "necessarily
decided that latter point as well and move[d] on." *Id*. The Court
concluded, "counterintuitively perhaps," that *Atkins* was retroactive to
Johnson as well. *Id*. at 292. The Court thus stayed Johnson's August 2019
execution. *Id*. at 296.

## IV.   Second Gateway Proceedings

Johnson filed his successive petition raising an *Atkins* claim shortly thereafter. ROA.11–62, 475. The Director moved to dismiss the petition as successive and untimely. ROA.370–419. The lower court denied the Director's motion without prejudice and granted Johnson's request for an evidentiary hearing. ROA.463, 487. The Director moved the lower court to reconsider its order, but the lower court denied the motion. ROA.497–537, 605–08. The court held the hearing, and McCann was the sole witness to testify. ROA.1184. Thereafter, the parties submitted post-hearing briefing, including the Director's renewed motion to dismiss and two supplemental briefs. *See* ROA.865–933, 942–48, 1019–25.

On October 28, 2022, the lower court denied the Director's renewed motion to dismiss, finding Johnson's petition neither successive nor untimely. ROA.1070. As to successiveness, the district court applied this Court's "judicially created" "*futility* exception" to § 2244(b)(2)(A). ROA.1052 & n.10. Under that exception, "both the 'significant changes in medical methodology for evaluating relevant disabilities' and the 'courts' recognition of those changes' may make a claim available for the first

time." ROA.1053 (quoting *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020)) (citing *In re Halprin*, 788 F. App'x 941, 944 (5th Cir. 2019)).

The district court held that "because earlier psychological standards made *Atkins* relief inapplicable to Johnson, raising an *Atkins* claim would have been futile until the DSM-V issued" in 2013. ROA.1053. The court determined that an *Atkins* claim was thus "previously unavailable," § 2244(b)(2)(A), to Johnson until then. ROA.1054.

But in 2013, Johnson was still litigating his first federal habeas petition. ROA.1054. The lower court then turned to a "feasibility" analysis—supposedly derived from the "previously unavailable" statutory text into which the court read a "futility" exception—to determine whether "it would have been *feasible* for Johnson to litigate an *Atkins* claim during his on-going federal action." ROA.1054. The court concluded it would not have been feasible to amend his petition with an *Atkins* claim because the court had denied Johnson's latter-day attempt to raise other, unrelated claims around the same time the DSM-V was published. ROA.1055–56. Thus, the court determined the *Atkins* claim

was unavailable. ROA.1056.[2] In turn, the court concluded that Johnson's *Atkins* claim was not successive. ROA.1057.

As to timeliness, the district court appeared to assume Johnson would benefit from a later factual predicate date but did not explicitly state what the accrual date was. *See* ROA.1057 & n.14 (noting this Court had "not yet decided whether to measure an inmate's compliance with the limitations period from the publication of the [DSM-V] or from *Moore I*," but noting "[u]nder any scenario, [Johnson] filed his petition late"). The court instead proceeded directly to whether Johnson was entitled to equitable tolling.

---

[2] The lower court then discussed—but did not decide—yet another "extra-statutory exception" to § 2244(b)(2)(A): whether petitioner's counsel's "representation in the initial federal proceedings was so deficient as to render the *Atkins* claim functionally unavailable." ROA.1056–57 (quoting *In re Wood*, 648 F. App'x 388, 392 (5th Cir. 2016)). The lower court found it wasn't necessary to consider McCann's representation of Johnson within the context of the successiveness inquiry because it would have been futile to raise the claim before the publication of the DSM-V and it wasn't feasible to add the claim after. ROA.1056. The court noted, however, that its discussion about McCann's representation in the timeliness analysis would "appl[y] with full force to Mr. McCann's representation immediately after the DSM-V issued." *Id.* at 1057. Similarly, the Director's argument that the courts cannot read judicially created exceptions to § 2244(b)(2)(A) applies with equal force to any such ineffective-assistance-of-federal-habeas-counsel exception. *See infra* Argument I.D.

11

In that analysis, the district court found that McCann testified credibly at the evidentiary hearing that he "made choices based on his own assessment of the law and Johnson's own circumstances." ROA.1059. The court found McCann had "a rich understanding of *Atkins* law and mental-health issues in capital cases," and he had undoubtedly "kept abreast of changes in both the psychological understanding of intellectual disability and the legal responses to those changes." ROA.1060. McCann used that knowledge and expertise "to pursue *Atkins* relief in other cases," and in fact, McCann successfully litigated Bobby Moore's case in the Supreme Court. ROA.1059.[3] But while "McCann never ceased litigating on Johnson's behalf," he "just did not litigate an *Atkins* claim until the eve of any execution date." ROA.1059. He chose not to do so because: 1) he prioritized other claims "for which he had received a Certificate of Appealability" instead; and 2) he adjudged that the specific facts of Johnson's intellectual disability claim would be

---

[3]  McCann was the lead attorney who handled Bobby Moore's state habeas hearing in January 2014—the same hearing that resulted in the state trial court finding Moore was *not* intellectually disabled. ROA.1286. McCann also assisted in the Supreme Court briefing that led to *Moore II*. ROA.1287.

unsuccessful under Texas law,[4] despite the DSM-V and *Moore I* opinion, and he believed receiving a negative adjudication in state court would have been "possibly fatal to any hope of federal relief." ROA.1061–62, 1064.

The district court ultimately found that McCann's representation of Johnson "amounts to an extraordinary circumstance that warrants equitable tolling in this case." ROA.1067. The district court never explicitly found that McCann was neglectful, ineffective, or committed gross misconduct. Rather, the court acknowledged McCann made strategic decisions, but it held that McCann's strategic decisions resulted in him withholding a potentially meritorious claim from federal habeas review and failing to litigate as zealously for Johnson as he did for other inmates. ROA.1061–67, 1068–69. In other words, the court held that, as a matter of law, capital attorneys may *never* "withhold viable claims when an avenue of federal relief exits." ROA.1061; ROA.1062 ("Federal

---

[4]     Specifically, McCann testified at the evidentiary hearing that the testimony from the co-defendants at Johnson's trial showed that Johnson "was more or less in charge, which show[ed] leadership," "[t]hat he hid the vehicle[,] and that he was also the shooter." ROA.1320. McCann testified that these were all factors that would have made Johnson's intellectual disability claim a difficult one to sustain under the now-overturned *Briseno* factors. ROA.1297, 1320.

review cannot countenance any decision—however strategic it may seem—formed with the intent of withholding potentially viable claims from an initial federal habeas petition."); ROA.1069 ("When weighing the various factors which play into litigation strategy, an attorney bears an overarching ethical duty to leave no potentially meritorious claim aside, to preserve a client's right to raise any claim which may provide relief.").

The district court also found that petitioners who have made prima facie showings of intellectual disability have no burden to meet the diligence requirements of the equitable tolling standard. ROA.1067–68. The court thus concluded that Johnson's petition was not barred by the one-year statute of limitations. ROA.1070.

The Director then moved the lower court to certify its October 28 Order for interlocutory appeal. ROA.1076–97. On January 12, 2023, the lower court granted the Director's motion, certifying the first of the three controlling questions of law described above, *see supra* Issues Presented, for appeal. ROA.1121–23.

The Director timely filed a petition for permission to appeal the district court's October 28 Order under § 1292(b) on January 23, 2023. *See* Pet. Permission Appeal Oct. 28, 2022 Order Under 28 U.S.C.

§ 1292(b), *Johnson v. Lumpkin*, No. 23-90003 (5th Cir. May 31, 2023) (Pet. Interlocutory Appeal). This Court granted the Director's petition on May 31, 2023. ROA.1124. This appeal follows.

## SUMMARY OF THE ARGUMENT

**I.**     Under a plain reading of the text of 28 U.S.C. § 2244(b)(2)(A), Johnson's *Atkins* claim is successive: *Atkins* was not new in 2011 when he filed his initial federal petition, it was not made retroactive to him because he committed his crimes after it was decided, and it was available to raise during his first federal habeas proceedings. To avoid this harsh result, this Court in prima facie proceedings, and the district court on second gateway review, have read a judicially created equitable exception into the statute. This so-called "futility exception" permits petitioners to raise long-available *Atkins* claims if their claim became meritorious in the interim by virtue of something *other than* "a new rule of constitutional law made retroactive . . . by the Supreme Court." § 2244(b)(2)(A). But to read that judicially created exception into the statute, the courts must judicially amend it; they must add words that aren't there and ignore words that are. As the Supreme Court and this Court have long held, courts are prohibited from judicially amending a

statute in that manner. The district court thus erred both in following this Court's nonappealable prima facie rulings and relying on an extra-statutory equitable exception to find Johnson's claim not successive.

II.      Even if the district court's jurisdictional decision is correct, its equitable tolling decision is wrong. The district court determined that Johnson showed the type of extraordinary circumstances necessary for such tolling because his initial federal habeas counsel refused to raise what he deemed to be a meritless *Atkins* claim before 2019. But Johnson's initial federal habeas counsel had decades of experience in the state courts in general and years of experience in intellectual disability issues in specific, and he reasonably relied on that experience to decide that it would have been futile to raise Johnson's *Atkins* claim sooner. If there is an ineffective-assistance-of-federal-habeas-counsel exception to the statute of limitations—and there is not—then certainly the district court's mere disagreement with Johnson's counsel's appraisal of the chances of success isn't enough to suggest ineffectiveness. In short, intentional strategic decisions made by learned counsel are run-of-the-mill, not extraordinary, and should never constitute extraordinary circumstances.

**III**.   The district court also wrongly decided that petitioners who have made a prima facie showing of intellectual disability—despite state court findings to the contrary—are exempt from the usual diligence required to establish equitable tolling. Even if Johnson's counsel had neglected or abandoned him, Johnson would still be required to show diligence. And this Court has already held that intellectual disability claims are not exempt from the statute of limitations. The district court's holding is an end-run around that decision and should be reversed.

## STANDARD OF REVIEW

Under § 1292(b), this Court reviews de novo any controlling legal questions raised by a district court's certified order. *Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 526 (5th Cir. 2022). The Court's "jurisdiction 'is not confined to the precise question[s] certified by the lower court,' but is 'nonetheless confined to the particular order[s] appealed from.'" *Id.* (alterations in original) (quoting *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018)).

## ARGUMENT

## I.   Courts Are Prohibited from Reading Extra-Statutory Exceptions into § 2244(b)(2)(A).

Under the plain language of § 2244(b)(2)(A), there is no question that Johnson's *Atkins* claim is successive. The district court, however, rejected the notion that it was bound by the plain text of the statute, choosing instead to follow this Court's nonappealable determinations in the prima facie context. *See generally* ROA.1049–54. In those prima facie proceedings, this Court ruled that § 2244(b)(2)(A) is subject to what the district court appropriately characterized as an extra-statutory, judicially-created exception. *See* ROA.1052 n.10 (acknowledging "the Fifth Circuit cases which have recognized [a] *judicially created exception*" to that subsection (emphasis added)). The district court believed itself bound by this so-called "*futility* exception," *see* ROA.1052, and ultimately found Johnson's *Atkins* claim not successive using it, ROA.1057. The district court was wrong to do so, and this Court should reverse.

### A.   The law on the second gateway successiveness inquiry.

A petitioner seeking to file a successive petition must be granted permission to do so by a circuit court. 28 U.S.C. § 2244(b)(3). A circuit court may authorize the filing of a successive petition if it determines

18

that the petitioner makes a prima facie showing that his claim satisfies the requirements of § 2244(b). *See* § 2244(b)(3)(C). This Court determined that Johnson made this showing in 2019 and authorized the filing of his successive *Atkins* claim. *Johnson*, 935 F.3d at 294–95.

The district court's task was to then conclusively determine whether Johnson's petition meets the requirements of § 2244(b); if it does not, the court "must dismiss the motion that [this Court] allowed the applicant to file." *See In re Swearingen*, 556 F.3d 344, 349 (5th Cir. 2009) (the district court "must independently determine whether the petition *actually satisfies* the stringent § 2244(b)(2) requirements").

In this context, Johnson bears the burden of showing he conclusively meets the requirements of § 2244(b)(2)(A), the new-constitutional-rule provision of § 2244(b) under which he proceeds.[5] *See Mathis*, 616 F.3d at 467 (holding that petitioner "bears the burden of

---

[5]     Johnson does not, and cannot, proceed under § 2244(b)(2)(B) because an *Atkins* claim relates only to eligibility for the death penalty, not actual innocence of the underlying offense. *See* § 2244(b)(2)(b)(ii) (the facts underlying the claim "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense"); *see Cathey*, 857 F.3d at 233 n.76 ("Cathey does not—and cannot—allege that the IQ scores establish that he is not guilty of capital murder. The argument that 'eligibility' for capital punishment ought not be governed by the rules on successive writs, though not without purchase, appears to be foreclosed.").

demonstrating that his successive federal habeas application falls within one of the two exceptions and thus should not be dismissed"); *Moore v. Dretke*, 369 F.3d 844, 845 n.1 (5th Cir. 2004) (finding as "insufficient" a district court's determination that petitioner's petition "appear[ed]" to satisfy the requirements of § 2244(b) and noting that the "correct standard" is that the "applicant bears the burden of demonstrating that the petition does in fact comply with the statute").

This requires him to show: "First, the rule on which the claim relies must be a 'new rule' of constitutional law; second, the rule must have been 'made retroactive to cases on collateral review by the Supreme Court'; and third, the claim must have been 'previously unavailable.'" *Tyler v. Cain*, 533 U.S. 656, 662 (2001) (interpreting the second prerequisite).

"Quite significantly, under this provision, the Supreme Court is the *only* entity that can 'ma[k]e' a new rule retroactive. The new rule becomes retroactive, not by the decisions of the lower court or by the combined action of the Supreme Court and the lower courts, but simply by the action of the Supreme Court." *Id*. at 663 (emphasis added). Thus, "a new rule is not 'made retroactive to cases on collateral review' unless the

Supreme Court holds it to be retroactive." *Id*. ("Based on the plain meaning of the text read as a whole," "'made' means 'held' and, thus, the requirement is satisfied only if this Court has held that the new rule is retroactively applicable to cases on collateral review"). If a petitioner does not show that the Supreme Court "*already* ha[s] made" a rule retroactive, "the District Court [is] required to dismiss" his petition. *Id*. at 667 (emphasis added).

### B. Under the plain text of the statute, Johnson's *Atkins* claim is successive.

Johnson's claim "relies on" the rule exempting intellectually disabled petitioners from the death penalty created by *Atkins*. *Atkins* is, as a general matter, a new rule of constitutional law made retroactive to cases on collateral review. *See* ROA.1051; *Johnson*, 935 F.3d at 292; *Cathey*, 857 F.3d at 227. The problem for Johnson is that *Atkins* was decided on June 20, 2002, which was four years before he "even committed his crimes," *Johnson*, 935 F.3d at 292, and nine years before he filed his initial federal petition, *see* ROA.1043.

It cannot be credibly argued that, by the time Johnson filed his initial petition, *Atkins* was "new." *See* § 2244(b)(2)(A); *Tyler*, 533 U.S. at 662 ("[T]he rule on which the claim relies must be a 'new rule' of

constitutional law."); *see also In re Bowles*, 935 F.3d 1210, 1216 (11th Cir. 2019) (noting that, since *Atkins* was decided six years before Bowles filed his first federal petition, Bowles "cannot now rely on *Atkins* as a 'new' rule of constitutional law"). Nor can it be plausibly argued that *Atkins* was "previously unavailable" to him during his initial federal proceedings. *See Mathis*, 616 F.3d at 473 (holding an *Atkins* claim successive where petitioner "offer[ed] no cogent argument to excuse his failure to include his *Atkins* claim in his first federal petition when that claim was available to him for nine months after *Atkins* was decided"); *In re Bowles*, 935 F.3d at 1215 ("That means [*Atkins*] was not 'previously unavailable' to him because he could have included it in his original habeas petition.").

Accordingly, under a plain interpretation of § 2244(b)(2)(A), Johnson's intellectual disability claim fails *several* parts of the statute: *Atkins* isn't a new rule, it wasn't "made retroactive" to him because his case was final long after it was decided, and it was "previously []available" to him in 2011. *E.g.* ROA.1052 (recognizing "[u]nder a strict interpretation of [§ 2244(b)(2)(A)], any inmate who filed a federal petition

after 2002 would have to include an *Atkins* claim in his initial petition" or be barred by § 2244(b)(2)(A)).

That should be the end of the matter. There is *no other* "new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court" upon which Johnson's "claim relies." § 2244(b)(2)(A). Since Johnson filed his initial petition in 2011, the only cases in which the Supreme Court has spoken substantively on intellectual disability as a death penalty exemption are *Hall v. Florida*, 572 U.S. 701, 703 (2014), *Moore I* in 2017, and *Moore II* in 2019.[6] And assuming *arguendo* those cases created new rules of constitutional law, that's not enough under § 2244(b)(2)(A): those new rules "must have been 'made retroactive to cases on collateral review by the Supreme Court.'" *Tyler*, 533 U.S. at 662.

As every circuit to consider the issue has held, the Supreme Court has not. *See In re Richardson*, 802 F. App'x 750, 755–56 (4th Cir. 2020) ("*Hall* and *Moore* do not address retroactivity, and no subsequent

---

[6]     The Supreme Court also discussed *Atkins* in *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Shoop v. Hill*, 139 S. Ct. 504 (2019) (per curiam). But both cases analyzed a state court's application of *Atkins* under 28 U.S.C. § 2254(d). *See Brumfield*, 576 U.S. at 307; *Hill*, 139 S. Ct. at 505. Thus, they aren't relevant here because review under that statute is backwards-looking and only for reasonableness, rather than clarifying or creating new law.

Supreme Court case has held that *Hall* or *Moore* apply retroactively to cases on collateral review."); *In re Payne*, 722 F. App'x 534, 538 (6th Cir. 2018) (denying authorization and finding that "[e]ven if we assume, without deciding, that *Hall* and *Moore* announce new rules of constitutional law, Payne has not shown that these decisions apply retroactively" and "[m]ore importantly, Payne fails to show that the Supreme Court has determined that *Moore* and *Hall* apply retroactively"); *Fulks v. Watson*, 4 F.4th 586, 592 (7th Cir. 2021) ("Nor do *Hall*, *Moore I*, or *Moore II* create 'new rule[s] of constitutional law, made retroactive to cases on collateral review by the Supreme Court,' that would permit a second or successive motion under [28 U.S.C.] § 2255(h)(2)."); *Williams v. Kelley*, 858 F.3d 464, 474 (8th Cir. 2017) (disagreeing "that *Moore* announced a new rule of constitutional procedure" and noting whether *Moore* may eventually be given retroactive effect "is a matter for the Court to decide in due course and not by us in the posture in which this case has been presented to us"); *In re Bowles*, 935 F.3d at 1219 ("*Hall* did announce a new rule of constitutional law, but the Supreme Court has not made that rule retroactive to cases on collateral review.").

Indeed, the Supreme Court has criticized a federal circuit court for relying on *Moore I* to assess the reasonableness of a state court adjudication under § 2254(d) because it was not a clearly established rule at the time of the state court's adjudication. *See Hill*, 139 S. Ct. at 507–09; *cf. Weathers v. Davis*, 915 F.3d 1025, 1027–1028 (5th Cir. 2019) ("As with *Moore*, it cannot be contended that *Hall*, which overturned a formulaic IQ standard that had been used by the state of Florida but never in Texas, simply enunciated 'clearly established Federal law' made retroactive as required by AEDPA."). This Court has noted that *Hill* at the very least "contradicts" the idea that *Moore I*'s rejection of Texas's "previous framework for determining intellectual disability" could facilitate a successive *Atkins* claim. *In re Sparks*, 939 F.3d 630, 632 (5th Cir. 2019) (denying authorization on successive *Atkins* claims relying in *Moore I*).

In short, state inmates are entitled to "one chance to bring a federal habeas challenge" to their conviction. *Banister v. Davis*, 140 S. Ct. 1698, 1704 (2020). "[A]fter that, the road gets rockier." *Id*. That's by design, because when Congress enacted AEDPA it "made the limits on entertaining second or successive habeas applications more stringent

than before." *Id.* at 1707. The upshot: Johnson was required to raise an *Atkins* claim in his first federal petition or risk "forever forfeit[ing] his right" to federal review of that claim. ROA.1052. No subsequent new rule of constitutional law reanimates his otherwise long-available *Atkins* claim—neither *Hall* nor *Moore I* nor *Moore II*. Harsh though the result may be, it is what Congress intended. *See Dodd v. United States*, 545 U.S. 353, 359 (2005) ("Although we recognize the potential for harsh results in some cases, we are not free to rewrite the statute that Congress has enacted."); *cf. In re Webster*, 605 F.3d 256, 258 (5th Cir. 2010) (denying federal prisoner authorization to file successive *Atkins* claim where "there is no reason to believe that Congress intended the language 'guilty of the offense' [in § 2244(b)(2)(B)(ii)] to mean 'eligible for a death sentence'"). Under a plain reading of § 2244(b)(2)(A), Johnson's claim is indisputably successive.

## C.   This Circuit reads an extra-statutory exception into § 2244(b)(2)(A).

Despite the plain text of the statute, petitioners like Johnson and Cathey[7] have been permitted another go at habeas relief long after their "one chance" was over. That's because this Circuit permits petitioners to surmount the strict prohibition against successive petitions by arguing that their claim relies *not* on a previously unavailable new rule of constitutional law made retroactive by the Supreme Court, *see supra* Argument I.B, but that their claim has become meritorious—and therefore available—for some *other* reason. *See Cathey*, 857 F.3d at 227–32; *Johnson*, 935 F.3d at 294; *see also* ROA.1053 (citing *Milam*, *Halprin*, and *In re Soliz*, 938 F.3d 200 (5th Cir. 2019)). In doing so, this Court has read words into the statute that aren't there and read words out of it that are. It has done so in several ways.

---

[7]     As the Director noted in his petition for permission to appeal the district court's interlocutory order, Johnson's is not the only case affected by the controlling question of law at issue here. *See* Pet. Interlocutory Appeal 13 n.2. While this Court's *Cathey* decision preceded *Johnson*, Eric Cathey has only recently reached the second gateway inquiry in federal court. *See* Order, *Cathey v. Lumpkin*, No. 4:15-CV-2883 (S.D. Tex. May 18, 2022) (ordering the parties to submit simultaneous briefing addressing the Court's jurisdiction under § 2244(b)), ECF No. 48. The district court there has since administratively stayed the federal proceedings pending resolution of this appeal. *See* Order, *Cathey v. Lumpkin*, No. 4:15-CV-2883 (S.D. Tex. July 6, 2023), ECF No. 56.

27

*First*, by allowing petitioners to rely on extra-judicial sources to bootstrap a belated *Atkins* claim, the Court has read out the statutory requirement that a successive claim must rely on "a new rule of constitutional law." § 2244(b)(2)(A); *Tyler*, 533 U.S. at 662. Both the DSM-V and the Flynn Effect are developments in the methodology used for clinically diagnosing intellectual disability, *see supra* Statement of the Case III, not new rules of constitutional law created by the courts, *see, e.g., Hall*, 572 U.S. at 703 (noting the "legal determination of intellectual disability is *distinct from* a medical diagnosis" (emphasis added)). As the Eleventh Circuit convincingly stated, "Congress did not say that the claim could proceed if it relied on any other type of change in case law," *Bowles*, 935 F.3d at 1217–18, and it certainly did not say the claim could proceed if it relies on any change at all. "Congress knew how to say that if it had wanted to." *Id*. at 1218.

*Second*, in reading out the "new rule of constitutional law" language, this Circuit reads in other language, namely, it reads the factual-predicate prong of § 2244(b)(2)(B) into the new-rule prong of § 2244(b)(2)(A). "Congress knew how to provide for second and successive petitions based on factual developments, such as the publication of a new

DSM manual." *Bowles*, 935 F.3d at 1218; *see* § 2244(b)(2)(B)(i). Yet Congress chose to allow such claims to proceed only if the petitioner could *also* establish that he is actually innocent of the underlying offense. § 2244(b)(2)(B)(ii).[8] "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (quoting *Bates v. United States*, 522 U.S. 23, 29–30 (1997)). Facts, like the publication of a new medical manual, are accounted for in one prong but irrelevant to the other. *Compare* § 2244(b)(2)(A), *with* § 2244(b)(2)(B). *Cathey* and *Johnson* ignored that distinction.[9] *See, e.g., Johnson*, 935 F.3d at 293 (noting *Cathey* ruled that "it is correct to equate *legal* availability with changes in the standards for psychiatric

---

[8]  Here, too, Congress "could have said 'or ineligible for the death penalty,' but it did not." *Bowles*, 935 F.3d at 1218; *see Webster*, 605 F.3d at 258.

[9]  *Halprin* shows the slippery slope this Court created by conflating the new-rule and new-facts prongs together. In that case, the petitioner argued under *Cathey* and *Johnson* that his judicial bias claim was previously unavailable until newly discovered evidence made it viable. 788 F. App'x at 944. After this Court tried to distinguish Halprin's allegation from those at issue in *Cathey* and *Johnson*, it held Halprin "incorrectly conflate[d] the 'previously unavailable' requirement of subsection (b)(2)(A) with the new 'factual predicate' standard found in subsection (b)(2)(B)(i)." *Id.*

evaluation of the key intellectual disability *factual issues* raised by *Atkins*" (emphasis added)).

Further, by doing so, this Circuit makes it as easy for petitioners to surmount the successiveness bar as to surmount the statute of limitations. Like § 2244(b), the habeas statute of limitations contains two separate provisions governing reliance on new rules of constitutional law versus new factual predicate dates. *See* §§ 2244(d)(1)(C), (D). Unlike § 2244(b)(2)(B) however, the factual-predicate prong of § 2244(d)(1)(D) does *not* require a petitioner to also prove his actual innocence. That means Congress intended the successiveness bar—jurisdictional in nature—to be *harder* to surmount than the statute of limitations. This Court's interpretation of § 2244(b)(2)(A) renders null that intent. *Cf. Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008) (recognizing "the well-established maxim that statutes should be construed to avoid an absurd result"). Indeed, it's telling that, in the court below, Johnson shoehorned the DSM-V into the new-legal-rule prong for purposes of successiveness while at the same time using it as a new *factual predicate* date for purposes of showing timeliness. *See* ROA.477.

Simply put, this Circuit "reads into the statute words that are not there when [it holds] that the publication of a new diagnostic manual can serve as a predicate to make a claim newly available under § 2244(b)(2)(A). That's not the statute that Congress wrote." *In re Bowles*, 935 F.3d at 1218.

*Third*, the Court ignores the requirement that any new rule of constitutional law must be "made retroactive to cases on collateral review." § 2244(b)(2)(A). "Retroactive" has only one generally accepted meaning: "extending in scope or effect to matters that have occurred in the *past*." *Retroactivity*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Under that definition, *Atkins* cannot be "retroactive" to Johnson because he didn't even commit the capital murder until four years *after* it was decided.

Courts "must presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Dodd*, 545 U.S. at 357 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). Certainly, Congress did not write a paradox into subsection (A) that a new constitutional rule can be made "retroactive" to cases in the *future*. *Cf. Martinez*, 519 F.3d at 544. The *Johnson* panel appeared to recognize

this paradox when it authorized Johnson's claim pursuant to *Cathey*. *See Johnson*, 935 F.3d at 293 (noting *Cathey* did not separately analyze whether *Atkins* "in a generic sense" was a new rule of law made retroactive to cases on collateral review "even though it was not so clearly retroactive in its application to Cathey"). But the only natural reading of "retroactive" doesn't square with *Cathey*.

Interpreting "retroactive" according to its plain use also makes sense "in [its] context and with a view to [its] place in the overall statutory scheme." *Tyler*, 533 U.S. at 665 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Section 2244(b)(2)(A) is meant to provide a narrow exception to the blanket prohibition against second shots at federal habeas relief, not to allow petitioners to raise claims based on rules that were available to them the first go-round. And while the Supreme Court rarely makes new rules of constitutional law retroactive to cases on collateral review, that rarity does not mean the court has "license to question the decision on policy grounds." *Tyler*, 533 U.S. at 663 n.5. A rule created before a petitioner has ever engaged in collateral review cannot be "made retroactive" to him.

*Fourth,* this Court ignores that recognizing new rules and making them retroactive is, under § 2244(b)(2)(A), exclusively the Supreme Court's prerogative. *See Tyler*, 533 U.S. at 662. The Supreme Court did not publish the DSM-V or even mandate its use. *See, e.g.*, *Hall*, 572 U.S. at 703 (holding that though such legal determinations are "informed by the medical community's diagnostic framework," it did not require the use of a particular manual); *Moore I*, 137 S. Ct. at 1044 (affirming *Hall*'s holding that legal determinations should be guided by the most recent medical guidelines but still not mandating the use of any particular diagnostic manual). And it certainly did not hold that the use of the DSM-V is retroactive to cases on collateral review. Allowing the courts of appeals to determine on a case-by-case basis whether new facts make a previously existing legal rule "retroactive" to a particular petitioner would allow courts of appeals to usurp the Supreme Court's authority— expressly delegated by Congress—to declare new rules retroactive. *See Tyler*, 533 U.S. at 663 (holding "new rules become retroactive, *not by the decisions of the lower court* or by the combined action of the Supreme Court and the lower courts, but simply by the action of the Supreme

Court" (emphasis added)). The text of the statute does not permit that result.

*Fifth*, this Court reads "previously unavailable" in a vacuum, divorced from the rest of the statute's text. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (describing the "cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)). But "under the statute Congress enacted, whether a claim is 'previously unavailable' depends on when a 'new rule of constitutional law' is made retroactive by the Supreme Court, because it is *that new rule* that the claim must rely on." *In re Bowles*, 935 F.3d at 1218 (emphasis added); *accord In re Graham*, 61 F.4th 433, 443 (4th Cir. 2023) (quoting *Bowles*); *Gray-Bey v. United States*, 209 F.3d 986, 988 (7th Cir. 2000) ("[F]or purposes of § 2255[(h)](2) a rule is 'unavailable' until the Supreme Court renders its decision, for it is the high court's decision that must be held retroactive."). "That a claim has become meritorious for some *other* reason has no bearing on whether the claim was 'previously unavailable' for § 2244(b)(2)(A) purposes." *In re Bowles*, 935 F.3d at 1218 (emphasis added). And given that the factual-predicate prong is distinct from the new-rule prong, it makes little sense

that Congress intended the courts to "search for outside factual predicates that may have made a claim meritorious." *Id.*

As the Eleventh Circuit appropriately recognized, reading "previously unavailable" to mean "meritorious" "equates the word 'cognizable' with the word 'meritorious,'" but those words don't "mean the same thing." *Id.* (comparing Black's Law Dictionary and Merriam-Webster Online definitions of "cognizable" and "meritorious"). Section § 2244(b)(2)(A) simply defines *when* a new legal claim is cognizable and therefore previously available. *Id.* ("If [the petitioner] could have [relied on that 'new rule' in his initial petition], then that claim was previously available to him and his application must be denied."); *cf. In re Edwards*, 865 F.3d 197, 203 (5th Cir. 2017) ("A petition is successive when it 'raises a claim . . . that was or *could have been* raised in an earlier petition . . . .'" (emphasis added) (quoting *Hardemon v. Quarterman*, 516 F.3d 272, 275 (5th Cir. 2008))). Any other interpretation renders the remainder of § 2244(b)(2)(A) essentially superfluous. *See Corley v. United States*, 566 U.S. 303, 314 (2009) (describing "one of the most basic interpretative canons," i.e., that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous,

void or insignificant . . . . '" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).

*Sixth,* this Court is clearly reading words into the statute that are not there because "previously available" has two separate meanings in this Circuit. On the one hand, the courts read it to mean that a claim was previously unavailable if it had no legal merit. *See* ROA.1051–54 (applying *Cathey* and *Johnson*). On the other, a claim was unavailable if it wasn't feasible, i.e., possible, for a petitioner to amend his initial federal petition to include it. *See* ROA.1054–56 (applying *In re Wood*, 648 F. App'x 388 (5th Cir. 2016) and *Cathey*). Indeed, the district court was required to apply *both* definitions to find Johnson not successive. *See* ROA.1051–56. "To give the[] same words a different meaning [in different factual contexts] would be to invent a statute rather than interpret one." *See Clark v. Martinez*, 543 U.S. 371, 378 (2005). And such an approach "would render every statute a chameleon," *id*. at 382, and "establish within [the Court's] jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases," *id*. at 386. The phrase "previously unavailable" cannot serve double duty in helping a petitioner overcome the successiveness bar.

In sum, by permitting petitioners like Johnson and Cathey to pass through the first gateway, this Circuit has gone far beyond the text of the statute—it has entirely ignored parts of it while adding words that simply aren't there. There is no "futility exception" to be found within the text of § 2244(b)(2)(A), except by judicial amendment.

### D. Courts are prohibited from judicially amending a statute.

The district court, believing itself bound by this Court's nonappealable, nonrehearable determinations, 28 U.S.C. § 2244(b)(3)(E), applied the Court's "futility exception" to find that Johnson's *Atkins* claim is not successive. ROA.1052 & n.10. The district court's opinion was error in two ways: 1) it wrongly assumed it was bound by *Cathey* and *Johnson*, and 2) it impermissibly read a judicially created exception into § 2244(b)(2)(A). This Court should reverse.

*First*, the district court twice rejected the Director's argument that, irrespective of their published status, it was not bound by this Court's authorization decisions in *Cathey* and *Johnson*. *See* ROA.603–04, 1049 n.7. The Director believes that the *Cathey* and *Johnson* decisions are wrongly decided. *See supra* Argument I.C. But the Court need not decide that at this juncture. Rather, the Court need only decide what binding

effect, if any, those decisions have on the second gateway inquiry. And the answer is clear: while published authorization decisions certainly have binding effect on *other* authorization cases (as *Cathey* did on *Johnson*, *see Johnson*, 935 F.3d at 292), they do not bind the district court's—or even this Court's—second gateway inquiry.

Authorization decisions, like *Johnson* and *Cathey*, are meant to be "tentative" and "preliminary." *See, e.g.*, *Cathey*, 857 F.3d at 226 ("Paramount to this decision is the standard of review at this stage and the process that follows."); *In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (citing *Reyes-Requena v. United States*, 243 F.3d 893, 898–99 (5th Cir. 2001)). They mean nothing more than that the petitioner made a "sufficient showing of possible merit to warrant fuller exploration by the district court." *Johnson*, 935 F.3d at 291 (quoting *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003)).

But the second gateway is a distinct inquiry. *See Reyes-Requena*, 243 F.3d at 899 ("[T]he previous panel's grant of permission to Reyes to

file a second § 2255[10] motion did not preclude the [district court] from conducting its own threshold inquiry; in fact, the [district court] was obligated to do so."). Indeed, this Court has distinguished second-gateway decisions when deciding whether to authorize a claim because those decisions "concerned whether [the petitioner] *satisfied* § 2244(b)(2)'s requirements, not the preliminary issue we face now whether a *prima facie* case has been shown." *Cathey*, 857 F.3d at 233. "This distinction is important." *Id*.

And that means the converse should also be true: the second-gateway inquiry is bound not by tentative decisions of this Court granting leave to proceed but by the text of the statute. *See Banister*, 140 S. Ct. at 1704 (noting that the statutory provisions of § 2244(b) "bind the district court even when leave is given"); *Reyes-Requena*, 243 F.3d at 899 n.16 ("We first note that the previous grant [of authorization] was not dispositive; . . . the grant was based on only a prima facie showing, and the [district court] is obligated to conduct its own threshold inquiry[.]").

---

[10]   Though the successive motion in *Reyes-Requena* was brought under § 2255, this Court held that § 2244(b)(4) applied to such proceedings and decided this question under that provision.

*In re Swearingen*, 556 F.3d at 347 (on the second gateway, the district court is tasked with "independently determin[ing] whether the petition *actually satisfies* the stringent § 2244(b)(2) requirements"). As the Eleventh Circuit convincingly noted:

> [I]t would make no sense for the district court to treat our prima facie decision as something more than it is or to mine our order for factual ore to be assayed. The district court is to decide the § 2244(b)(1) & (2) issues fresh, or in the legal vernacular, *de novo*.

*Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1358 (11th Cir. 2007) (citing *In re (Michael) Johnson*, 322 F.3d 881, 883 (5th Cir. 2003)).

This is akin to certificate of appealability grants, which this Court has held do not bind later panels in ruling on the merits of the claims. *See Black v. Davis*, 902 F.3d 541, 544 (5th Cir. 2018) ("Nonetheless, because a ruling by a motions judge in the initial stages of an appeal is not binding on the later merits panel, we have the responsibility to determine whether the significant ruling here is valid."). But there is even more reason to hold that authorization decisions have no binding precedential effect on the second gateway inquiry—the courts of appeals must consider motions for authorization under "stringent time limit[s]," *Tyler*, 533 U.S. at 664 (citing § 2244(b)(3)(D)), and often with a limited

record. What's more, authorization decisions are neither appealable nor subject to rehearing, § 2244(b)(3)(E), so neither party can test those determinations' correctness.[11] Under these circumstances, the district court erred in treating this Court's *Johnson* and *Cathey* decisions "as something more than" they are. *Jordan*, 485 F.3d at 1358.

*Second*, even if the Court's prima facie decisions have binding effect outside the authorization context, intervening decisions from both this Court and the Supreme Court show it is error to permit courts to read an extra-statutory equitable exception into the jurisdictional limits of § 2244(b).

Reading a judicially created exception into the successiveness statute runs directly afoul of the Supreme Court's reiteration in *Martinez Ramirez* that courts have no authority to amend or redefine a statute. 142 S. Ct. at 1736 ("We have no power to redefine when a prisoner 'has failed to develop the factual basis of a claim in State court proceedings.'" (quoting 28 U.S.C. § 2254(e)(2))); *see also id.* at 1737 ("Unlike for

---

[11]  Indeed, this is precisely why the Director sought permission to appeal the lower court's order at this juncture—it is the first opportunity for both the Director to challenge and this Court to resolve the implications and effects of *Cathey* and *Johnson*. The parties will also each have yet further opportunity to test this Court's determinations in these proceedings.

procedural default, we lack equitable authority to amend a statute to address only a subset of claims."). While *Martinez Ramirez* dealt with § 2254(e)(2), § 2244(b), too, is a "statute that [the courts] have no authority to amend." *Id.* at 1736; *see also Bowles v. Russell*, 551 U.S. 205, 214 (2007) (courts "have no authority to create equitable exceptions to jurisdictional requirements"). "Where Congress has erected a constitutionally valid barrier to habeas relief, a court *cannot* decline to give it effect." *Martinez Ramirez*, 142 S. Ct. at 1736 (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 402 (2013) (Scalia, J., dissenting)).

And though *Martinez Ramirez* is the latest reminder from the Supreme Court about the courts' limited power to rewrite habeas statutes, it's certainly not the first. In *Tyler*, the Supreme Court rejected the argument that it would be anomalous to interpret § 2244(b)(2)(A) to mean that the Court must hold a rule to be retroactive: "[E]ven if we disagreed with the legislative decision to establish stringent procedural requirements for retroactive application of new rules, we do not have license to question the decision on policy grounds." 533 U.S. at 663 n.5 (citing *Conn. Nat'l Bank*, 503 U.S. at 253–54).

Similarly, in *Dodd*, the Supreme Court recognized that its interpretation of the statute of limitations for § 2255 motions "makes it difficult for applicants filing second or successive § 2255 motions to obtain relief" because the Supreme Court "rarely decides that a new rule is retroactively applicable within one year of initially recognizing that right." 545 U.S. at 359. The Court nonetheless held that this "potential for harsh results in some cases" did not justify "rewrit[ing] the statute that Congress enacted." *Id*. "It is for Congress, not this Court, to amend the statute if it believes that the interplay of [the new-rule prong of the statute of limitations] and [the new-rule prong of the successive petition bar] of § 2255 unduly restricts federal petitioners' ability to file second or successive motions." *Id*. at 359–60. The takeaway of these cases is clear: the courts cannot avoid the hard jurisdictional limits imposed by § 2244(b) by equitably rewriting it.

The courts of appeals too have recognized that, while courts may work equitable exceptions to judicially created doctrines, as *Martinez v. Ryan*, 566 U.S. 1 (2012), did for procedural default, Congress's words may not be so circumvented. *See In re Bower*, 612 F. App'x 748, 752 (5th Cir. 2015) (unpublished) (holding petitioner failed to show a court can

43

"exercise[] its equitable powers to allow a movant to file a second or successive habeas petition when explicitly barred by the statute"); *United States v. Fulton*, 780 F.3d 683, 685 (5th Cir. 2015) (declining to address "whether attorney abandonment during an initial [federal] habeas proceeding should provide grounds for an exception to the bar against successive motions"); *In re Magwood*, 113 F.3d 1544, 1550–51 (11th Cir. 1997) ("Petitioner submits that his first federal habeas counsel cannot reasonably be expected to advance a claim based upon his own deficient performance on direct appeal. . . . We are not at liberty to disregard the clear mandate of [§ 2244(b)(2)]."). Indeed, this Court recently affirmed that the "narrow, equitable exception to procedural default" created by *Martinez* "has no applicability to the statutory limitations period prescribed by AEDPA." *Moody v. Lumpkin*, 70 F.4th 884, 892 (5th Cir. 2023).

In sum, the courts have no authority to read an equitable futility exception into § 2244(b)(2)(A). This Court's and the lower court's holdings to the contrary are error. This Court should reverse the lower court's successiveness determination and instruct it to dismiss Johnson's intellectual disability claim.

## II. An Attorney's Intentional, Strategic Decisions Can Never be Extraordinary Circumstances Warranting Equitable Tolling.

Johnson's *Atkins* claim is indisputably untimely absent equitable tolling. *See* ROA.1057 ("Under any scenario, [Johnson] filed his federal petition late."); *see also* ROA.484 (district court acknowledging that it can "only reach the merits of Johnson's *Atkins* claim if he can show equitable tolling forgives a strict application of the AEDPA limitations period"). After an evidentiary hearing on the matter, the district court concluded that Johnson was not barred by the statute of limitations because his initial federal habeas counsel's conduct entitled him to equitable tolling. *See supra* Statement of the Case IV. The district court is wrong.

A petitioner can demonstrate entitlement to equitable tolling by showing "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Equitable tolling is a fact- and case-specific inquiry. *Jackson v. Davis*, 933 F.3d 408, 410 (5th Cir. 2019); *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999). It is available "only in rare and exceptional circumstances." *Jackson*, 933 F.3d at 410 (quoting

*Hardy v. Quarterman*, 577 F.3d 596, 598 (5th Cir. 2009)). It principally applies where the petitioner is "actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Flores v. Quarterman*, 467 F.3d 484, 487 (5th Cir. 2006) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)). In other words, "[a] petitioner's failure to satisfy the statute of limitations must result from external factors beyond his control; delays of the petitioner's own making do not qualify." *Jackson*, 933 F.3d at 410 (quoting *Hardy*, 577 F.3d at 598). It is Johnson's burden to establish that he is entitled to equitable tolling. *See Pace*, 544 U.S. at 418.

In the court below, Johnson's equitable tolling case "depend[ed] on Mr. McCann's representation" of him during his initial federal habeas proceedings. ROA.1059. But the standard for establishing attorney conduct as a basis for equitable tolling is *high*. An attorney's decisions, even if in error, do not by themselves "excuse the failure to file [petitioner's] habeas petition in the district court within the one-year limitations period." *Fierro v. Cockrell*, 294 F.3d 674, 683 (5th Cir. 2002). Nor does an attorney's negligence in miscalculating a filing deadline provide a basis for tolling a statutory time limit. *Maples v. Thomas*, 565

46

U.S. 266, 282 (2012) (citing *Holland*, 560 U.S. at 651–52, 656); *see Lawrence v. Florida,* 549 U.S. 327, 336 (2007) (holding equitable tolling is not appropriate "for every person whose attorney missed a deadline"). Even where the state of the law may be unclear, equitable tolling is not warranted for an attorney missing the deadline. *See Flores*, 467 F.3d at 486–87 (holding, before it was clear whether state or federal law determined conviction finality for AEDPA limitations purposes, equitable tolling was still not warranted where counsel miscalculated).

Simply put, "mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified." *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *see also Christeson v. Roper*, 574 U.S. 373, 378 (2015) ("Tolling based on counsel's failure to satisfy AEDPA's statute of limitations is available *only* for 'serious instances of attorney misconduct." (emphasis added) (quoting *Holland*, 560 U.S. at 651–52);[12]

---

[12]     *See also In re Wilson*, 442 F.3d 872, 874–75 (5th Cir. 2006); *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000); *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000) (holding that attorney's confusion over applicability of § 2244(d)(1) did not justify equitable tolling); *Harris v. Hutchinson*, 209 F.3d 325, 330–31 (4th Cir. 2000) (holding that attorney's mistaken interpretation of § 2244(d) limitation provision did not justify equitable tolling); *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999) (holding that attorney's miscalculation of limitations period was not valid basis for equitable tolling); *Sandvik v. United States*, 177 F.3d 1269, 1272 (11th Cir. 1999).

*cf. United States v. Riggs*, 314 F.3d 796, 799 (5th Cir. 2002) (where "a petitioner's *own* ignorance or mistake does not warrant equitable tolling, and it would be rather peculiar to treat a trained attorney's error more leniently than we treat a *pro se* litigant's error").[13]

The Director does not contest the district court's factual findings about McCann. *See supra* Statement of the Case IV. The Director disagrees, however, with the district court's legal conclusions based on those factual findings, i.e., that an experienced capital attorney's strategic decision about a claim's likelihood of success can ever constitute the kind of extraordinary circumstances necessary to show equitable tolling. Indeed, the district court's holding effectively creates a *Martinez*-like exception to the statute of limitations predicated on *federal* habeas counsel's supposed ineffectiveness. But as this Court recently recognized, no such exception exists. *Moody*, 70 F.4th at 892 (holding *Martinez* has "no applicability to the statutory limitations period prescribed by AEDPA").

---

[13]   To be sure, "an attorney's intentional deceit could warrant equitable tolling . . . if the petitioner shows that he reasonably relied on his attorney's deceptive misrepresentations." *Riggs*, 314 F.3d at 799. Here, McCann's actions were not intended to deceive Johnson; rather, he pursued what he understood to be the best route for his client's intellectual disability claims.

Moreover, the district court's rule—that a capital attorney may *never* "withhold viable claims when an avenue of federal relief exists," ROA.1061–62, 1069—is precisely the kind of bright-line rule that *Strickland v. Washington*, 466 U.S. 668 (1986), abjures. *Strickland* governs claims of ineffectiveness. *See, e.g.*, *Martinez*, 566 U.S. at 14 (a reviewing court looks to *Strickland* to determine whether state habeas counsel was ineffective). When judging counsel's effectiveness under that standard, there is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91.

Importantly, counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective [] tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107

(2011). Evaluating facts and deciding upon the strongest claims is the essence of an appellate lawyer's craft:

> The law does not require counsel to raise every available nonfrivolous defense. . . . Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether.

*Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009); *see also Smith v. Robbins*, 528 U.S. 259, 285, 288 (2000) (appellate counsel is not ineffective for failing to raise every possible point on appeal; instead counsel should raise and brief only those issues he believes have the best chance of success); *cf. Smith v. Murray*, 477 U.S. 527, 534 (1986) (finding petitioner failed to establish cause for procedural default of claim where precedent "leave[s] no doubt that a deliberate, tactical decision not to pursue a particular claim [on appeal] is the very antithesis of the kind of circumstance that would warrant excusing a defendant's failure to adhere to a" State's procedural rules); *Johnston v. Mitchell*, 871 F.3d 52, 63 (1st Cir. 2017) ("Johnston's argument on this front boils down to the notion that a suppression motion would not have been frivolous, so his attorney had nothing to lose and everything to gain by taking a shot at it. But a lawyer's performance does not fall to the level of a Sixth

Amendment violation under *Strickland* simply because the lawyer fails to pursue any and all nonfrivolous strategies.").

Here, McCann did not abandon Johnson, *see* ROA.1059, nor was he in any way neglectful. McCann's actions never came close to the kind of conduct the courts have found sufficiently egregious to constitute extraordinary circumstances. *See Holland*, 560 U.S. at 636–642 (granting equitable tolling where attorney refused to communicate with petitioner for four years and ignored directives to file a federal petition); *Maples*, 565 U.S. at 283–90 (granting equitable tolling where counsel abandoned petitioner without leave of court and without notice to him).

Rather, McCann "never ceased litigating on Johnson's behalf," ROA.1059, and actively made strategic decisions throughout his representation of Johnson to raise what he calculated would be Johnson's best chances at relief, *id*. McCann needed no more tactical reason than that for not raising an *Atkins* claim sooner in federal court. *Mirzayance*, 556 U.S. at 127; *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *Smith*,

477 U.S. at 534 (holding cause not established where record unambiguously showed counsel "consciously elected not to pursue" a claim because his perception was "that the claim had little chance of success in the Virginia courts").

That the district court may have ultimately disagreed with McCann's assessment of the strength of Johnson's *Atkins* claim at various points in its evolution does not undermine the simple fact that McCann *made conscious, strategic decisions*. To suggest that an attorney—who had been practicing in front of the CCA for over two decades, was a preeminent advocate in the area of intellectual disability, and was heavily involved in the landmark case that overturned *Briseno*— was unreasonable to rely on that depth of experience in making an educated guess about the likelihood of success on an *Atkins* claim would turn *Strickland* on its head, obviating all discretion entrusted to learned defense counsel and allowing no room for strategy or disagreement. *See Strickland*, 466 U.S. at 681 ("Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of

the attorney[.]").[14] The district court's assessment that McCann had essentially nothing to lose by raising the claim and, therefore, should have raised it was rejected by the Supreme Court in *Mirzayance*. At best, McCann's strategic decision might have been error, but mere error is not enough to establish extraordinary circumstances either. *See Cousin*, 310 F.3d at 849; *Smith*, 477 U.S. at 535 (noting that, even if counsel erred in his assessment of the likelihood of a claim's success in appeal, it cannot "seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under" *Strickland*).

---

[14] The Director is unaware of any case where equitable tolling was granted based on an attorney's intentional, strategic decisions not to raise a claim in state and federal court for years. To the contrary, several district courts have found the opposite. *See, e.g.*, *Mabbs v. Gipson*, No. 2:13-cv-0550-JAM-GGH, 2014 WL 4098501, at *4 (E.D. Cal. Aug. 18, 2014) (holding petitioner was not entitled to equitable tolling "on the basis of ineffective assistance of counsel" where "petitioner fail[ed] to identify and explain how appellate counsel's strategic decisions [not to raise all meritorious arguments in his direct appeal] rise to the level of egregious conduct"); *Martinez v. Martinez*, No. SACV 10-540 DOC(CW), 2011 WL 672557, at *4 (C.D. Cal. Jan. 4, 2011) (rejecting claim for equitable tolling where it was "apparent that counsel made a well-considered strategic decision that these issues did not have a reasonable potential for success on appeal"); *cf. Lowe v. Knipp*, No. 07cv2232-LAB (CAB), 2013 WL 4525401, at *2 (S.D. Cal. Aug. 2, 2013) (rejecting argument made in context of motion for post-judgment relief that "unprofessional attorney conduct could amount to an extraordinary circumstance and toll the AEDPA statute of limitations," where, "[i]f an honest [attorney] error doesn't warrant equitable tolling, certainly a conscious but misguided strategic decision does not").

McCann's strategic decisions should have been "virtually unchallengeable," *Strickland*, 466 U.S. at 682, by the lower court; instead, the lower court turned the appellate lawyer's craft against him, creating a rule that an experienced attorney's run-of-the-mill decision not to raise what he perceives to be a weak claim in favor of other, stronger arguments is "extraordinary." This cannot be. The district court's equitable tolling decision should be reversed.

## III. A Prima Facie Showing of Intellectual Disability Does Not Exempt a Petitioner from Diligently Pursuing his Rights.

Finding extraordinary circumstances is not the end of the equitable tolling inquiry; a petitioner must also show he diligently pursued his rights. *Holland*, 560 U.S. at 649. That's because "[e]quity is not intended for those who sleep on their rights." *Hardy*, 577 F.3d at 598 (quoting *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006)). The district court sidestepped an analysis of Johnson's diligence, holding instead that petitioners who make a prima facie showing of intellectual disability are effectively exempt from having to show diligence. ROA.1067–68. This too is error.

Under this Court's precedent, a petitioner is still required to show diligence even if his attorney neglected or abandoned him (and McCann

did neither). *See Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012) ("Precedent instructs that petitioners seeking to establish due diligence must exercise diligence even when they received inadequate legal representation."). "The 'act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition." *Id.* (citing *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (Sotomayor, J., concurring)). And where even pro se petitioners are expected to comply with AEDPA's statute of limitations, it would be unfair to expect less from petitioners who are represented by counsel. *Id.*

Beyond that, this Court has already rejected the contention that intellectual disability claims are not subject to the statute of limitations. *See Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010); *In re Lewis*, 484 F.3d 793, 798 n.20 (5th Cir. 2007). Permitting a petitioner to evade the diligence requirement on the basis of a prima facie showing of intellectual disability would have the same effect. This is particularly true where, as here, the state courts have already found Johnson not intellectual disabled. *See Ex parte Johnson*, No. WR-73,600-02, 2019 WL 1915204, at *1 (Tex. Crim. App. Apr. 29, 2019) (dismissing *Atkins* claim

under Texas Code of Criminal Procedure article 11.071 § 5(a)(3)); *Ex parte Johnson*, No. WR-73,600-03, 2019 WL 3812803, at *1 (Tex. Crim. App. Aug. 13, 2019); *see also Busby v. Davis*, 925 F.3d 699, 710–11 (5th Cir. 2019) (holding the CCA's dismissal of an *Atkins* claim is "necessarily" an adjudication on the merits and is entitled to AEDPA deference). These findings should have been entitled to deference under 28 U.S.C. § 2254(e)(1); instead, the district court ignored them and obviated Johnson from any showing of diligence.

Given that this Court has already declined to categorically exempt *Atkins* claims from the statute of limitations, it was error for the district court to hold that such presumed intellectual disability would categorically exempt a petitioner from having to meet his diligence burden. The Court should reverse the lower court's diligence determination.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand with instructions to dismiss Johnson's petition as successive or, alternatively, to dismiss as untimely.

Respectfully submitted,

ANGELA COLMENERO
Provisional Attorney General of Texas


BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Gwendolyn Vindell
GWENDOLYN VINDELL*
Assistant Attorney General
Criminal Appeals Division
State Bar No. 24088591
    *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
gwendolyn.vindell2@oag.texas.gov

*Counsel For Respondent–Appellant*

## CERTIFICATE OF SERVICE

I do hereby certify that on July 25, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to the following attorneys of record, who consented in writing to accept the NEF as service of this document by electronic means:

Jeremy Don Schepers
Federal Public Defender
525 S Griffin St, Ste 629
Dallas, TX 75202
jeremy_schepers@fd.org

Michael Kawi
Office of the Federal Public Defender
525 S Griffin St, Ste 629
Dallas, TX 75202
Michael_Kawi@fd.org

s/ Gwendolyn Vindell
GWENDOLYN VINDELL
Assistant Attorney General

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by 5th Cir. R. 5 and Rule 32(f), it has 11,611 words.

2.    This document complies with the typeface and type-style requirements of Fed. R. App. P. 5(c) and 32(c)(2) because the motion has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO, in Century Schoolbook font, 14 points.

s/ Gwendolyn Vindell
GWENDOLYN VINDELL
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Gwendolyn Vindell
GWENDOLYN VINDELL
Assistant Attorney General

# United States Court of Appeals

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

July 25, 2023

Ms. Gwendolyn Suzanne Vindell
Office of the Attorney General
Financial Litigation & Charitable Trusts Division
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548

      No. 23-70002    Johnson v. Lumpkin
                    USDC No. 4:19-CV-3047

Dear Ms. Vindell,

Within 14 days, counsel must separately file a copy of the Record Excerpts in Portable Document Format (PDF) file, as required by 5TH CIR. R. 30.1.2, by using the docket event "Record Excerpts Filed," which is found under the "Briefs" category. Failure to do so may result in the dismissal of the appeal.

Note: Once you have prepared your sufficient brief, you must electronically file your 'Proposed Sufficient Brief' by selecting from the Briefs category the event, Proposed Sufficient Brief, via the electronic filing system. Please do not send paper copies of the brief until requested to do so by the clerk's office. The brief is not sufficient until final review by the clerk's office. If the brief is in compliance, paper copies will be requested and you will receive a notice of docket activity advising you that the sufficient brief filing has been accepted and no further corrections are necessary. The certificate of service/proof of service on your proposed sufficient brief **MUST** be dated on the actual date that service is being made. Also, if your brief is sealed, this event automatically seals/restricts any attached documents, therefore you may still use this event to submit a sufficient brief.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Monica R. Washington, Deputy Clerk
                        504-310-7705

cc:  Mr. Jeremy Schepers

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
NEW ORLEANS, LOUISIANA
EAST COURTROOM**

The Court has scheduled the following case for oral argument in Room 223 of the John Minor Wisdom United States Court of Appeals Building, 600 Camp Street, NEW ORLEANS, LOUISIANA on the day shown:

COUNSEL FOR EACH PARTY MUST PRESENT ARGUMENT UNLESS EXCUSED BY THE COURT. CASES MARKED * ARE LIMITED TO 20 MINUTES PER SIDE; CASES WITH NO * ARE LIMITED TO 30 MINUTES PER SIDE UNLESS PREVIOUSLY GRANTED ADDITIONAL TIME. "SIDE" REFERS TO PARTIES IN THEIR POSITION ON APPEAL. IF IN DOUBT, CONSULT THE CLERK'S OFFICE.

**WEDNESDAY, NOVEMBER 6, 2024 –** *COURT CONVENES AT 1:00 P.M.*

No. 23-70002 Dexter Johnson v. Bobby Lumpkin, Appellant. **(30 MINUTES PER SIDE)**

LYLE W. CAYCE
CLERK OF COURT

NEW ORLEANS, LA-08/01/24-A5

**IMPORTANT NOTES**

1. Counsel presenting argument must report to Room 223 of the Wisdom Courthouse at 12:30 p.m.

2. Click on this link to listen live to an oral argument: East Courtroom. (Note, this link is active only during the hearing.) If the live stream is not functioning properly during the hearing, call 504-310-7804 to report the problem.

3. Click on this link to listen to a recording of the argument after the hearing: Oral Argument Recordings. (Recordings are posted shortly after the hearing.)

4. To receive notices of actions in the case, follow instructions at these links:

Attorneys requesting notice of case activity click here: Notice for Cases of Interest for Attorneys
Non-attorneys requesting notice of case activity click here: Notice for Cases of Interest for Non-Attorneys

PLEASE VISIT OUR WEBSITE AT WWW.CA5.USCOURTS.GOV. FOR UPDATES TO THE CALENDARS AND TO OBTAIN THE NAMES OF THE PANEL JUDGES, WHICH WILL BE POSTED ON THE CALENDARS ONE WEEK BEFORE THE BEGINNING OF THE COURT WEEK.

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

August 01, 2024

    No. 23-70002    Johnson v. Lumpkin
                  USDC No. 4:19-CV-3047

Dear Counsel,

The above referenced case has been scheduled for oral argument on November 6, 2024. It will be held in East Courtroom at 1:00 p.m.  The Oral Argument session number is A5.

**Arguing counsel is responsible for electronically filing the Oral Argument Acknowledgment Form by no later than October 23, 2024.** To submit your form, log in to CM/ECF and select the event 'Oral Argument Acknowledgment Form Filed.' Please include your session number when completing the Oral Argument Acknowledgment Form.

IMPORTANT: Please confer with all counsel on your side regarding the order and division of time before submitting the form. This step is critical to ensure you are providing the court with accurate information. The court will not allow any changes except in emergency situations.

**The Oral Argument Acknowledgment Form is available on our website at https://www.ca5.uscourts.gov/oral-argument-information/attending-oral-arguments.** Also available on this page are links to the 'Court and Special Hearings Calendar' and 'Court Policy on Electronic Devices'.

If you have not electronically filed a "Form for Appearance of Counsel," you must do so before filing the Oral Argument Acknowledgment Form.  You must name each party you represent, See Fed. R. App. P. and 5th Cir. R. 12.  The form is available at https://www.ca5.uscourts.gov/appearanceform.  Attorneys appointed under the Criminal Justice Act are exempt from the requirement to file a Form for Appearance of Counsel.

To ensure that we can provide all pertinent materials to the court before argument, we must receive any additional filings in this office by noon on the workday immediately preceding the day your case is scheduled for argument. Exceptions will be made for emergencies only.

Notice to Court Appointed Counsel: Please review for information on CJA travel at https://www.ca5.uscourts.gov/oral-argument-information/attorney-information/cja-travel-information.

All questions regarding the scheduling and argument of this case should be directed to the assigned courtroom deputy, Kim Pollard at 504-310-7635.

Sincerely,

LYLE W. CAYCE, Clerk

By:_____
Charles B. Whitney, Calendar Clerk
504-310-7679

(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY *v.* MARTINEZ RAMIREZ

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–1009.   Argued December 8, 2021—Decided May 23, 2022*

Respondents David Martinez Ramirez and Barry Lee Jones were each convicted of capital crimes in Arizona state court and sentenced to death.  The Arizona Supreme Court affirmed each case on direct review, and each prisoner was denied state postconviction relief.  Each also filed for federal habeas relief under 28 U. S. C. §2254, arguing that trial counsel had been ineffective for failing to conduct adequate investigations.  The Federal District Court held in each case that the prisoner's ineffective-assistance claim was procedurally defaulted because it was not properly presented in state court.  To overcome procedural default in such cases, a prisoner must demonstrate "cause" to excuse the procedural defect and "actual prejudice."  *Coleman* v. *Thompson,* 501 U. S. 722, 750.  To demonstrate cause, Ramirez and Jones relied on *Martinez* v. *Ryan,* 566 U. S. 1, which held that ineffective assistance of postconviction counsel may be cited as cause for the procedural default of an ineffective-assistance-of-trial-counsel claim.  In Ramirez's case, the District Court permitted him to supplement the record with evidence not presented in state court to support his case to excuse the procedural default.  Assessing the new evidence, the court excused the procedural default but rejected Ramirez's ineffective-assistance claim on the merits.  The Ninth Circuit reversed and remanded for more evidentiary development to litigate the merits of

———————

*Together with *Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry, et al.* v. *Jones* (see this Court's Rule 12.4), also on certiorari to the same court.

2                    SHINN *v.* MARTINEZ RAMIREZ

Syllabus

Ramirez's ineffective-assistance-of-trial-counsel claim.  In Jones' case, the District Court held a lengthy evidentiary hearing on "cause" and "prejudice," forgave his procedural default, and held that his state trial counsel had provided ineffective assistance.  The State of Arizona petitioned this Court in both cases, arguing that §2254(e)(2) does not permit a federal court to order evidentiary development simply because postconviction counsel is alleged to have negligently failed to develop the state-court record.

*Held*: Under §2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on the ineffective assistance of state postconviction counsel.  Pp. 6–22.

(a) To respect federal-state dual sovereignty, see *Printz* v. *United States,* 521 U. S. 898, 918, the availability of federal habeas relief is narrowly circumscribed, see *Brown* v. *Davenport*, 596 U. S. ___, ___–___.  For example, only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.  Pp. 6–13.

(1) Federal habeas review overrides the States' core power to enforce criminal law—an intrusion that "imposes special costs" on the federal system.  *Engle* v. *Isaac,* 456 U. S. 107, 128.  Two of those costs are particularly relevant here.  First, a federal order to retry or release a state prisoner overrides the State's sovereign power to enforce "societal norms through criminal law."  *Calderon* v. *Thompson,* 523 U. S. 538, 556.  Second, federal intervention imposes significant costs on state criminal justice systems.  See, *e.g., Wainwright* v. *Sykes,* 433 U. S. 72, 90.  Pp. 6–8.

(2) In light of these costs, this Court recognizes that federal habeas review is not "a substitute for ordinary error correction through appeal," but is an "extraordinary remedy" that guards only against "extreme malfunctions in the state criminal justice systems."  *Harrington* v. *Richter,* 562 U. S. 86, 102–103.  To ensure that federal habeas retains its narrow role, both Congress and federal habeas courts have set out strict rules requiring prisoners to raise all of their federal claims in state court before seeking federal relief.  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires state prisoners to "exhaus[t] the remedies available in the courts of the State" before seeking federal habeas relief.  §2254(b)(1)(A).  And the doctrine of procedural default—"an important 'corollary' to the exhaustion requirement," *Davila* v. *Davis*, 582 U. S. ___, ___—generally prevents federal courts from hearing any federal claim that was not presented to the state courts "consistent with [the State's] own procedural rules," *Edwards* v. *Carpenter,* 529 U. S. 446, 453.  Together, exhaustion and procedural default promote federal-state comity by affording States

Syllabus

"an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights," *Duckworth* v. *Serrano,* 454 U. S. 1, 3 (*per curiam*), and by protecting against "the significant harm to the States that results from the failure of federal courts to respect" state procedural rules, *Coleman*, 501 U. S., at 750.  Pp. 8–10.

(3) Nonetheless, a federal court is not required to automatically deny unexhausted or procedurally defaulted claims.  For instance, when a claim is procedurally defaulted, a federal court can forgive the default and adjudicate the claim if the prisoner provides an adequate excuse.  And if the state-court record for that defaulted claim is undeveloped, the prisoner must show that factual development in federal court is appropriate.  Pp. 10–13.

(i) Federal courts may excuse procedural default only if a prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."  *Coleman*, 501 U. S., at 750.  With respect to cause, "attorney error cannot provide cause to excuse a default" "in proceedings for which the Constitution does not guarantee the assistance of counsel at all."  *Davila*, 582 U. S., at ___.  But in *Martinez*, this Court recognized a "narrow exception" to that rule, holding that ineffective assistance of state postconviction counsel may constitute "cause" to forgive procedural default of a trial-ineffective-assistance claim, but only if the State requires prisoners to raise such claims for the first time during state collateral proceedings.  566 U. S., at 9.  Pp. 10–11.

(ii) Excusing a prisoner's failure to develop the state-court record faces an even higher bar.  Section 2254(e)(2) applies when a prisoner "has failed to develop the factual basis of a claim," *i.e.,* is "at fault" for the undeveloped record in state court, *Williams* v. *Taylor,* 529 U. S. 420, 432.  If a prisoner is "at fault," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios not relevant here.  See §§2254(e)(2)(A)(i), (ii).  The prisoner also must show that further factfinding would demonstrate, by clear and convincing evidence, that he is innocent of the crime charged.  Pp. 12–13.

(b) Although respondents do not satisfy §2254(e)(2)'s narrow exceptions, the Court of Appeals forgave respondents' failures to develop the state-court record because, in its view, they each received ineffective assistance of state postconviction counsel.  The Court of Appeals erred.  Pp. 13–22.

(1) Respondents primarily argue that a prisoner is not "at fault" for the undeveloped record if state postconviction counsel negligently failed to develop the state record for a claim of ineffective assistance of trial counsel.  But under AEDPA and this Court's precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner.  Pp. 13–19.

(i) A prisoner "bears the risk in federal habeas for all attorney errors made in the course of the representation." *Coleman,* 501 U. S., at 754. And, because there is no constitutional right to counsel in state postconviction proceedings, a prisoner must ordinarily "bea[r] responsibility" for all attorney errors during those proceedings, *Williams,* 529 U. S., at 432, including responsibility for counsel's negligent failure to develop the state postconviction record. This Court's prior cases make this point clear. See, *e.g., Keeney* v. *Tamayo-Reyes,* 504 U. S. 1; *Williams,* 529 U. S. 420; *Holland* v. *Jackson,* 542 U. S. 649 (*per curiam*). Thus, a prisoner is "at fault" even when state postconviction counsel is negligent. Pp. 14–15.

(ii) Respondents propose extending *Martinez* so that ineffective assistance of postconviction counsel can excuse a prisoner's failure to develop the state-court record under §2254(e)(2). But unlike judge-made exceptions to procedural default, §2254(e)(2) is a statute, and thus, this Court has no power to redefine when a prisoner "has failed to develop the factual basis of a claim in State court proceedings." Nor is it plausible, as respondents contend, that Congress might have enacted §2254(e)(2) with the expectation that this Court would one day open the door to allowing the ineffective assistance of state postconviction counsel to be cause to forgive procedural default. Finally, *Martinez* itself cuts against respondents' proposed result. *Martinez* foreclosed any extension of its holding beyond the "narrow exception" to procedural default at issue in that case. See 566 U. S., at 9. That assurance has bite only if the State can rely on the state-court record. The cases here demonstrate the improper burden imposed on the States when *Martinez* applies beyond its narrow scope, with the sprawling evidentiary hearing in Jones' case being particularly poignant. Pp. 15–19.

(2) Respondents propose a second reading of §2254(e)(2) that supposedly permits consideration of new evidence in their habeas cases. First, they argue that because §2254(e)(2) bars only "an evidentiary hearing on the claim," a federal court may hold an evidentiary hearing to determine whether there is cause and prejudice. Second, respondents contend that the habeas court may then consider that new evidence to evaluate the merits of the underlying ineffective-assistance claim. By considering already admitted evidence, respondents reason, the habeas court is not holding a "hearing" prohibited by §2254(e)(2). But, in *Holland,* this Court explained that §2254(e)(2)'s "restrictions apply *a fortiori* when a prisoner seeks relief based on new evidence without an evidentiary hearing." 542 U. S., at 653 (emphasis deleted). Therefore, when a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise reviews any evidence for any purpose, it may not consider that evidence on the merits of a negligent

Cite as:  596 U. S. ____ (2022)                    5

Syllabus

prisoner's defaulted claim unless the exceptions in §2254(e)(2) are satisfied.  Pp. 19–22.

937 F. 3d 1230 and 943 F. 3d 1211, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined.  SOTOMAYOR, J., filed a dissenting opinion, in which BREYER and KAGAN, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 20–1009

———

DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, PETITIONER *v.* DAVID MARTINEZ RAMIREZ

DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, ET AL., PETITIONERS *v.* BARRY LEE JONES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 23, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures. When the prisoner has failed to do so, and the state court would dismiss the claim on that basis, the claim is "procedurally defaulted." To overcome procedural default, the prisoner must demonstrate "cause" to excuse the procedural defect and "actual prejudice" if the federal court were to decline to hear his claim. *Coleman* v. *Thompson*, 501 U. S. 722, 750 (1991). In *Martinez* v. *Ryan*, 566 U. S. 1 (2012), this Court explained that ineffective assistance of postconviction counsel is "cause" to forgive procedural default of an ineffective-assistance-of-trial-counsel claim, but only if the State required the prisoner to raise that claim

Opinion of the Court

for the first time during state postconviction proceedings.

Often, a prisoner with a defaulted claim will ask a federal habeas court not only to consider his claim but also to permit him to introduce new evidence to support it.  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the standard to expand the state-court record is a stringent one.  If a prisoner has "failed to develop the factual basis of a claim in State court proceedings," a federal court "shall not hold an evidentiary hearing on the claim" unless the prisoner satisfies one of two narrow exceptions, see 28 U. S. C. §2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence "by clear and convincing evidence," §2254(e)(2)(B).  In all but these extraordinary cases, AEDPA "bars evidentiary hearings in federal habeas proceedings initiated by state prisoners." *McQuiggin* v. *Perkins*, 569 U. S. 383, 395 (2013).

The question presented is whether the equitable rule announced in *Martinez* permits a federal court to dispense with §2254(e)(2)'s narrow limits because a prisoner's state postconviction counsel negligently failed to develop the state-court record.  We conclude that it does not.

I

In this case, we address two petitions brought by the State of Arizona.  See *Ramirez* v. *Ryan*, 937 F. 3d 1230 (CA9 2019); *Jones* v. *Shinn*, 943 F. 3d 1211 (CA9 2019).

A

On May 25, 1989, David Ramirez fatally stabbed his girlfriend, Mary Ann Gortarez, and her 15-year-old daughter, Candie, in their home.  937 F. 3d, at 1234–1235; *State* v. *Ramirez*, 178 Ariz. 116, 119, 121, 871 P. 2d 237, 240, 242 (1994).  Ramirez stabbed Mary Ann 18 times in the neck with a pair of scissors, and Candie 15 times in the neck with a box cutter.  *Id.*, at 121, 871 P. 2d, at 242.  Police also found physical evidence that Ramirez had raped Candie, and

Opinion of the Court

Ramirez later admitted that he had sex with the child on the night of the murders and four times before. *Ibid.* A jury convicted Ramirez of two counts of premeditated first-degree murder. *Ibid.* The trial court sentenced Ramirez to death, *ibid.*, and the Arizona Supreme Court affirmed on direct review, *id.*, at 132, 871 P. 2d, at 253.

Ramirez then filed his first petition for state postconviction relief. That petition raised myriad claims, but it did not raise the one at issue here: that Ramirez's trial counsel provided ineffective assistance for "failing to conduct a complete mitigation investigation" or "obtai[n] and present available mitigation evidence at sentencing." App. 402. Ramirez did not raise this ineffective-assistance claim until he subsequently filed a successive state habeas petition, which the state court summarily denied as untimely under Arizona law. See *ibid.*

Ramirez also petitioned the U. S. District Court for the District of Arizona for a writ of habeas corpus under 28 U. S. C. §2254. As relevant here, the District Court held that Ramirez had procedurally defaulted his ineffective-assistance claim by failing to raise it before the Arizona courts in a timely fashion. See App. 402–403. Ramirez responded that the District Court should forgive the procedural default because his state postconviction counsel was himself ineffective for failing to raise the trial-ineffective-assistance claim and develop the facts to support it.

The District Court permitted Ramirez to file several declarations and other evidence not presented to the state court to support his request to excuse his procedural default. See 937 F. 3d, at 1238. Assessing the new evidence, the District Court excused the procedural default but rejected Ramirez's ineffective-assistance claim on the merits. See *id.*, at 1240.

The Ninth Circuit reversed and remanded. Like the District Court, it held that Ramirez's state postconviction coun-

sel's failure to raise and develop the trial-ineffective-assistance claim was cause to forgive the procedural default. See *id.*, at 1247–1248. The Ninth Circuit also held that Ramirez's underlying trial-ineffective-assistance claim was substantial, and that Ramirez therefore had suffered prejudice. See *id.*, at 1243–1247. But, unlike the District Court, the Court of Appeals declined to decide the merits of Ramirez's claim. The court remanded the case for further factfinding because, in its view, Ramirez was "entitled to evidentiary development to litigate the merits of his ineffective assistance of trial counsel claim." *Id.*, at 1248.

Arizona petitioned for rehearing en banc, arguing that the Ninth Circuit's remand for additional evidentiary development violated 28 U. S. C. §2254(e)(2). The Ninth Circuit denied rehearing over an eight-judge dissent by Judge Collins. See 971 F. 3d 1116 (2020).

### B

On May 1, 1994, Barry Lee Jones repeatedly beat his girlfriend's 4-year-old daughter, Rachel Gray. See 943 F. 3d, at 1215–1216; *State* v. *Jones*, 188 Ariz. 388, 391, 937 P. 2d 310, 313 (1997). One blow to Rachel's abdomen ruptured her small intestine. See *id.*, at 391, 937 P. 2d, at 313. She also sustained several injuries to her vagina and labia consistent with sexual assault. *Ibid.* Early the next morning, Jones drove Rachel to the hospital, where she was pronounced dead on arrival. See *ibid.* Rachel died of peritonitis—"an infection of the lining of the abdomen caused by a ruptured intestine." *Ibid.* A jury convicted Jones of sexual assault, three counts of child abuse, and felony murder. *Ibid.* The trial judge sentenced Jones to death, *ibid.*, and the Arizona Supreme Court affirmed on direct review, see *id.*, at 401, 937 P. 2d, at 323.

Jones then petitioned for state postconviction relief. He alleged ineffective assistance by his trial counsel, but not the specific trial-ineffective-assistance claim at issue here:

Opinion of the Court

that his counsel "fail[ed] to conduct sufficient trial investigation." 943 F. 3d, at 1218. The Arizona Supreme Court summarily denied relief. See *ibid.*

Jones next filed a habeas petition in the U. S. District Court for the District of Arizona. The District Court held that Jones' trial-ineffective-assistance claim was procedurally defaulted, so Jones, like Ramirez, invoked his postconviction counsel's ineffective assistance as grounds to forgive the default. *Ibid.* To bolster his case for cause and prejudice, Jones also moved to supplement the undeveloped state-court record. *Ibid.* The District Court held a 7-day evidentiary hearing with more than 10 witnesses and ultimately decided to forgive Jones' procedural default. See *id.*, at 1219, 1225–1226. The court then relied on the new evidence from the cause-and-prejudice hearing to hold, on the merits, that Jones' trial counsel had provided ineffective assistance. See *id.*, at 1219.

Arizona appealed, arguing that §2254(e)(2) did not permit the evidentiary hearing. The Ninth Circuit affirmed, holding that §2254(e)(2) did not apply because Jones' state postconviction counsel was ineffective for failing to develop the state-court record for Jones' trial-ineffective-assistance claim. See *id.*, at 1220–1222.

As in *Ramirez*, Arizona petitioned for rehearing en banc. And, also as in *Ramirez*, the Ninth Circuit denied Arizona's petition over the dissent of Judge Collins, joined by seven other judges. *Jones* v. *Shinn*, 971 F. 3d 1133 (2020).

C

As noted above, Arizona petitioned for a writ of certiorari in both *Ramirez* and *Jones*. The State maintains that 28 U. S. C. §2254(e)(2) does not permit a federal court to order evidentiary development simply because postconviction counsel is alleged to have negligently failed to develop the state-court record. Respondents do not dispute, and therefore concede, that their habeas petitions fail on the state-

6                    SHINN *v.* MARTINEZ RAMIREZ

Opinion of the Court

court record alone.   We granted certiorari, 593 U. S. ___
(2021).*

## II

A state prisoner may request that a federal court order
his release by petitioning for a writ of habeas corpus.  See
28 U. S. C. §2254.  The writ may issue "only on the ground
that [the prisoner] is in custody in violation of the Consti-
tution or laws or treaties of the United States."  §2254(a).
To respect our system of dual sovereignty, see *Printz* v.
*United States*, 521 U. S. 898, 918 (1997), the availability of
habeas relief is narrowly circumscribed, see *Brown* v. *Dav-
enport*, 596 U. S. ___, ___–___ (2022) (slip op., at 11–14).
Among other restrictions, only rarely may a federal habeas
court hear a claim or consider evidence that a prisoner did
not previously present to the state courts in compliance
with state procedural rules.

### A

"From the beginning of our country, criminal law enforce-
ment has been primarily a responsibility of the States."
*Kansas* v. *Garcia*, 589 U. S. ___, ___ (2020) (slip op., at 19).
The power to convict and punish criminals lies at the heart
of the States' "residuary and inviolable sovereignty."  The
Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison);

---

*Ramirez alleges that Arizona forfeited any §2254(e)(2) argument
in his case because it did not object to some evidentiary development in
the District Court or before the Ninth Circuit panel.  But Arizona did
object to further factfinding before the Ninth Circuit panel, see Respond-
ents-Appellees' Answering Brief in *Ramirez* v. *Ryan*, No. 10–99023
(CA9), ECF Doc. 37, p. 58, and, in any event, the Ninth Circuit passed
upon §2254(e)(2) when it ordered additional factfinding on remand, see
*United States* v. *Williams*, 504 U. S. 36, 41 (1992).  Further, because we
have discretion to forgive any forfeiture, and because "our deciding the
matter now will reduce the likelihood of further litigation" in a 30-year-
old murder case, *Polar Tankers, Inc.* v. *City of Valdez*, 557 U. S. 1, 14
(2009) (plurality opinion), we choose to forgive the State's forfeiture be-
fore the District Court.

Opinion of the Court

see also *Gamble* v. *United States*, 587 U. S. ___, ___–___ (2019) (slip op., at 9–10). Thus, "[t]he States possess primary authority for defining and enforcing the criminal law," *Engle* v. *Isaac*, 456 U. S. 107, 128 (1982), and for adjudicating "constitutional challenges to state convictions," *Harrington* v. *Richter*, 562 U. S. 86, 103 (2011).

Because federal habeas review overrides the States' core power to enforce criminal law, it "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Ibid.* (internal quotation marks omitted). That intrusion "imposes special costs on our federal system." *Engle*, 456 U. S., at 128; see also *Kuhlmann* v. *Wilson*, 477 U. S. 436, 453, n. 16 (1986); *Davila* v. *Davis*, 582 U. S. ___, ___ (2017) (slip op., at 15). Here, two of those costs are particularly relevant.

First, a federal order to retry or release a state prisoner overrides the State's sovereign power to enforce "societal norms through criminal law." *Calderon* v. *Thompson*, 523 U. S. 538, 556 (1998) (internal quotation marks omitted). That is so because habeas relief "frequently cost[s] society the right to punish admitted offenders." *Engle*, 456 U. S., at 127; see also *Edwards* v. *Vannoy*, 593 U. S. ___, ___ (2021) (slip op., at 6) ("When previously convicted perpetrators of violent crimes go free merely because the evidence needed to conduct a retrial has become stale or is no longer available, the public suffers, as do the victims"). "Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U. S., at 556. "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Ibid.* (internal quotation marks and citation omitted).

Second, federal intervention imposes significant costs on state criminal justice systems. It "disturbs the State's sig-

nificant interest in repose for concluded litigation," *Harrington*, 562 U. S., at 103 (internal quotation marks omitted), and undermines the States' investment in their criminal trials.  If the state trial is merely a "'tryout on the road'" to federal habeas relief, that "detract[s] from the perception of the trial of a criminal case in state court as a decisive and portentous event."  *Wainwright* v. *Sykes*, 433 U. S. 72, 90 (1977).

### B

In light of these significant costs, we have recognized that federal habeas review cannot serve as "a substitute for ordinary error correction through appeal."  *Harrington*, 562 U. S., at 102–103.  The writ of habeas corpus is an "extraordinary remedy" that guards only against "extreme malfunctions in the state criminal justice systems."  *Id.*, at 102 (internal quotation marks omitted); see also *Brecht* v. *Abrahamson*, 507 U. S. 619, 633–634 (1993).  To ensure that federal habeas corpus retains its narrow role, AEDPA imposes several limits on habeas relief, and we have prescribed several more.  See, *e.g.*, *Brown*, 596 U. S., at ___–___ (slip op., at 11–13).  And even if a prisoner overcomes all of these limits, he is never entitled to habeas relief.  He must still "persuade a federal habeas court that law and justice require [it]."  *Id.*, at ___ (slip op., at 11) (internal quotation marks omitted).

As relevant here, both Congress and federal habeas courts have set out strict rules requiring prisoners to raise all of their federal claims in state court before seeking federal relief.  First, AEDPA requires state prisoners to "exhaus[t] the remedies available in the courts of the State" before seeking federal habeas relief.  28 U. S. C. §2254(b)(1)(A).  Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures.  See *O'Sullivan* v. *Boerckel*, 526 U. S. 838, 848 (1999).  If he does

Opinion of the Court

so, a federal habeas court may hear his claim, but its review is highly circumscribed. In particular, the federal court may review the claim based solely on the state-court record, see *Cullen* v. *Pinholster*, 563 U. S. 170, 180 (2011), and the prisoner must demonstrate that, under this Court's precedents, no "fairminded juris[t]" could have reached the same judgment as the state court, *Harrington*, 562 U. S., at 102; see §2254(d).

State prisoners, however, often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court at all. If a state court would dismiss these claims for their procedural failures, such claims are technically exhausted because, in the habeas context, "state-court remedies are . . . 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Woodford* v. *Ngo*, 548 U. S. 81, 92–93 (2006). But to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule. See *Coleman*, 501 U. S., at 732. Thus, federal habeas courts must apply "an important 'corollary' to the exhaustion requirement": the doctrine of procedural default. *Davila*, 582 U. S., at ___ (slip op., at 4). Under that doctrine, federal courts generally decline to hear any federal claim that was not presented to the state courts "consistent with [the State's] own procedural rules." *Edwards* v. *Carpenter*, 529 U. S. 446, 453 (2000).

Together, exhaustion and procedural default promote federal-state comity. Exhaustion affords States "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights," *Duckworth* v. *Serrano*, 454 U. S. 1, 3 (1981) (*per curiam*), and procedural default protects against "the significant harm to the States that results from the failure of federal courts to respect" state procedural rules, *Coleman*, 501 U. S., at 750. Ultimately, "it would be unseemly in our dual system of government for a federal

10              SHINN *v.* MARTINEZ RAMIREZ

Opinion of the Court

district court to upset a state court conviction without [giving] an opportunity to the state courts to correct a constitutional violation," *Darr* v. *Burford*, 339 U. S. 200, 204 (1950), and to do so consistent with their own procedures, see *Edwards*, 529 U. S., at 452–453.

C

Despite the many benefits of exhaustion and procedural default, and the substantial costs when those doctrines are not enforced, we have held that a federal court is not required to automatically deny unexhausted or procedurally defaulted claims. When a claim is unexhausted, the prisoner might have an opportunity to return to state court to adjudicate the claim. See, *e.g.*, *Rose* v. *Lundy*, 455 U. S. 509, 520 (1982). When a claim is procedurally defaulted, a federal court can forgive the default and adjudicate the claim if the prisoner provides an adequate excuse. Likewise, if the state-court record for that defaulted claim is undeveloped, the prisoner must show that factual development in federal court is appropriate.

1

"Out of respect for finality, comity, and the orderly administration of justice," *Dretke* v. *Haley*, 541 U. S. 386, 388 (2004), federal courts may excuse procedural default only if a prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," *Coleman*, 501 U. S., at 750. To establish cause, the prisoner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray* v. *Carrier*, 477 U. S. 478, 488 (1986). Then, to establish prejudice, the prisoner must show not merely a substantial federal claim, such that "'the errors at . . . trial created a *possibility* of prejudice," but rather that the constitutional violation "worked to his *actual* and substantial disadvantage.'" *Id.*, at 494 (quoting *United*

Opinion of the Court

*States* v. *Frady*, 456 U. S. 152, 170 (1982)).

With respect to cause, "[a]ttorney ignorance or inadvertence" cannot excuse procedural default. *Coleman*, 501 U. S., at 753. "[T]he attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Ibid.* (internal quotation marks omitted). That said, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." *Murray*, 477 U. S., at 488. That is not because a constitutional error "is so bad that the lawyer ceases to be an agent" of the prisoner, but rather because a violation of the right to counsel "must be seen as an external factor" to the prisoner's defense. *Coleman*, 501 U. S., at 754 (internal quotation marks omitted). "It follows, then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." *Davila*, 582 U. S., at ___ (slip op., at 6).

In *Martinez*, this Court recognized a "narrow exception" to the rule that attorney error cannot establish cause to excuse a procedural default unless it violates the Constitution. 566 U. S., at 9. There, the Court held that ineffective assistance of state postconviction counsel may constitute "cause" to forgive procedural default of a trial-ineffective-assistance claim, but only if the State requires prisoners to raise such claims for the first time during state collateral proceedings. See *ibid.* One year later, in *Trevino* v. *Thaler*, 569 U. S. 413 (2013), this Court held that this "narrow exception" applies if the State's judicial system effectively forecloses direct review of trial-ineffective-assistance claims. *Id.*, at 428. Otherwise, attorney error where there is no right to counsel remains insufficient to show cause. *Martinez*, 566 U. S., at 16.

Opinion of the Court

2

There is an even higher bar for excusing a prisoner's fail-
ure to develop the state-court record.   Shortly before
AEDPA, we held that a prisoner who "negligently failed" to
develop the state-court record must satisfy *Coleman*'s
cause-and-prejudice standard before a federal court can
hold an evidentiary hearing.  *Keeney* v. *Tamayo-Reyes*, 504
U. S. 1, 9 (1992).  In *Keeney*, we explained that "little [could]
be said for holding a habeas petitioner to one standard for
failing to bring a claim in state court and excusing the peti-
tioner under another, lower standard for failing to develop
the factual basis of that claim in the same forum."   *Id.*, at
10.  And, consistent with *Coleman*, we held that evidentiary
development would be inappropriate "where the cause as-
serted is attorney error."  504 U. S., at 11, n. 5.

Four years later, Congress enacted AEDPA and replaced
*Keeney*'s cause-and-prejudice standard for evidentiary de-
velopment with the even "more stringent requirements"
now codified at 28 U. S. C. §2254(e)(2).  *Williams* v. *Taylor*,
529 U. S. 420, 433 (2000) (*Michael Williams*).   Section
2254(e)(2) provides that, if a prisoner "has failed to develop
the factual basis of a claim in State court proceedings," a
federal court may hold "an evidentiary hearing on the
claim" in only two limited scenarios.  Either the claim must
rely on (1) a "new" and "previously unavailable" "rule of
constitutional law" made retroactively applicable by this
Court, or (2) "a factual predicate that could not have been
previously discovered through the exercise of due dili-
gence."  §§2254(e)(2)(A)(i), (ii).  If a prisoner can satisfy ei-
ther of these exceptions, he also must show that further
factfinding would demonstrate, "by clear and convincing ev-
idence," that "no reasonable factfinder" would have con-
victed him of the crime charged.  §2254(e)(2)(B).  Finally,
even if all of these requirements are satisfied, a federal ha-
beas court still is not *required* to hold a hearing or take any
evidence.  Like the decision to grant habeas relief itself, the

Opinion of the Court

decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case. Cf. *Brown*, 596 U. S., at ___–___ (slip op., at 13–14).

Even though AEDPA largely displaced *Keeney*, §2254(e)(2) retained "one aspect of *Keeney*'s holding." *Michael Williams*, 529 U. S., at 433. Namely, §2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim." We interpret "fail," consistent with *Keeney*, to mean that the prisoner must be "at fault" for the undeveloped record in state court. 529 U. S., at 432. A prisoner is "at fault" if he "bears responsibility for the failure" to develop the record. *Ibid.*

### III

Respondents concede that they do not satisfy §2254(e)(2)'s narrow exceptions. Nonetheless, the Court of Appeals forgave respondents' failures to develop the state-court record because, in its view, they each received ineffective assistance of state postconviction counsel. We now hold that, under §2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.

### A

Respondents' primary claim is that a prisoner is not "at fault," *Michael Williams*, 529 U. S., at 432, and therefore has not "failed to develop the factual basis of a claim in State court proceedings," §2254(e)(2), if state postconviction counsel negligently failed to develop the state record for a claim of ineffective assistance of trial counsel. But under AEDPA and our precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner.

1

As stated above, a prisoner "bears the risk in federal habeas for all attorney errors made in the course of the representation," *Coleman*, 501 U. S., at 754, unless counsel provides "constitutionally ineffective" assistance, *Murray*, 477 U. S., at 488.  And, because there is no constitutional right to counsel in state postconviction proceedings, see *Davila*, 582 U. S., at ___ (slip op., at 6), a prisoner ordinarily must "bea[r] responsibility" for all attorney errors during those proceedings, *Michael Williams*, 529 U. S., at 432.  Among those errors, a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record.

Both before and after AEDPA, our prior cases have made this point clear.  First, in *Keeney*, "material facts had not been adequately developed in the state postconviction court, apparently due to the negligence of postconviction counsel." 504 U. S., at 4 (citation omitted).  We required the prisoner to demonstrate cause and prejudice to forgive postconviction counsel's deficient performance, see *id.*, at 11, and recognized that counsel's negligence, on its own, was not a sufficient cause, see *id.*, at 10, n. 5.

Second, in *Michael Williams*, we confirmed that "the opening clause of §2254(e)(2) codifies *Keeney*'s threshold standard of diligence, so that prisoners who would have had to satisfy *Keeney*'s [cause-and-prejudice] test . . . are now controlled by §2254(e)(2)."  529 U. S., at 434.  In other words, because *Keeney* held a prisoner responsible for state postconviction counsel's negligent failure to develop the state-court record, the same rule applied under §2254(e)(2).  For that reason, "a failure to develop the factual basis of a claim," as §2254(e)(2) requires, "is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*."  529 U. S., at 432 (emphasis added).  We then applied that rule and held that state postconviction counsel's "failure to investigate . . . in anything but a cursory manner trigger[ed] the opening

Opinion of the Court

clause of §2254(e)(2).”  *Id.*, at 439–440.

Third, in *Holland* v. *Jackson*, 542 U. S. 649 (2004) (*per curiam*), we again held a prisoner responsible for state postconviction counsel's negligent failure to develop the state-court record.  Seven years after the prisoner's conviction, and after he had already been denied state postconviction relief, the prisoner found a new witness to provide impeachment testimony.  See *id.*, at 650–651.  The prisoner claimed that he discovered the witness so late because "state postconviction counsel did not heed his pleas for assistance." *Id.*, at 653.  Citing *Coleman* and *Michael Williams*, we rejected the prisoner's claim.  "Attorney negligence," we held, "is chargeable to the client and precludes relief unless the conditions of §2254(e)(2) are satisfied."  542 U. S., at 653.

In sum, under §2254(e)(2), a prisoner is "at fault" even when state postconviction counsel is negligent.  In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy §2254(e)(2)'s stringent requirements.

### 2

Respondents dispute none of this.  Instead, they rely almost exclusively on *Martinez*'s holding that ineffective assistance of postconviction counsel can be "cause" to forgive procedural default of a trial-ineffective-assistance claim if a State forecloses direct review of that claim, as Arizona concededly does.  See 566 U. S., at 9.  Respondents contend that where, per *Martinez*, a prisoner is not responsible for state postconviction counsel's failure to raise a claim, it makes little sense to hold the prisoner responsible for the failure to develop that claim.  Thus, respondents propose extending *Martinez* so that ineffective assistance of postconviction counsel can excuse a prisoner's failure to develop the state-court record under §2254(e)(2).

Congress foreclosed respondents' proposed expansion of *Martinez* when it passed AEDPA.  *Martinez* decided that,

Opinion of the Court

in the exercise of our "equitable judgment" and "discretion," it was appropriate to modify "[t]he rules for when a prisoner may establish cause to excuse a procedural default." *Id.*, at 13. Such "exceptions" to procedural default "are judge-made rules" that we may modify "only when necessary." *Dretke*, 541 U. S., at 394. Here, however, §2254(e)(2) is a statute that we have no authority to amend. "Where Congress has erected a constitutionally valid barrier to habeas relief, a court *cannot* decline to give it effect." *McQuiggin*, 569 U. S., at 402 (Scalia, J., dissenting); see also *Ex parte Bollman*, 4 Cranch 75, 94 (1807) (Marshall, C. J., for the Court). For example, in *McQuiggin*, we explained that we have no power to layer a miscarriage-of-justice or actual-innocence exception on top of the narrow limitations already included in §2254(e)(2). See 569 U. S., at 395–396 (majority opinion).

The same follows here. We have no power to redefine when a prisoner "has failed to develop the factual basis of a claim in State court proceedings." §2254(e)(2). Before AEDPA, *Keeney* held that "attorney error" during state postconviction proceedings was not cause to excuse an undeveloped state-court record. 504 U. S., at 11, n. 5. And, in *Michael Williams*, we acknowledged that §2254(e)(2) "raised the bar *Keeney* imposed on prisoners who were not diligent in state-court proceedings," 529 U. S., at 433, while reaffirming that prisoners are responsible for attorney error, see *id.*, at 432. Yet here, respondents claim that attorney error alone permits a federal court to expand the federal habeas record. That result makes factfinding more readily available than *Keeney* envisioned pre-AEDPA and ignores *Michael Williams*' admonition that "[c]ounsel's failure" to perform as a "diligent attorney" "triggers the opening clause of §2254(e)(2)." 529 U. S., at 439–440. We simply cannot square respondents' proposed result with AEDPA or our precedents.

Respondents propose that Congress may have actually

Opinion of the Court

invited their judicial update.   According to respondents, *Martinez* explained that *Coleman* left open whether ineffective assistance of state postconviction counsel might one day be cause to forgive procedural default, at least in an "initial-review collateral proceeding," *Martinez*, 566 U. S., at 5, "where state collateral review is the first place a prisoner can present a challenge to his conviction," *Coleman*, 501 U. S., at 755.   Respondents contend that Congress might have enacted §2254(e)(2) with the expectation that this Court one day would open that door.

We do not agree.   First, "[g]iven our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief . . . it is implausible that, without saying so," *Fry* v. *Pliler*, 551 U. S. 112, 119 (2007), Congress intended this Court to liberalize the availability of habeas relief generally, or access to federal factfinding specifically. Second, in *Coleman*, we "reiterate[d] that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation," and surmised that a hypothetical constitutional right to initial-review postconviction counsel could give rise to a corresponding claim for cause.   501 U. S., at 755; see also *Martinez*, 566 U. S., at 8–9.   Since then, however, we have repeatedly reaffirmed that there is no constitutional right to counsel in state postconviction proceedings.   See, *e.g.*, *Davila*, 582 U. S., at ___ (slip op., at 6).

We also reject respondents' equitable rewrite of §2254(e)(2) because it lacks any principled limit.   This Court's holding in *Martinez* addressed only one kind of claim: ineffective assistance of trial counsel.   See 566 U. S., at 9.   We limited our holding in that way to reflect our "equitable judgment" that trial-ineffective-assistance claims are uniquely important.   *Id.*, at 12–13.   Respondents propose that we similarly should permit factual development under §2254(e)(2) only for trial-ineffective-assistance claims.   But §2254(e)(2) applies whenever any state prisoner "failed to develop the factual basis of *a claim*,"

Opinion of the Court

§2254(e)(2) (emphasis added), without limitation to any specific claim.  There would be no reason to limit respondents' reconstruction of §2254(e)(2) as they propose.  Unlike for procedural default, we lack equitable authority to amend a statute to address only a subset of claims.  Thus, if a prisoner were not "at fault" under §2254(e)(2) simply because postconviction counsel provided ineffective assistance, *Michael Williams*, 529 U. S., at 432, the prisoner's blamelessness necessarily would extend to *any claim* that postconviction counsel negligently failed to develop.  Not even *Martinez* sweeps that broadly.

Finally, setting aside that we lack authority to amend §2254(e)(2)'s clear text, *Martinez* itself cuts against respondents' proposed result.  *Martinez* was "unusually explicit about the narrowness of our decision."  *Trevino*, 569 U. S., at 431 (ROBERTS, C. J., dissenting).  The Court left no doubt that "[t]he rule of *Coleman* governs in *all* but the limited circumstances recognized here."  *Martinez*, 566 U. S., at 16 (emphasis added).  "This aggressively limiting language was not simply a customary nod to the truism that we decide only the case before us."  *Trevino*, 569 U. S., at 432 (ROBERTS, C. J., dissenting) (internal quotation marks omitted).  "It was instead an important part" of the Court's holding.  *Ibid.*  In short, *Martinez* foreclosed any extension of its holding beyond the "narrow exception" to procedural default at issue in that case.  566 U. S., at 9.

To be sure, *Martinez* recognized that state prisoners often need "evidence outside the trial record" to support their trial-ineffective-assistance claims.  *Id.*, at 13.  But *Martinez* did not prescribe largely unbounded access to new evidence whenever postconviction counsel is ineffective, as respondents propose.  Rather, *Martinez* recognized our overarching responsibility "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  *Id.*, at 9.  In particular, the Court explained that its

"holding . . . ought not to put a significant strain on state resources," because a State "faced with the question whether there is cause for an apparent default . . . may answer" that the defaulted claim "is wholly without factual support." *Id.*, at 15–16. That assurance has bite only if the State can rely on the state-court record. Otherwise, "federal habeas courts would routinely be required to hold evidentiary hearings to determine" whether state postconviction counsel's factfinding fell short. *Murray*, 477 U. S., at 487.

The cases under review demonstrate the improper burden imposed on the States when *Martinez* applies beyond its narrow scope. The sprawling evidentiary hearing in *Jones* is particularly poignant. Ostensibly to assess cause and prejudice under *Martinez*, the District Court ordered a 7-day hearing that included testimony from no fewer than 10 witnesses, including defense trial counsel, defense postconviction counsel, the lead investigating detective, three forensic pathologists, an emergency medicine and trauma specialist, a biomechanics and functional human anatomy expert, and a crime scene and bloodstain pattern analyst. See 943 F. 3d, at 1219, 1225–1226. Of these witnesses, only one of the forensic pathologists and the lead detective testified at the original trial. See *id.*, at 1223–1225. The remainder testified on virtually every disputed issue in the case, including the timing of Rachel Gray's injuries and her cause of death. See *id.*, at 1226–1228. This wholesale relitigation of Jones' guilt is plainly not what *Martinez* envisioned.

B

*Martinez* aside, respondents propose a second reading of §2254(e)(2) that supposedly permits consideration of new evidence in their habeas cases. Their interpretation proceeds in two steps. First, respondents argue that because §2254(e)(2) bars only "an evidentiary hearing on the claim,"

a federal court may hold an evidentiary hearing to deter-
mine whether there is cause and prejudice.  In respondents'
view, a so-called "*Martinez* hearing" is not a "hearing *on the
claim*."  §2254(e)(2) (emphasis added).  Second, with that
evidence admitted for cause and prejudice, respondents
contend that the habeas court may then consider the new
evidence to evaluate the merits of the underlying ineffective-
assistance claim.  By considering already admitted evi-
dence, respondents reason, the habeas court is not holding
a "hearing" that §2254(e)(2) otherwise would prohibit.  *Ibid.*

There are good reasons to doubt respondents' first point,
but we need not address it because our precedent squarely
forecloses the second.  In *Holland*, we explained that
§2254(e)(2)'s "restrictions apply *a fortiori* when a prisoner
seeks relief based on new evidence without an evidentiary
hearing."  542 U. S., at 653 (emphasis deleted).  The basis
for our decision was obvious: A contrary reading would have
countenanced an end-run around the statute.  Federal ha-
beas courts could have accepted any new evidence so long
as they avoided labeling their intake of the evidence as a
"hearing."  Therefore, when a federal habeas court convenes
an evidentiary hearing for any purpose, or otherwise ad-
mits or reviews new evidence for any purpose, it may not
consider that evidence on the merits of a negligent pris-
oner's defaulted claim unless the exceptions in §2254(e)(2)
are satisfied.

Respondents all but concede that their argument
amounts to the same kind of evasion of §2254(e)(2) that we
rejected in *Holland*.  They nonetheless object that *Holland*
renders many *Martinez* hearings a nullity, because there is
no point in developing a record for cause and prejudice if a
federal court cannot later consider that evidence on the
merits.  While we agree that any such *Martinez* hearing
would serve no purpose, that is a reason to dispense with
*Martinez* hearings altogether, not to set §2254(e)(2) aside.

Opinion of the Court

Thus, if that provision applies and the prisoner cannot satisfy its "stringent requirements," *Michael Williams*, 529 U. S., at 433, a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*.

This follows from our decision in *Schriro* v. *Landrigan*, 550 U. S. 465 (2007). There, we held that a federal court, "[i]n deciding whether to grant an evidentiary hearing, . . . must consider whether such a hearing could enable an applicant to prove . . . factual allegations [that] would entitle [him] to federal habeas relief." *Id.*, at 474. "This approach makes eminent sense," for if "district courts held evidentiary hearings without first asking whether the evidence the petitioner seeks to present would satisfy AEDPA's demanding standards, they would needlessly prolong federal habeas proceedings." *Cullen*, 563 U. S., at 208–209 (SOTOMAYOR, J., dissenting). Here, holding a *Martinez* hearing when the prisoner cannot "satisfy AEDPA's demanding standards" in §2254(e)(2) would "prolong federal habeas proceedings" with no purpose. 563 U. S., at 209 (SOTOMAYOR, J., dissenting). And because a federal habeas court may *never* "needlessly prolong" a habeas case, *ibid.*, particularly given the "essential" need to promote the finality of state convictions, *Calderon*, 523 U. S., at 555, a *Martinez* hearing is improper if the newly developed evidence never would "entitle [the prisoner] to federal habeas relief," *Schriro*, 550 U. S., at 474.

### C

Ultimately, respondents' proposed expansion of factfinding in federal court, whether by *Martinez* or other means, conflicts with any appropriately limited federal habeas review. In our dual-sovereign system, federal courts must afford unwavering respect to the centrality "of the trial of a criminal case in state court." *Wainwright*, 433 U. S., at 90. That is the moment at which "[s]ociety's resources have

Opinion of the Court

been concentrated . . . in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Ibid.*; see also *Herrera* v. *Collins*, 506 U. S. 390, 416 (1993); *Davila*, 582 U. S., at ___ (slip op., at 8). Such intervention is also an affront to the State and its citizens who returned a verdict of guilt after considering the evidence before them. Federal courts, years later, lack the competence and authority to relitigate a State's criminal case.

The dissent contends that we "overstat[e] the harm to States that would result from allowing" prisoners to develop evidence outside §2254(e)(2)'s narrow exceptions. *Post,* at 17. Not so. Serial relitigation of final convictions undermines the finality that "is essential to both the retributive and deterrent functions of criminal law." *Calderon*, 523 U. S., at 555; see also *Engle*, 456 U. S., at 126–127, and n. 32. Further, broadly available habeas relief encourages prisoners to "'sandba[g]'" state courts by "select[ing] a few promising claims for airing" on state postconviction review, "while reserving others for federal habeas review" should state proceedings come up short. *Murray*, 477 U. S., at 492; see also *Wainwright*, 433 U. S., at 89. State prisoners already have a strong incentive to save claims for federal habeas proceedings in order to avoid the highly deferential standard of review that applies to claims properly raised in state court. See §2254(d); *Harrington*, 562 U. S., at 105. Permitting federal factfinding would encourage yet more federal litigation of defaulted claims.

\*          \*          \*

Because we have no warrant to impose any factfinding beyond §2254(e)(2)'s narrow exceptions to AEDPA's "genera[l] ba[r on] evidentiary hearings," *McQuiggin*, 569 U. S., at 395, we reverse the judgments of the Court of Appeals.

*It is so ordered.*

Cite as: 596 U. S. \_\_\_\_ (2022)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 20–1009

————

DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, PETITIONER *v.* DAVID MARTINEZ RAMIREZ

DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, ET AL., PETITIONERS *v.* BARRY LEE JONES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 23, 2022]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, dissenting.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel at trial. This Court has recognized that right as "a bedrock principle" that constitutes the very "foundation for our adversary system" of criminal justice. *Martinez* v. *Ryan*, 566 U. S. 1, 12 (2012). Today, however, the Court hamstrings the federal courts' authority to safeguard that right. The Court's decision will leave many people who were convicted in violation of the Sixth Amendment to face incarceration or even execution without any meaningful chance to vindicate their right to counsel.

In reaching its decision, the Court all but overrules two recent precedents that recognized a critical exception to the general rule that federal courts may not consider claims on habeas review that were not raised in state court. Just 10 years ago, the Court held that a federal court may consider

2                     SHINN *v.* MARTINEZ RAMIREZ

SOTOMAYOR, J., dissenting

a habeas petitioner's substantial claim of ineffective assistance of trial counsel (a "trial-ineffectiveness" claim), even if not presented in state court, if the State barred the petitioner from asserting that claim until state postconviction proceedings, and the petitioner's counsel in those proceedings was also ineffective.  See *id.*, at 17; see also *Trevino* v. *Thaler*, 569 U. S. 413, 429 (2013).  *Martinez* and *Trevino* establish that such a petitioner is not at fault for any failure to bring a trial-ineffectiveness claim in state court.  Despite these precedents, the Court today holds that such a petitioner is nonetheless at fault for the ineffective assistance of postconviction counsel in developing the evidence of trial ineffectiveness in state court.  The Court instead holds that a petitioner in these circumstances, having received ineffective assistance of trial and postconviction counsel, is barred from developing such evidence in federal court.

This decision is perverse.  It is illogical: It makes no sense to excuse a habeas petitioner's counsel's failure to raise a claim altogether because of ineffective assistance in postconviction proceedings, as *Martinez* and *Trevino* did, but to fault the same petitioner for that postconviction counsel's failure to develop evidence in support of the trial-ineffectiveness claim.  In so doing, the Court guts *Martinez*'s and *Trevino*'s core reasoning.  The Court also arrogates power from Congress: The Court's analysis improperly reconfigures the balance Congress struck in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) between state interests and individual constitutional rights.

By the Court's telling, its holding (however implausible) is compelled by statute.  Make no mistake.  Neither AEDPA nor this Court's precedents require this result.  I respectfully dissent.

I

The majority sets forth the gruesome nature of the mur-

SOTOMAYOR, J., dissenting

ders with which respondents were charged.  Our Constitution insists, however, that no matter how heinous the crime, any conviction must be secured respecting all constitutional protections.  The history of respondents' trials and their state postconviction proceedings illustrates the breakdown in the adversarial system caused by ineffective assistance of counsel, a violation of the Sixth Amendment.

A

Respondent Barry Lee Jones was charged with the murder of his girlfriend's 4-year-old daughter, Rachel Gray. The State argued that Rachel died as a result of an injury she sustained while in Jones' care.  Jones' trial counsel failed to undertake even a cursory investigation and, as a result, did not uncover readily available medical evidence that could have shown that Rachel sustained her injuries when she was not in Jones' care.  Having heard none of this evidence, the jury convicted Jones and the trial judge sentenced him to death.

Jones filed for postconviction review in Arizona state court.  Under Arizona law, Jones was not permitted to argue on direct appeal that his trial counsel rendered constitutionally ineffective assistance; accordingly, state postconviction review was his first opportunity to raise his trial-ineffectiveness claim.  See *State* v. *Spreitz*, 202 Ariz. 1, 3, 39 P. 3d 525, 527 (2002).  At this stage, however, Jones was met with another egregious failure of counsel.  Arizona state law sets minimum qualifications that attorneys must meet to be appointed in capital cases like Jones', but the Arizona Supreme Court waived those requirements in Jones' case, and the state court appointed postconviction counsel who lacked those qualifications.  See *Jones* v. *Ryan*, 327 F. Supp. 3d 1157, 1214 (Ariz. 2018) (citing Ariz. Rev. Stat. Ann. §13–4041 (2019)).  Jones' new counsel conducted almost no investigation outside of the evidence in the trial

record.  In short, Jones' postconviction counsel failed to investigate the ineffective assistance of Jones' trial counsel.  Counsel moved for the appointment of an investigator, but did so under the wrong provision of Arizona law.  The motion was denied.  Counsel ultimately filed a petition for postconviction relief that failed to advance any argument that Jones' trial counsel was ineffective for failing to investigate the State's medical evidence.  Arizona courts denied the petition.  See *ante,* at 4–5.

   Jones then sought federal habeas relief, at last represented by competent counsel, and alleged that his trial counsel provided ineffective assistance by failing adequately to investigate his case.  The District Court held an evidentiary hearing at which Jones presented evidence that the injuries to Rachel could not have been inflicted at the time the State alleged that Jones was with her, and that this evidence would have been readily available to Jones' trial and state postconviction counsel, had they investigated the case.  The District Court concluded that Jones' postconviction counsel had rendered ineffective assistance in failing to raise this claim in state postconviction proceedings and therefore held that Jones could raise it for the first time in federal court under *Martinez.*  The District Court also relied on this evidence to hold, on the merits, that Jones received ineffective assistance at trial.  The court found that there was a "reasonable probability that the jury would not have unanimously convicted [Jones] of any of the counts" if Jones' trial counsel had "adequately investigated and presented medical and other expert testimony to rebut the State's theory" of Jones' guilt.  327 F. Supp. 3d*,* at 1211.

   Arizona moved to stay the granting of the habeas writ by arguing that 28 U. S. C. §2254(e)(2), a provision enacted as part of AEDPA, barred the District Court from considering on the merits the evidence that Jones developed to satisfy *Martinez*'s requirements.  The District Court denied the motion, and the Ninth Circuit affirmed in relevant part.

SOTOMAYOR, J., dissenting

Relying on *Martinez*'s recognition that "'[c]laims of ineffective assistance at trial often require investigative work,'" the Ninth Circuit concluded that "§2254(e)(2) does not prevent a district court from considering new evidence, developed to overcome a procedural default under *Martinez* v. *Ryan*, when adjudicating the underlying claim on de novo review." 943 F. 3d 1211, 1222 (2019) (quoting *Martinez*, 566 U. S., at 11).

### B

Respondent David Ramirez was convicted for the capital murders of his girlfriend and her daughter.  At the sentencing phase, the state court appointed a psychologist to conduct a mental health evaluation.  Ramirez's counsel failed to provide the psychologist with evidence that Ramirez had an intellectual disability and failed to develop a claim of intellectual disability to present in mitigation against the imposition of a death sentence and in support of the imposition of a sentence of life without parole.  Ramirez was sentenced to death.

As in Jones' case, an Arizona state court appointed Ramirez counsel for his state postconviction claim.  And as in Jones' case, state postconviction proceedings were Ramirez's first opportunity to raise a claim of trial ineffectiveness.  Ramirez's postconviction attorney, however, did not conduct any investigation beyond the existing trial record, despite being aware of indications that Ramirez might have intellectual disabilities, including that his mother drank when she was pregnant with him and that he demonstrated developmental delays as a child.  Nor did Ramirez's postconviction counsel argue that Ramirez's trial counsel provided ineffective assistance by failing to develop and present this mitigating evidence.  Arizona courts denied Ramirez's postconviction petition.

Citing "'concerns regarding the quality'" of Ramirez's

Sotomayor, J., dissenting

prior counsel, a Federal District Court appointed the Arizona Federal Public Defender to represent him in federal habeas proceedings. *Ramirez* v. *Ryan*, 937 F. 3d 1230, 1238 (CA9 2019). In his habeas petition, Ramirez raised a claim concerning the ineffectiveness of his trial counsel. In support of his claim, Ramirez submitted evidence from family members, whom trial counsel and state postconviction counsel had never contacted, revealing the depths of abuse and neglect Ramirez experienced as a child and the life-long manifestations of his possible disability. The evidence showed that Ramirez grew up eating on the floor and sleeping on dirty mattresses in houses filthy with animal feces; that Ramirez's mother would beat him with electrical cords; and that Ramirez displayed multiple apparent developmental delays, including "delayed walking, potty training, and speech" and inability to maintain basic hygiene or to use utensils to eat. *Id.*, at 1239. In addition, the court-appointed psychologist who evaluated Ramirez during the sentencing phase of trial averred to the habeas court that if trial counsel had provided him with Ramirez's school records and prior IQ scores, he would have thought they suggested intellectual disability and insisted on more comprehensive testing.[1] Finally, Ramirez's trial counsel submitted an affidavit stating that she had not been "prepared to handle 'the representation of someone as mentally disturbed as . . . Ramirez'" and explaining that the evidence from

---

[1] This evidence would have been relevant for the jurors' penalty deliberations. Arizona law requires the penalty phase jury to consider, in deciding whether to impose a death sentence, certain "mitigating circumstances," including the "defendant's capacity to appreciate the wrongfulness of his conduct." Ariz. Rev. Stat. Ann. §13–751(G)(1). The Constitution guarantees convicted capital defendants the right to present mitigating evidence. See *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982).

Ramirez's family members, had she uncovered it in an investigation, "'would have changed the way [she] handled both [Ramirez's] guilt phase and his sentencing phase.'" *Id.*, at 1240. In light of this evidence, Ramirez sought an opportunity to develop his trial-ineffectiveness claim further.[2]

The District Court denied relief on Ramirez's trial-ineffectiveness claim and declined to allow further evidentiary development. On appeal, Arizona conceded that Ramirez's postconviction counsel performed deficiently. The Ninth Circuit reversed and remanded, holding that Ramirez had satisfied the requirements of *Martinez* because postconviction counsel had provided ineffective representation and Ramirez's trial-ineffectiveness claim was substantial. The Ninth Circuit directed the District Court to allow evidentiary development of Ramirez's trial-ineffectiveness claim, recognizing that he had been "precluded from such development because of his post-conviction counsel's ineffective representation." 937 F. 3d, at 1248.

## II

*Martinez* and *Trevino* afford habeas petitioners like Jones and Ramirez the opportunity to bring certain trial-ineffectiveness claims for the first time in federal court. The question before the Court is whether Jones and Ramirez can make good on that opportunity by developing evidence in support of these claims, or whether AEDPA nevertheless requires them to rely on the state-court records, constructed by ineffective trial and postconviction

────────────

[2]The District Court initially denied Ramirez's petition, and Ramirez appealed. While his appeal was pending in the Ninth Circuit, this Court decided *Martinez* v. *Ryan*, 566 U. S. 1 (2012), and the Ninth Circuit remanded Ramirez's appeal to the District Court in light of that decision. See App. 452–453. On remand, the District Court ordered supplemental briefing, and Ramirez submitted affidavits from his family members and trial counsel in support of his trial-ineffectiveness claim. See *id.,* at 454–455, 473–474.

counsel, because they "failed to develop the factual basis of
[the ineffective assistance] claim[s] in State court proceed-
ings." 28 U. S. C. §2254(e)(2).

Under this Court's precedents, the answer is clear. *Mar-
tinez* and *Trevino* establish that petitioners are not at fault
for any failure to raise their claims in state court in these
circumstances. Other precedents hold that AEDPA's
§2254(e)(2)'s "failed to develop" language, too, incorporates
a threshold requirement that the petitioner be at fault for
not developing evidence. A petitioner cannot logically be
faultless for not bringing a claim because of postconviction
counsel's ineffectiveness, yet at fault for not developing its
evidentiary basis for exactly the same reason.

A

This Court's precedents, culminating in *Martinez* and
*Trevino*, explain the circumstances under which habeas pe-
titioners are deemed accountable for their attorneys' fail-
ures to present claims in state court. A petitioner who does
not properly present a claim in a state proceeding generally
may not raise the claim in federal court, because the claim
has been "procedurally defaulted." See, *e.g., Murray* v. *Car-
rier*, 477 U. S. 478, 486 (1986).

A federal court, however, can excuse a procedural default
and permit a petitioner to raise a claim for the first time in
federal court if the petitioner can "demonstrate cause for
the procedural default in state court and actual prejudice
as a result of the alleged violation of federal law." *Maples*
v. *Thomas*, 565 U. S. 266, 280 (2012) (internal quotation
marks and alterations omitted). This Court has held that
"[c]ause for a procedural default exists where something ex-
ternal to the petitioner . . . that cannot fairly be attributed
to him impeded his efforts to comply with the State's proce-
dural rule." *Ibid.* (internal quotation marks and alterations
omitted).

As a general matter, attorney error does not constitute

SOTOMAYOR, J., dissenting

cause to excuse procedural default because courts attribute attorneys' errors to their clients.  *Coleman* v. *Thompson*, 501 U. S. 722, 753 (1991).  In certain situations, however, attorney error will instead "be seen as an external factor" and therefore constitute cause.  *Id.,* at 754.  In *Maples*, we held that where an attorney abandoned his client without notice, "principles of agency law and fundamental fairness" required finding cause to excuse a procedural default, as the petitioner had been "disarmed by extraordinary circumstances quite beyond his control."  565 U. S., at 289.  In *Coleman*, we explained that "[a]ttorney error that constitutes ineffective assistance of counsel" similarly demonstrates cause to excuse procedural default in the context of a direct appeal.  501 U. S., at 753–754.  *Coleman* explained that error that "constitutes a violation of petitioner's right to counsel . . . must be seen as an external factor, *i.e.,* 'imputed to the State'" because the Sixth Amendment places the burden of guaranteeing effective assistance of counsel on the State.  *Id.,* at 754.

*Coleman* left unanswered the question whether ineffective assistance of counsel at the postconviction stage, where defendants generally do not have a constitutional right to counsel, could also constitute cause to excuse default.  See *id.*, at 755.  This question is critical in Arizona and other States that do not allow defendants to raise trial-ineffectiveness claims on direct appeal, where individuals are constitutionally entitled to effective counsel, and instead require them to raise these claims for the first time in collateral proceedings, in which this Court has not recognized a constitutional right to counsel.

*Martinez*, 566 U. S. 1, held that in these States, postconviction counsel's failure to raise a substantial trial-ineffectiveness claim could constitute cause to excuse a procedural default.  The Court observed that where a state collateral proceeding is the first time that a petitioner can press a trial-ineffectiveness claim, the collateral proceeding is "the

Sotomayor, J., dissenting

equivalent of a prisoner's direct appeal," and constitutes the petitioner's "'one and only appeal'" as to that claim. *Id.,* at 8, 11 (quoting *Coleman,* 501 U. S., at 756). Because this result was occasioned by the State's "deliberat[e] cho[ice] to move [such] claims outside of the direct-appeal process, where counsel is constitutionally guaranteed," the Court held that the general attorney-attribution rule did not apply where postconviction counsel rendered ineffective assistance, just as it would not if appellate counsel on direct review had done so. *Martinez,* 566 U. S., at 13–14, 16. Instead, *Martinez* held, for a habeas petitioner with a "substantial" underlying trial-ineffectiveness claim who also has the misfortune of being represented by ineffective postconviction counsel, the failure of postconviction counsel to raise the trial-ineffectiveness claim is not properly attributable to the petitioner. *Id.,* at 14.

A year later, in *Trevino,* 569 U. S. 413, the Court reaffirmed and extended *Martinez*'s core holding. *Trevino* held that where a State does not offer "a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal," a defendant whose collateral-review counsel renders ineffective assistance has demonstrated cause to excuse the procedural default of his trial-ineffectiveness claim. 569 U. S., at 428.[3]

### B

There is no dispute here that respondents' trial-ineffectiveness claims clear the procedural default hurdle under *Martinez* and *Trevino*. The question is whether a habeas petitioner can be faultless for a procedural default under

---

[3] While *Martinez* analyzed a state statutory regime that expressly required defendants to raise an ineffective-assistance-of-trial-counsel claim on collateral review, *Trevino* confronted a state statutory regime that left open the theoretical possibility of raising such a claim on direct appeal, but made it "'virtually impossible'" for defendants to do so. 569 U. S., at 423.

*Martinez* and nonetheless barred by AEDPA's §2254(e)(2) from seeking an evidentiary hearing in federal court, subject to exceptions not applicable here, because the petitioner "failed to develop the factual basis of [the procedurally defaulted] claim in State court proceedings."

Precedent establishes that §2254(e)(2) incorporates a threshold, fault-based "fail[ure] to develop" standard that must be understood in conjunction with the fault-based reasoning in *Martinez*. In *Williams* v. *Taylor*, 529 U. S. 420 (2000), this Court examined what it means to have "failed to develop the factual basis of a claim" under §2254(e)(2). The Court concluded that this language imposes a fault-based standard, meaning that it erects a bar only to those who bear some responsibility for a lack of evidentiary development in state-court proceedings. The Court acknowledged that "fail" is "sometimes used in a neutral way, not importing fault or want of diligence." *Id.,* at 431. As a matter of ordinary meaning, however, the Court concluded that "fail" in §2254(e)(2) connotes "some omission, fault, or negligence." *Ibid.* The Court explained that "a person is not at fault when his diligent efforts to perform an act are thwarted" by an external force. *Id.,* at 432.

*Williams* found further support for its fault-based reading of "failed to develop" in pre-AEDPA cases that foreshadowed the language of §2254(e)(2). Specifically, *Williams* noted the similarity between the text of §2254(e)(2) and the language of the Court's decision in *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1 (1992). The *Williams* Court reasoned that when it enacted AEDPA, Congress had "raised the bar *Keeney* imposed on prisoners who were *not* diligent" (*i.e.,* those who were at fault) "in state-court proceedings." 529 U. S., at 433 (emphasis added). At the same time, however, "the opening clause of §2254(e)(2) codifies *Keeney*'s threshold standard of diligence." *Id.,* at 434. Phrased differently, under AEDPA, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed

to develop' the facts under §2254(e)(2)'s opening clause, and
he will be excused from showing compliance with the bal-
ance of the subsection's requirements." *Id.,* at 437.

The reasoning of *Martinez* and *Trevino* applies with equal
force to the threshold diligence/fault standard of *Keeney*,
*Williams*, and §2254(e)(2). Under *Williams*, whether peti-
tioners who satisfy *Martinez* are nevertheless subject to
§2254(e)(2) turns on whether they were at fault for not de-
veloping evidence in support of their trial-ineffectiveness
claims in state postconviction proceedings. All agree that a
habeas petitioner is not at fault when the responsibility for
an error is properly imputed to the State or to some other
external factor. *Martinez* cases are among the rare ones in
which attorney error constitutes such an external factor.
That is because a State's "deliberat[e] cho[ice]" to move trial
ineffectiveness claims outside of direct appeal and into post-
conviction review "significantly diminishes prisoners' abil-
ity to file such claims." *Martinez*, 566 U. S., at 13. There is
nothing nefarious about this choice, but it is "not without
consequences." *Ibid.* Together, *Martinez*, *Trevino*, and *Wil-
liams* demonstrate that when a State both provides a crim-
inal defendant with ineffective trial counsel and decides to
remove his trial-ineffectiveness claim from appellate re-
view, postconviction counsel's ineffectiveness cannot fairly
be attributed to the defendant, and he therefore has not
"failed to develop the factual basis of [his] claim."
§2254(e)(2).

Any other reading hollows out *Martinez* and *Trevino*.
*Martinez* repeatedly recognized that to prove a trial-ineffec-
tiveness claim (or even to show that it is "substantial"), ha-
beas petitioners frequently must introduce evidence outside
of the trial record. See, *e.g.,* 566 U. S., at 13 ("Ineffective-
assistance claims often depend on evidence outside the trial
record"). Ineffective-assistance claims frequently turn on
errors of omission: evidence that was not obtained, wit-

SOTOMAYOR, J., dissenting

nesses that were not contacted, experts who were not re-
tained, or investigative leads that were not pursued.
Demonstrating that counsel failed to take each of these
measures by definition requires evidence beyond the trial
record. See *Trevino*, 569 U. S., at 413 (observing that "'the
inherent nature of most ineffective assistance'" claims
means that the "trial court record will often fail to 'contai[n]
the information necessary to substantiate' the claim"); Brief
for Federal Defender Capital Habeas Units as *Amici Curiae*
4–6. Indeed, the very reason States like Arizona might
choose to reserve a trial-ineffectiveness claim for a collat-
eral proceeding is to allow development of the factual basis
for the claim. *Martinez*, 566 U. S., at 13. To hold a peti-
tioner at fault for not developing a factual basis because of
postconviction counsel's ineffectiveness in the *Martinez*
context, however, would be to eliminate altogether such ev-
identiary development and doom many meritorious trial-in-
effectiveness claims that satisfy *Martinez*. Such a rule is
not only inconsistent with the reasoning of *Martinez* and
*Trevino* but renders those decisions meaningless in many,
if not most, cases.

### C

Applying this interpretation of §2254(e)(2) here makes
clear that Jones and Ramirez are not at fault for their at-
torneys' failures to develop the state-court record. In Jones'
case, the District Court found, and the Ninth Circuit
agreed, that Jones satisfied the demanding requirements of
*Martinez*: Arizona appointed postconviction counsel who
did not meet the minimum qualifications for appointment
and who failed to raise a substantial (indeed, meritorious)
trial-ineffectiveness claim. In Ramirez's case, too, the
Ninth Circuit held that postconviction counsel was ineffec-
tive for failing to investigate Ramirez's upbringing (despite
clear indications of his disability) and for failing to raise or
develop a substantial claim of trial ineffectiveness. The

lower courts thus held that both respondents satisfied the demanding requirements of *Martinez*, holdings that the Court does not question.

By definition, Jones and Ramirez are not at fault for their state postconviction counsel's failures to develop evidence. Jones and Ramirez acted diligently, but their attorneys' errors, paired with the State's choice of how to structure their review proceedings, constituted external impediments.  As a result, Jones and Ramirez have not "failed to develop" the factual bases of their claims, and AEDPA's §2254(e)(2), properly interpreted, poses no bar to evidentiary development in federal court.

### III

Rejecting the teachings of *Martinez* and *Trevino*, the Court adopts an irrational reading of §2254(e)(2).  The Court begins with the uncontested proposition that, in the ordinary case, a habeas petitioner "'must bear the risk of attorney error.'"  *Ante*, at 11 (quoting *Coleman*, 501 U. S., at 753).  From there, the Court leaps to the conclusion that a petitioner is at fault for not developing the evidentiary record on a trial-ineffectiveness claim even if that lack of development was the result of his postconviction counsel's ineffective assistance.  *Ante*, at 12.

The Court's analysis rests on two fundamental errors.  First, the Court eviscerates *Martinez* and *Trevino* and mischaracterizes other precedents.  Second, the Court relies upon its own mistaken understanding of AEDPA's policies and the state interests at issue, recycling claims rejected by the *Martinez* Court and ignoring the careful balance struck by Congress.  In doing so, the Court gives short shrift to the egregious breakdowns of the adversarial system that occurred in these cases, breakdowns of the type that federal habeas review exists to correct.

SOTOMAYOR, J., dissenting

### A

The doctrinal consequence of the Court's distortion of precedent is to render *Martinez* and *Trevino* dead letters in the mine run of cases. As explained, those precedents are premised on the understanding that a habeas petitioner is not responsible for a postconviction attorney's ineffective failure to assert a substantial trial-ineffectiveness claim in States that do not offer petitioners a meaningful opportunity to raise such claims on direct appeal. The Court, however, does not grapple with this logic on its own terms. Instead, the Court limits *Martinez* and *Trevino* to their facts, emptying them of all meaning in the ordinary case (where, as those precedents explain, a trial-ineffectiveness claim will necessarily rely on evidence beyond the trial record). Tellingly, the Court relies on the *dissent* in *Trevino* to support its disregard of these cases' reasoning. See *ante,* at 18.

The Court's analysis also rests on a misplaced view of *Williams*. The Court fixates on *Williams*' statement that §2254(e)(2) "raised the bar *Keeney* imposed on prisoners who were not diligent in state-court proceedings." 529 U. S., at 433; see *ante,* at 16. The Court emphasizes the first part of that statement while ignoring its qualification: that §2254(e)(2) raised the bar for "prisoners who were not diligent." In other words, it is undisputed that the "bar for excusing a prisoner's failure to develop the state-court record" is an onerous one, *ante,* at 12; the question is whether, in this context, a habeas petitioner has failed to develop the record in the first place. *Martinez* and *Trevino* make clear that habeas petitioners in Jones' and Ramirez's position do not lack diligence and are not at fault for the failures of their ineffective trial and postconviction counsel.

The Court further charges that respondents' interpretation of §2254(e)(2) "lacks any principled limit." *Ante,* at 17. Here again, the Court resuscitates a complaint that previously was relegated to a dissent. See *Martinez*, 566 U. S.,

at 19 (Scalia, J., dissenting) ("[N]o one really believes that [the holding of *Martinez*] will remain limited to ineffective-assistance-of-trial-counsel cases"). The complaint is just as unavailing now that it has captured a majority. Respondents' interpretation only affects habeas petitioners raising substantial trial-ineffectiveness claims in the subset of States that limit such claims to postconviction review, just as *Martinez* did. In that context, postconviction review is a prisoner's "one and only appeal" of a trial-ineffectiveness claim, *Coleman*, 501 U. S., at 756 (internal quotation marks omitted; emphasis deleted), and the ineffective assistance of counsel at that stage forecloses review of a crucially important constitutional right. Any assertion that respondents' interpretation of the statute would blow the door open to myriad other claims is hyperbole that this Court, until today, consistently has rejected.

Finally, the Court finds it implausible that Congress would have considered the threshold diligence inquiry under §2254(e)(2) to account for the *Martinez* context. *Ante*, at 16–17. But Congress legislated against the backdrop of *Coleman*. *Coleman*, in turn, made clear (decades before *Martinez*) that in certain circumstances where attorney error could be "seen as an external factor, *i.e.*, 'imputed to the State,'" including the ineffective assistance of counsel on direct appeal, the prisoner would not properly be deemed at fault. *Coleman*, 501 U. S., at 754. Moreover, it is not uncommon for Congress to adopt statutory language that incorporates an evolving judicial doctrine, see, *e.g., Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 461 (2015), and there is no reason this Court should second-guess Congress' choice to incorporate a judicially created diligence doctrine here.

## B

Much of the Court's opinion focuses not on the text of §2254(e)(2), nor on the relevant precedents, but on what the

SOTOMAYOR, J., dissenting

Court views as AEDPA's unyielding purpose: ensuring that federal courts "afford unwavering respect" to state court criminal proceedings.  *Ante,* at 21; see also *ante*, at 6–9, 18–19, 20–21.  The Court seriously errs by suggesting that AEDPA categorically prioritizes maximal deference to state-court convictions over vindication of the constitutional protections at the core of our adversarial system.

It is of course true that AEDPA's rules are designed to "ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  *Martinez*, 566 U. S., at 9.  The enacting Congress, however, did not pursue these aims at all costs.  AEDPA does not render state judgments unassailable, but strikes a balance between respecting state-court judgments and preserving the necessary and vital role federal courts play in "guard[ing] against extreme malfunctions in the state criminal justice systems."  *Harrington* v. *Richter*, 562 U. S. 86, 102–103 (2011) (internal quotation marks omitted).  Indeed, " 'Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty.' "  *Christeson* v. *Roper*, 574 U. S. 373, 377 (2015) (*per curiam*).  Absent that role, what this Court regularly calls "the Great Writ" hardly would be worthy of the label.  See, *e.g., Holland* v. *Florida*, 560 U. S. 631, 649 (2010).

The Court today supplants the balance Congress struck with its single-minded focus on finality.  In doing so, it overstates the harm to States that would result from allowing petitioners to develop facts in support of *Martinez* claims.  See *ante,* at 18.  Importantly, *Martinez* applies only where the underlying claim is one of trial ineffectiveness, and only if a petitioner demonstrates that the claim is "substantial." 566 U. S., at 14.  The Court reaches to support its holding by yet again repackaging a dissenter's warning, this time

that *Martinez* would "put a significant strain on state re-
sources." *Id.,* at 22 (opinion of Scalia, J.).  Nearly a decade
of experience with *Martinez,* however, has proved this un-
founded prediction false.  In a 9-year sample of three States
(Florida, Pennsylvania, and South Carolina), federal courts
adjudicated 1,200 habeas petitions raising *Martinez* claims.
See Brief for Habeas Scholars as *Amici Curiae* 7–8.  These
courts held evidentiary hearings in less than two percent of
these cases.  *Ibid.*  The lower federal courts, in other words,
are perfectly capable of policing *Martinez*'s limits.  There is
no reason to expect that to change from an affirmance here.

In the same vein, the Court bemoans the "sprawling evi-
dentiary hearing" conducted by the District Court in Jones'
case.  *Ante,* at 19.  Of course, the scope of the District Court's
hearing (including evidence from medical experts, forensic
experts, law enforcement personnel, and others) was neces-
sary only because trial counsel failed to present any of that
evidence during the guilt phase of Jones' capital case.  Far
from constituting an inappropriate and "wholesale relitiga-
tion of Jones's guilt," *ibid.*, the District Court's hearing was
wide-ranging precisely because the breakdown of the adver-
sarial system in Jones' case was so egregious.

The Court suggests that evidentiary hearings like Jones'
will "encourag[e] prisoners" to "'sandba[g]' state courts" by
strategically holding back claims from state postconviction
review to present them for the first time in federal court.
*Ante,* at 22.  That claim is odd, particularly in this context.
It is a State's decision to divert trial-ineffectiveness claims
from direct appeal to postconviction review, and then to pro-
vide ineffective postconviction counsel, that results in the
failure to raise or develop such claims before state courts.
No habeas petitioner or postconviction counsel could possi-
bly perceive a strategic benefit from failing to raise a meri-
torious trial-ineffectiveness claim in an available forum.
Indeed, the whole thrust of Jones' and Ramirez's argument
is that their Sixth Amendment claims were so obvious that

SOTOMAYOR, J., dissenting

their state postconviction attorneys were ineffective in failing to assert them.

On the other side of the ledger, the Court understates, or ignores altogether, the gravity of the state systems' failures in these two cases. To put it bluntly: Two men whose trial attorneys did not provide even the bare minimum level of representation required by the Constitution may be executed because forces outside of their control prevented them from vindicating their constitutional right to counsel. It is hard to imagine a more "extreme malfunctio[n]," *Harrington*, 562 U. S., at 102 (internal quotation marks omitted), than the prejudicial deprivation of a right that constitutes the "foundation for our adversary system," *Martinez*, 566 U. S., at 12.

Nor will the damage be limited to these two cases. Even before *Martinez*, this Court recognized that a trial record is "often incomplete or inadequate" to demonstrate inadequate assistance of counsel. *Massaro* v. *United States*, 538 U. S. 500, 505 (2003). A trial record "may contain no evidence of alleged errors of omission," like a failure sufficiently to investigate a case. *Ibid.* For a court to discern "whether [any] alleged error was prejudicial," too, it is obvious that "additional factual development" may be required. *Ibid.* The on-the-ground experience of capital habeas attorneys confirms this commonsense notion. See Brief for Federal Defender Capital Habeas Units as *Amici Curiae* 3–4. The Court's decision thus reduces to rubble many habeas petitioners' Sixth Amendment rights to the effective assistance of counsel.

Contrary to the Court's account, the fundamental fairness concerns that arise from this particular type of breakdown are not unconditionally eclipsed by the need to accord finality and respect to state-court judgments. *Ante,* at 18. Finality interests are at their apex when the "essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged."

SOTOMAYOR, J., dissenting

*Strickland* v. *Washington*, 466 U. S. 668, 694 (1984). The effective assistance of counsel is one of those essential elements. See *Martinez*, 566 U. S., at 12. When the effective assistance of counsel is absent, leaving a severely diminished basis for presuming fairness and accuracy, "finality concerns are somewhat weaker." *Strickland*, 466 U. S., at 694. Neither statute nor precedent supports the Court's assertion that the virtues of finality override fundamental fairness to such a degree that meaningful review of life-or-death judgments obtained through such deeply flawed proceedings should be foreclosed.

Ultimately, the Court's decision prevents habeas petitioners in States like Arizona from receiving any guaranteed opportunity to develop the records necessary to enforce their Sixth Amendment right to the effective assistance of counsel. For the subset of these petitioners who receive ineffective assistance both at trial and in state postconviction proceedings, the Sixth Amendment's guarantee is now an empty one. Many, if not most, individuals in this position will have no recourse and no opportunity for relief. The responsibility for this devastating outcome lies not with Congress, but with this Court.

\*          \*          \*

Text and precedent instruct that in States that limit review of trial-ineffectiveness claims to postconviction proceedings, habeas petitioners who receive ineffective assistance of both trial and postconviction counsel are not responsible for any failure to raise their substantial claim of trial ineffectiveness, nor for any "fail[ure] to develop" evidence in support of that claim under AEDPA's §2254(e)(2). By holding otherwise, the Court not only extinguishes the central promise of *Martinez* and *Trevino*, but it makes illusory the protections of the Sixth Amendment. I respectfully dissent.