IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARCIA GLENN WHITE, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:02-CV-1805 |
| | § | ECF |
| BOBBY LUMPKIN, Director, | § | *DEATH PENALTY CASE* |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| *Respondent*. | § | |

**RESPONDENT'S OPPOSITION TO PETITIONER'S MOTIONS FOR
SUBSTITUTION OF COUNSEL AND A STAY OF EXECUTION**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

JAY CLENDENIN
Assistant Attorney General
*Lead Counsel*
State Bar No. 24082888
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400

*Counsel for Respondent*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ......................................................................... iii

RESPONDENT'S OPPOSITION TO PETITIONER'S MOTIONS FOR SUBSTITUTION OF COUNSEL AND A STAY OF EXECUTION .................. 1

STATEMENT OF THE ISSUES .................................................................... 2

PROCEDURAL HISTORY ........................................................................... 2

I.      Facts of the Crime ............................................................................. 2

II.     Evidence Pertaining to Punishment ................................................. 5

        A.      Evidence presented by the State .......................................... 5

        B.      Evidence presented by the defense ...................................... 7

III.    Direct Appeal and Postconviction Proceedings ............................. 9

SUMMARY OF THE ARGUMENT ............................................................ 12

ARGUMENT ............................................................................................... 13

I.      Applicable Law ............................................................................... 13

II.     White Is Not Entitled to Last-Minute Substitution of Counsel ........... 14

        A.      White's substitution request is indisputably untimely .............. 15

        B.      Substitution of counsel would be futile ............................... 22

                1.      White's proposed *Atkins* claim would be impermissibly successive ............................................................. 22

                2.      White's proposed *Atkins* claim would be time barred ........ 28

                3.      White does not have a prima facie claim for relief ............ 31

III.  White Is Not Entitled to a Stay of Execution Under *McFarland v. Scott* or *Nken v. Holder* ....................................................................... 35

    A.  White is not entitled to a stay under *McFarland* ........................ 37

    B.  White is not entitled to a stay under *Nken* .................................. 38

CONCLUSION ................................................................................................. 39

CERTIFICATE OF SERVICE ......................................................................... 41

# TABLE OF AUTHORITIES

**Cases**                                                        **Page**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) .................................................. 23

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................... 12, 16

*Battaglia v. Stephens*, 824 F.3d 470 (5th Cir. 2016) ................................... 14, 36

*Brumfield v. Cain*, 808 F.3d 1041 (5th Cir. 2015) ........................................... 34

*Busby v. Davis,* 925 F.3d 699 (5th Cir. 2019) ............................................ 31, 33

*Charles v. Stephens*, 612 F. App'x 214 (5th Cir. 2015) ................................... 38

*Christeson v. Roper*, 574 U.S. 373 (2015) ....................................... 13, 15, 18, 19

*Clark v. Davis*, 850 F.3d 770 (5th Cir. 2017) .................................................. 14

*Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004) .................................................. 31

*Dunn v. Reeves*, 594 U.S. 731 (2021) ............................................................... 34

*Ex parte Blue,* 230 S.W.3d 151 (Tex. Crim. App. 2007) ................................. 31

*Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2015) ................................. 34

*Felker v. Turpin*, 518 U.S. 651 (1996) ............................................................. 23

*Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999) ............................................ 16

*Ford v. Wainwright*, 477 U.S. 399 (1986) ....................................................... 39

*Gamboa v. Davis*, Civ. Act. No. 5:15-CV-113 (W.D. Tex. July 8, 2016) .......... 13

*Green v. Lumpkin*, 860 F. App'x 930 (5th Cir. 2021) ..................................... 33

*Hall v. Florida*, 572 U.S. 701 (2014) .............................................................. 21

*Holiday v. Stephens*, No. H-11-1696, 2015 WL 10733909 (S.D. Tex. Oct. 22, 2015) ................................................................................................ 15

*Holland v. Florida*, 560 U.S. 631 (2010) .................................................... 29, 30

*In re Burton*, 111 F.4th 664 (5th Cir. 2024) .............................................. 23, 28

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ............................................ 28, 31

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) ........................................ 21, 26, 32

*In re Johnson*, 935 F.3d 284 (5th Cir. 2019) ...............................................*passim*

*In re Jones,* 998 F.3d 187 (5th Cir. 2021) .................................................. 28, 29

*In re Lewis*, 484 F.3d 793 (5th Cir. 2007) ........................................................ 30

*In re Mathis*, 483 F.3d 395 (5th Cir. 2007) ...................................................... 34

*In re Milam*, 838 F. App'x 796 (5th Cir. 2020) ................................................ 27

*In re Pruett*, 711 F. App'x 732 (5th Cir. 2017) .................................... 23, 26, 27

*In re Soliz*, 938 F.3d 200 (5th Cir. 2019) .................................................. 25, 27

*In re Sparks*, 939 F.3d 630 (5th Cir. 2019) .............................................. 23, 28

*In re Swearingen*, 935 F.3d 415 (5th Cir. 2019) .............................................. 26

*In re Webster*, 605 F.3d 256 (5th Cir. 2010) .................................................... 23

*Johnson v. Davis*, No. 4:11-CV-2466, 2019 WL 13440694 (S.D. Tex. Aug. 12, 2019) ................................................................................................ 18

*Jones v. Stephens*, 541 F. App'x 499 (5th Cir. 2013) ...................................... 30

*Magwood v. Patterson*, 561 U.S. 320 (2010) .................................................. 24

*Manning v. Epps*, 688 F.3d 177 (5th Cir. 2012) .............................................. 31

*Martel v. Clair*, 565 U.S. 648 (2012) .......................................................*passim*

iv

*McFarland v. Scott*, 512 U.S. 849 (1994).....................................................35, 37

*Moore v. Texas*, 581 U.S. 1 (2017) .........................................................23, 32, 35

*Moore v. Texas*, 586 U.S. 133 (2019) ...............................................................23

*Nken v. Holder*, 556 U.S. 418 (2009).................................................................35

*Petetan v. State*, 622 S.W.3d 321 (Tex. Crim. App. 2021).........................32, 34

*Rosales v. Quarterman*, 565 F.3d 308 (5th Cir. 2009) ....................................35

*Smith v. Kelly*, 301 F. App'x 375 (5th Cir. 2008)..............................................30

*Speer v. Stephens*, 781 F.3d 784 (5th Cir. 2015) ..............................................17

*Teague v. Johnson*, 151 F.3d 291 (5th Cir. 1998).............................................35

*Tyler v. Cain*, 533 U.S. 656 (2001) ..................................................................23

*United States v. Jones*, 796 F.3d 483 (5th Cir. 2015).......................................24

*Walker v. Epps*, 287 F. App'x 371 (5th Cir. 2008) .....................................38, 39

*Wilkins v. Davis*, 832 F.3d 547 (5th Cir. 2016) ................................................13

*Woods v. Warden, Holman Corr. Facility*, 952 F.3d 1251 (11th Cir. 2020)....18

**Statutes**

18 U.S.C. § 3599(e).............................................................................................13

28 U.S.C. § 2244(b)(1) .......................................................................................23

28 U.S.C. § 2244(b)(2)(A) .............................................................................23, 26

28 U.S.C. § 2244(b)(3)(A) .........................................................................22, 23, 35

28 U.S.C. § 2244(d)(1) ..................................................................................28, 29

28 U.S.C. § 2251(a) .........................................................................................35, 36

**RESPONDENT'S OPPOSITION TO PETITIONER'S MOTIONS FOR
SUBSTITUTION OF COUNSEL AND A STAY OF EXECUTION**

Petitioner Garcia Glenn White was properly convicted and sentenced to die for the murders of sixteen-year-old twin sisters Annette and Bernette Edwards. He committed three killings during that criminal transaction, and he has killed two others. *White v. Thaler*, No. H-02-1805, 2011 WL 4625361, at *1–2 (S.D. Tex. Sept. 30, 2011). **White is scheduled to be executed after 6:00 p.m. (Central Time) on October 1, 2024**. He has unsuccessfully challenged his conviction and death sentence in state and federal court. White has been continuously represented by appointed counsel, Patrick McCann, for more than twenty years. Order Granting Appointment of Counsel, ECF No. 3. McCann has ably represented White, challenging White's conviction and sentence in multiple forums and obtaining a stay of White's previously scheduled execution in 2015, *Ex parte White*, No. WR-48,152-08, 2015 WL 375733, at *1 (Tex. Crim. App. Jan. 27, 2015). Nonetheless, White has now filed plainly dilatory motions for substitution of counsel and a stay of execution arguing that McCann has failed to adequately represent him. At bottom, White now seeks to reinitiate his long-dormant federal habeas proceedings. For the reasons discussed below, the Court should deny White's motions.

1

## STATEMENT OF THE ISSUES

1.    Whether last-minute substitution of counsel for the purpose of raising a futile claim of intellectual disability is in the interest of justice.

2.    Whether White is entitled to a stay of execution despite the extremely dilatory nature of his request, the lack of merit to any potential claim substitute counsel may raise, and the State's and victims' strong interest in finality.

## PROCEDURAL HISTORY

## I.    Facts of the Crime

In late November 1989, Annette, Bernette, and their mother Bonita Edwards were found inside their apartment, one just inside the front door, one in the dining area, and one in a bedroom. 15 RR 60.[1] Annette was lying face down semi-nude with her head on a pillow and a blanket partially covering her. 15 RR 75–76. Her twin sister Bernette had a towel wrapped around her neck and shoved into her mouth. 15 RR 85. Bonita was clothed but had blood on her shirt. 15 RR 78, 83. The three women had sustained multiple stab

---

[1]    "RR" refers to the "Reporter's Record," the transcribed proceedings of White's trial, preceded by the volume number and followed by the page number(s) cited. "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "SX" refers to the State's Exhibits admitted at White's trial. "SCHR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte White*, No. WR-48,152-01.

wounds to the neck and chest and had been dead for several days. 15 RR 83–84, 146–47. Although there was no sign of a forced entry into the apartment, the telephone was off the receiver, and it appeared the bedroom door had been forced open. 15 RR 70, 73, 91, 151. It appeared that Annette, who was found in the bedroom, may have been sexually assaulted. 15 RR 153. Moreover, blood was found on the walls and on numerous items in the apartment, including the bathtub and kitchen sink. 15 RR 76–78, 83, 88–100, 109–10, 151.

The initial interviews of witnesses proved to be fruitless, and the crime remained unsolved for nearly six years. 15 RR 153–56. However, in July of 1995, the police finally received a break in the case. During an interview regarding an unrelated murder of a convenience store owner involving White, Tecumseh Manuel, a close friend of White's, told the police that White admitted to killing the Edwards family. 16 RR 185–86, 189–90. Officer Todd Miller took a statement from Manuel on July 20, 1995, and arrested White the following day. 15 RR 190. Miller contacted Sergeant Rudolph because he had been involved in the original investigation of this case, and Rudolph questioned White for several hours during the early morning of July 22, 1995. 15 RR 157–59; 16 RR 193–94. White denied involvement in the murders during the interview and believed the police were lying to him about Manuel implicating him in the crime. 15 RR 161. Miller showed White a portion of the taped

statement from Manuel. 15 RR 161; 16 RR 195. Afterwards, Miller asked White if he was ready to tell the truth, and White said he was. 16 RR 195–96.

White then gave a videotaped statement of his version of the murders. 15 RR 162; 16 RR 196. The gist of White's statement was that he and Terrence Moore went over to Bonita's apartment to do drugs and have sex with her. SX 55A. They both tried to have sex with Bonita and, after they failed, Bonita got mad because they would not share the drugs with her. *Id.* A fight ensued, and Moore ended up stabbing all of the women. *Id.* White acknowledged during the interview that Terrence Moore was no longer alive. *Id.*

The police investigated Moore's death and discovered Moore had been killed on July 25, 1989, four months before the Edwards were murdered. 16 RR 205–06, 224. Miller and Rudolph confronted White with this discrepancy, and then White gave another taped statement. *Id.* at 206–09. In this brief statement, White admitted that he made up the story involving Moore, and he confessed to killing all three women himself. SX 56A. Further, serology and DNA testing revealed that semen found on a beige sheet in one of the bedrooms was consistent with White's DNA, and blood found on the same sheet was consistent with the DNA of either Annette or Bernette. 16 RR 240–41; 17 RR 381–384. DNA retesting conducted in 2006 further incriminated White. *See* ECF No. 70-1 at 8–9.

## II.    Evidence Pertaining to Punishment

### A.    Evidence presented by the State

During the punishment phase, the State proved White had committed two prior murders, including one capital murder. With regard to the capital murder, Hau Pham, a sixteen-year-old immigrant from Vietnam, testified that on July 13, 1995, two men came into his father's convenience store and robbed it. 19 RR 33–34. Around 3:00 p.m. that day, Hau heard a scream, and then one of the men grabbed him by the neck and told him to open the register. 19 RR 34–35. Hau recognized the men because they had been in the store earlier in the day. 19 RR 34. One man was "fat," and the other had a medium build. 19 RR 35–36. Hau saw his father, Hai Pham, lying on the floor with blood on him. 19 RR 37. The men took some cigarettes and walked out of the store. 19 RR 38. Hai died several days later from multiple blunt traumas to the head with skull fractures, brain contusions, and associated complications. 19 RR 47, 83–84. Hau was shown photographs of possible suspects and identified White as the "fat" man. 19 RR 46–47, 62–64. Officer Miller then obtained a warrant for White's arrest, and White gave a videotaped statement admitting his involvement in the crime. *Id.* at 64–69. In the statement, White said he grabbed Hai Pham, threw him to the floor, hit him several times, and kicked him in the chest when he tried to get up. SX 98. White was charged with capital murder. 19 RR 65.

5

With regard to the second offense, several Houston police officers testified that, on November 1, 1989, they were dispatched to an abandoned house. 20 RR 114, 121–22. When officers arrived, White and Raymond Manuel were at the scene. 20 RR 121. Officer Philip Clark pulled away plywood from one of the windows and saw a body lying in a back room. 20 RR 116. When homicide officer Wayne Wendel arrived, he found the body of a black female, Greta Williams, beaten to death and covered in carpet. 20 RR 122–23, 134. Greta's body was in the early stages of decomposition, and there was evidence of head trauma. 20 RR 129. Broken teeth were by her neck, and blood spatter on the walls indicated that she sustained repeated blows. 20 RR 131–32. An autopsy revealed that Greta had been struck by a blunt object at least ten times and died from trauma to the head, face, chest, and abdomen. 20 RR 189–95.

When White was initially questioned about the incident, he gave a statement in which he admitted seeing Greta walking down the street but denied having anything to do with her murder. 20 RR 178–79. White was charged with the murder, and the case was presented to a grand jury on November 29, 1989. 20 RR 141–42. At that time, however, White was "no billed" because there was insufficient evidence for the grand jury to present the indictment. 20 RR 142. But when the police questioned Tecumseh Manuel about his knowledge of the Hai Pham murder, Manuel told the police that

6

White told him about his involvement in both the instant case and Greta Williams's murder. 19 RR 67.

The police confronted White with this new information, and White agreed to give another statement regarding his involvement in Greta's death. 20 RR 207–08. White stated that he approached Greta and offered to pay her for sex. SX 116A. They went to the abandoned house and had sex. *Id.* Afterward, White believed that Greta had taken some of his money. *Id.* When he started to walk away, Greta pulled his shirt and started hitting him. *Id.* White hit her hard about three times, and Greta fell to the ground. *Id.* White then rolled Greta up in carpet and left. *Id.* White further stated that he and Manuel came back to the house two weeks later and noticed a foul odor coming from the house. *Id.* Although White knew it was Greta's body that was causing the smell, he told Manuel that it was probably a dead dog, and they ended up calling the dog pound. *Id.* According to White, the health department contacted the police when they found Greta's body inside. *Id.*

## B.    Evidence presented by the defense

White's first two witnesses were his mother and sister, who testified regarding White's childhood, character, family, problems related to injuries and work, and drug use. 21 RR 230–78. White's mother, Lizzie White, testified that White was a poor student in school but had good conduct records, was only disciplined once, and got along well with his siblings. 21 RR 230–37. White was

a starter on the Wheatley High football team, wanted to play college and pro football, and got accepted to Lubbock Christian College to play football. 21 RR 237–39. However, White injured his knee during his first semester, which terminated his football career, and he dropped out of school. 21 RR 239–40. White came back home and, after working several jobs, he got a job with Clean America sandblasting buildings. 21 RR 240–44. Eventually, he was promoted to crew leader. 21 RR 244. However, in March of 1988, he sustained a serious fall on the job and was hospitalized. 21 RR 245–46. The injury resulted in pain and drug use, and White started hanging around drug abusers. 21 RR 246–49. Although White's medical records were not available, records were produced showing White had been admitted and discharged from the hospital around that time. 21 RR 283. Further, although White had three children whom he loved and was separated from his common-law wife, he was a poor provider and was behind on his child support payments due to his drug use. 21 RR 249– 53. Lizzie asked the jury to spare her son's life. 21 RR 254.

Monica Garrett, White's sister, testified to similar effect as her mother. She stated White was a nice brother who got along well with his siblings. 21 RR 271. White had difficulty in school. 21 RR 271. She tried to help White with his grades but to little avail. 21 RR 271–72. Monica and her siblings considered White to be a football hero. 21 RR 272–73.

8

White then presented two expert witnesses. Robert Yohman, a clinical neuropsychologist, testified that he conducted a battery of tests on White and reviewed records provided by White's attorneys. 21 RR 308–13. Yohman's examination showed, among other things, that White had an IQ of 76, which was in the borderline range of intellectual functioning but not in the range of intellectual disability. 21 RR 315–16. Dennis Nelson, a psychologist, testified that he examined White and conducted various tests on White's intellectual and emotional functioning, as well as his personality. 21 RR 387, 390. According to screening tests, White had an estimated IQ of 85 or 87. 21 RR 391.

On rebuttal, the State presented a probation officer, John Thomas, who stated that on March 20, 1995, White received a probated three-year sentence for theft. 21 RR 451–52. As part of his alcohol and drug evaluation, he was referred to a program but did not follow through. 21 RR 454–55. Further, although White admitted to using drugs on his personal data sheet, he denied being a drug abuser. 21 RR 453–54.

## III.   Direct Appeal and Postconviction Proceedings

White was convicted and sentenced to death for the murder of Annette and Bernette Edwards. CR 5, 222, 233–36, 242–43. The Texas Court of Criminal Appeals (CCA) upheld White's conviction and death sentence on

9

direct appeal. Op., *White v. State*, No. AP-72,580 (Tex. Crim. App. June 17, 1998).

White then filed a state application for a writ of habeas corpus in the trial court. SHCR-01 at 2–109. The trial court entered findings of fact and conclusions of law recommending that White be denied relief. *Id.* at 259–290. The CCA adopted the trial court's findings and conclusions and denied relief. Order, *Ex parte White,* No. WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001). White also filed a second state habeas application, which the. CCA dismissed as an abuse of the writ. Order, *Ex parte White,* No. WR-48,152-02 (Tex. Crim. App. Apr. 24, 2002).

White then filed a federal habeas petition. ECF No. 27. The district court granted White an administrative stay pending the outcome of DNA retesting. ECF No. 53. White later filed two additional state habeas applications, which the CCA dismissed pursuant to Art. 11.071, § 5(a) of the Texas Code of Criminal Procedure. Order, *Ex parte White*, Nos. WR-48,152-03, -04 (Tex. Crim. App. May 6, 2009). Following DNA retesting and the state court's dismissal of those applications, the district court lifted the stay. ECF No. 63. White filed an amended petition on December 31, 2009, ECF No. 64, after which the Director filed a motion for summary judgment, ECF No. 70. The district court then granted the Director's motion for summary judgment, denied White's petition, and denied White a certificate of appealability (COA).

10

*White v. Thaler*, 2011 WL 4625361, at *15. Next, White filed an application for a COA in the Fifth Circuit, which was denied. *White v. Thaler*, 522 F. App'x 226, 236 (5th Cir. 2013), *cert. denied*, 571 U.S. 1133 (2014).

Thereafter, the convicting court scheduled White's execution for January 28, 2015. On January 8, 2015, White filed in the CCA a Motion for Leave to file an Original Petition for a Writ of Habeas Corpus, a Motion for Leave to file a Petition for a Writ of Prohibition, and a Motion for a Stay of Execution.  SHCR-05, -06. The CCA denied White's motions on January 15, 2015. *Id.* White then filed in the Fifth Circuit a Motion for Authorization to File a Successive Federal Habeas Petition, which was denied. *In re White*, 602 F. App'x 954, 958 (5th Cir. 2015).

Subsequently, White filed in state court, on January 19 and January 20, 2015, respectively, a Motion for Leave to File a Petition for Writ of Prohibition and his fourth subsequent state habeas application. SHCR-07, -08. The CCA denied the Motion for Leave to File a Petition for a Writ of Prohibition on January 21, 2015. SHCR-07. The United States Supreme Court ultimately denied certiorari review. *White v. Texas,* 135 S. Ct. 1510 (2015). The CCA issued an order staying White's execution based on the subsequent habeas application. *Ex parte White*, 2015 WL 375733, at *1. The CCA ultimately dismissed the application pursuant to Article 11.071, § 5. *Ex parte White,* 506 S.W.3d 39, 52 (Tex. Crim. App. 2016), *cert. denied*, 583 U.S. 850 (2017).

The state trial court then scheduled White's execution for October 1, 2024. White's appointed counsel, McCann, filed in state court an application for a writ of habeas corpus and a motion to withdraw the trial court's execution order. On September 3, 2024, the state trial court denied White's motion to withdraw the execution order. The CCA dismissed White's state habeas application and denied his motion for a stay of execution on September 18, 2024. Order, *Ex parte White*, No. WR-48,152-09 (Tex. Crim. App. Sept. 18, 2024). On September 18, 2024, White filed in the CCA a motion for leave to file a petition for a writ of prohibition. The motion remains pending.

On September 13, 2024, outside counsel filed a motion in White's concluded federal habeas proceedings for substitution of counsel and a stay of execution. ECF No. 109. The instant opposition follows.

## SUMMARY OF THE ARGUMENT

This Court should deny White's motions for substitution of counsel and a stay of execution because they are indisputably dilatory. The asserted basis for substitution—appointed counsel's purported failure to raise a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), that White is ineligible for execution— has existed for at least *five years*. Moreover, White is not entitled to substitution of counsel for the purpose of raising a futile *Atkins* claim. White is also not entitled to a stay of execution after having waited until mere days before his second scheduled execution date to request substitution of counsel.

# ARGUMENT

## I.   Applicable Law

Section 3599 of Title 18 "entitles indigent defendants to the appointment of counsel in capital cases, including habeas corpus proceedings." *Martel v. Clair*, 565 U.S. 648, 652 (2012). Appointed counsel

> shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

18 U.S.C. § 3599(e). Appointed counsel is obligated to continue representing the inmate unless and until a court of competent jurisdiction grants a motion to withdraw. *Wilkins v. Davis*, 832 F.3d 547, 557–58 (5th Cir. 2016). When an indigent defendant moves for the appointment of substitute counsel under § 3599, a court must review the motion under the "interests of justice" standard. *Clair*, 565 U.S. at 652.

An indigent petitioner does not have an absolute right to the counsel of his choice. *Christeson v. Roper*, 574 U.S. 373, 377 (2015); *see* Order Striking Mot. to Dismiss Counsel 2, *Gamboa v. Davis*, Civ. Act. No. 5:15-CV-113 (W.D. Tex. July 8, 2016) ("[P]etitioner does not possess an absolute right to have new counsel appointed in this capital habeas proceeding . . . long after the AEDPA's

13

one-year statute of limitations on petitioner's federal habeas corpus petition expired."). The Fifth Circuit has held, however, that "[c]apital habeas petitioners have a statutory right [under § 3599] to conflict-free counsel." *Clark v. Davis*, 850 F.3d 770, 779 (5th Cir. 2017).

The Supreme Court and Fifth Circuit have identified various factors that guide appellate review of the denial of a motion for substitution of counsel: "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for the complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Clair*, 565 U.S. at 663; *see Battaglia v. Stephens*, 824 F.3d 470, 472 (5th Cir. 2016). This Court's review of White's substitution request is, therefore, necessarily fact and context specific. *Clair*, 565 U.S. at 663–64. As discussed below, White's motion for substitution of counsel is indisputably untimely, and he is not entitled to new counsel for the purpose of filing a futile motion for authorization to file a successive habeas petition.

## II.   White Is Not Entitled to Last-Minute Substitution of Counsel.

Almost a decade after he was previously scheduled to be executed, White requests a last-minute change of counsel. ECF No. 109 at 1–2. He seeks substitution to tread the same path—the filing of a motion for authorization to raise a successive *Atkins* claim based on purported ineffectiveness of appointed

14

counsel—paved by Dexter Johnson *five years* ago. ECF No. 109 at 1–2; *see In re Johnson*, 935 F.3d 284, 291 (5th Cir. 2019). As discussed below, White's substitution request is indisputably untimely, and substitution of counsel would be futile. Therefore, White's motion for substitution of counsel should be denied.

### A.     White's substitution request is indisputably untimely.

White's federal habeas proceedings concluded almost eleven years ago. *White v. Stephens*, 571 U.S. 1133. He was previously scheduled to be executed in January 2015. *See Ex parte White*, 2015 WL 375733, at *1. Prior to that date, White attempted to secure assistance from new counsel due to his dissatisfaction with McCann. ECF No. 109-1, Pet'r's App. 236–39 (Pet'r's App.) (White's letters to Richard Ellis in November and December 2014). However, McCann secured a stay of White's then-scheduled execution. *Ex parte White*, 2015 WL 375733, at *1. After succeeding with McCann's assistance, White waited almost a decade, and until only weeks remained before his currently scheduled execution, to again seek new counsel. Pet'r's App. 234–35. The dilatory nature of White's request for substitution of counsel is reason enough to deny it. *See Christeson*, 574 U.S. at 380.

Indeed, the fact that White, himself, has at least twice sought assistance from outside counsel not only undercuts his assertion that he is intellectually

disabled,[2] but it also underscores that the true purpose of this last-minute request is delay. *See Holiday v. Stephens*, No. H-11-1696, 2015 WL 10733909, at *1 (S.D. Tex. Oct. 22, 2015) ("Little time remains before Holiday's execution date. If a new attorney were appointed, he or she would invariably argue that the pending execution date must be stayed to become familiar with the case."), *aff'd*, 806 F.3d 334 (5th Cir. 2015). As an example, in the statute-of-limitations context, a pro se inmate's lack of diligence may be excused by periods of mental incompetency but only for the time the condition prevented him from pursuing his legal rights. *Fisher v. Johnson*, 174 F.3d 710, 715–16 (5th Cir. 1999).

But there is no reason to conclude White can justify a *decade* of inaction after exhibiting the ability and willingness to express his dissatisfaction with McCann in 2014. Indeed, the substitution request and motion for a stay are explicit that they seek delay. *E.g.,* ECF No. 109 at 17 (asserting the need for new counsel to investigate an *Atkins* claim and McCann's purported conflict of interest). Consequently, it is in the interests of justice to deny last-minute substitution of counsel. *See Clair*, 565 U.S. at 662 ("Protecting against abusive delay *is* an interest of justice." (emphasis in original)). This is particularly true where McCann has ably represented White for more than twenty years, and

---

[2]    *See Atkins*, 536 U.S. at 320 (explaining that one basis for the Eighth Amendment's prohibition on execution the intellectually disabled is that they "may be less able to give meaningful assistance to their counsel").

16

White only now seeks this Court's intervention at the last minute so he can reinitiate his federal habeas proceedings. *See Speer v. Stephens*, 781 F.3d 784, 786 (5th Cir. 2015) (appointing supplemental, not substitute, counsel where the petitioner sought new counsel "late in the process" but during the initial federal habeas proceedings and recognizing appointed counsel's experience in the case as a "rich resource").

The Supreme Court in *Christeson* found the petitioner's substitution request, "while undoubtedly delayed, was not abusive" where it was filed "well before the State had set an execution date" and only one month after outside counsel learned of the petitioner's predicament with his appointed counsel, and it requested only ninety days to investigate. 574 U.S. at 380. White's motion for substitution is not only "undoubtedly delayed," *id.*, it is indisputably abusive. Indeed, it comes a decade after White initially expressed to outside counsel his displeasure with McCann in 2014. Pet'r's App. 236–38. As noted above, McCann secured a stay of White's previously scheduled execution in 2015, after which White appears to have been content not to seek new counsel until *another* execution date was set almost a decade later. This entirely distinguishes White's case from *Christeson*.

White relies largely, if not entirely, on McCann's alleged conflict of interest in seeking to raise an *Atkins* claim in federal court where doing so would require him to admit his own error to justify the claim's successiveness

17

or untimeliness. ECF No. 109 at 1. But the Supreme Court has made clear that review of a substitution request is "a peculiarly context-specific inquiry," *Clair*, 565 U.S. at 663, so the asserted basis for substitution is no trump card, *see id.* Indeed, White's is one of the "many cases," *Christeson*, 574 U.S. at 380, where delay warrants denial of substitution. *See Woods v. Warden, Holman Corr. Facility*, 952 F.3d 1251, 1255–56 (11th Cir. 2020) (denying motions for substitution of counsel and a stay of execution where petitioner requested substitution shortly before his scheduled execution "despite his assertion that he has never been satisfied with his representation" and despite the petitioner's assertion that his clemency counsel recently discovered new evidence weeks earlier).

White's substitution request is also more abusive than Dexter Johnson's, who was previously represented by McCann and whose case White attempts to pattern his on. ECF No. 109 at 1. There, Johnson's execution was scheduled in December 2018 for May 2, 2019. *Johnson v. Davis*, No. 4:11-CV-2466, 2019 WL 13440694, at *3 (S.D. Tex. Aug. 12, 2019). About a month after the date was scheduled, Johnson wrote to the federal district court to request new counsel. Letter, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Jan. 18, 2019), ECF No. 65. With months remaining prior to Johnson's scheduled execution, the district court appointed supplemental counsel to determine whether Johnson could successfully raise new claims. *Johnson v. Davis*, 2019 WL 13440694, at *4. A

month prior to Johnson's scheduled execution, supplemental counsel filed a motion to terminate McCann's appointment and a motion for a stay of execution. Opposed Mot. for Stay of Execution, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Apr. 8, 2019), ECF No. 77; Opposed Mot. to Terminate Patrick F. McCann's Appointment, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Apr. 5, 2019), ECF No. 76.

Here, as discussed above, White expressed dissatisfaction with McCann a decade ago, Pet'r's App. 236–38, but it appears he took no action to remedy that dissatisfaction after McCann secured him a stay of execution in 2015. Nor did White do so soon after the state court scheduled his current execution date in June this year. By White's telling, he waited until late August to contact outside counsel. ECF No. 109 at 18; Pet'r's App. 234–35. White now attempts to leverage the lateness of his request to justify substitution of counsel and a consequent stay of execution, but this gets it backwards. The lateness weighs against White. *See Christeson*, 574 U.S. at 380. White cannot use his dissatisfaction with McCann—which he seems to have expressed only with a pending execution date—to justify starting his habeas proceedings over.

Aside from White's own expression a decade ago of his dissatisfaction with McCann, his substitution request is untimely considering the particular context in which the complaint arises. *See Clair*, 565 U.S. at 663. His central complaint is McCann's failure to file a motion for authorization to raise a

19

successive *Atkins* claim. ECF No. 109 at 1. The precise time McCann should have done so, according to White's argument, is at best unclear, but it could not be any later than when the Fifth Circuit adjudicated a similar request by Dexter Johnson *five years* ago. Importantly, though, McCann developed evidence regarding White's intellectual functioning during the course of his representation of White. Prior to *Atkins*, McCann presented the state court Dr. Seth Silverman's report stating, among other things, that White had "compromised intellectual functioning," and borderline to low intellectual functioning.[3] SHCR-02 at 78–80, 83. After *Atkins*, McCann presented the state court Dr. Patricia Averill's report reflecting new IQ testing that produced a full-scale score of 78 with an error of measurement between 74–83. SCHR-04 at 11–16. Like Dr. Silverman, Dr. Averill described White as having borderline intellectual functioning. *Id*. at 15. According to Dr. Averill, White was "ineligible for the [intellectual disability] label and associated protections," but suffered from the same limitations as the intellectually disabled. *Id*. Notably, the experts attributed at least some of White's intellectual deficits to his abuse of cocaine. *Id*. at 16 ("However, it is quite possible that [White's] cocaine use

---

[3]    At trial, Dr. Robert Yohman testified that he administered intelligence testing to White that resulted in a full-scale score of 76, which indicated borderline intellectual functioning. 21 RR 315. Dr. Dennis Nelson testified that he administered two screening tests for intellectual functioning that gave estimates of White's IQ as 85 and 87. 21 RR 391–92.

compromised an already compromised brain."); SHCR-02 at 75 (White used cocaine "over a period of time and at a rate that he would have suffered a loss of memory, decreased intellectual functioning, and significantly decreased [ ] ability to engage in deliberate thought at the time of the offense").

In Johnson's case, the Fifth Circuit found his *Atkins* claim was previously unavailable to him because the DSM-5, a 2013 revision of the Diagnostic and Statistical Manual of Mental Disorders, "changed the framework for intellectual disability" such that an IQ score above 70 was no longer a bar to an intellectual disability diagnosis. *In re Johnson*, 935 F.3d at 292. Moreover, in *Hall v. Florida*, 572 U.S. 701, 721–22 (2014), "the Supreme Court held there could not be a mandatory IQ number cutoff for consideration of intellectual disability." *In re Johnson*, 935 F.3d at 292. The Fifth Circuit explained that its earlier opinion in *In re Cathey*, 857 F.3d 221, 232–33, 237–38 (5th Cir. 2017), recognized that "[t]he significant change was in the medical methodology for evaluating the relevant disabilities and in courts' recognition of those changes." *In re Johnson*, 935 F.3d at 293. Therefore, when determining the relevant accrual date for Johnson's limitations period, the Fifth Circuit determined it was when the DSM-5 was published in 2013. *Id.* at 296.

While the Fifth Circuit left it to the district court to determine Johnson's entitlement to equitable tolling, it is instructive here that White's delay in seeking substitution of counsel (a second time) is *twice* as long as Johnson's. If

the delays in *In re Johnson* and *In re Cathey* gave reason to "pause" to consider the timeliness of the petitioners' *Atkins* claims, *In re Johnson*, 935 F.3d at 296, White's significantly more egregious delay in seeking substitution of counsel—after having considered but foregone that option a decade ago—is plainly sufficient reason to decline the request. Therefore, the Court should deny White's motion for substitution of counsel.

## B.   Substitution of counsel would be futile.

White's motion for substitution of counsel is presumably for the purpose of filing a request for authorization to file a successive *Atkins* claim. ECF No. 109 at 1. Not only does this Court presently lack jurisdiction to consider such a request, 28 U.S.C. § 2244(b)(3)(A), any such request would be futile because White's proposed *Atkins* claim would be impermissibly successive and time barred. *See Clair*, 565 U.S. at 663–66. Therefore, this Court should deny White's motion for substitution of counsel.

### 1.   White's proposed *Atkins* claim would be impermissibly successive.

Substitution of counsel should be denied because it would be a futile exercise, as White requests it solely for the purpose of seeking permission from the Fifth Circuit to raise a successive *Atkins* claim. *See Clair*, 565 U.S. at 663–66. He would not be entitled to that permission.

A habeas petitioner must obtain leave from the court of appeals before filing a second habeas petition in the district court. *Adams v. Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). White has filed both an initial federal habeas petition, which was denied in 2011, ECF Nos. 81–82, and a motion for authorization to file a successive petition, which was denied in 2015, *In re White*, 602 F. App'x at 958. Therefore, he would be required to satisfy an exception under 28 U.S.C. § 2244(b).

White has not previously raised an *Atkins* claim in federal court. *See* 28 U.S.C. § 2244(b)(1). Therefore, to establish an entitlement to file another federal petition, White would be required to show his *Atkins* claim was unavailable to him in 2015 when his motion for authorization was denied. 28 U.S.C. § 2244(b)(2)(A) (requiring that a claim presented in a successive application "that was not presented in a prior application shall be dismissed unless" it relies on a new, retroactive rule of constitutional law);[4] *see In re*

---

[4]     The Fifth Circuit in *In re Johnson* found a claim like White's did not satisfy § 2244's factual predicate provision in § 2244(b)(2)(B). *In re Johnson*, 935 F.3d at 291 n.1; *see In re Webster*, 605 F.3d 256, 258–59 (5th Cir. 2010) (a successive *Atkins* claim based on new evidence would not negate the evidence of the petitioner's guilt). Notably, White does not assert that the Supreme Court's opinions in *Moore v. Texas*, 581 U.S. 1 (2017) (*Moore I*), or *Moore v. Texas*, 586 U.S. 133 (2019) (*Moore II*), satisfy § 2244(b)(2)(A)'s requirement that a movant show a successive claim relies on a new, retroactive rule of constitutional law. That is for good reason, because the Supreme Court has not held that *Moore I* or *Moore II* are retroactively applicable. *See Tyler v. Cain*, 533 U.S. 656, 662 (2001); *see also In re Burton*, 111 F.4th 664, 666, n. 3 (5th Cir. 2024); *In re Sparks*, 939 F.3d 630, 632 (5th Cir. 2019).

*Pruett*, 711 F. App'x 732, 736 (5th Cir. 2017) ("[T]here is no reason why Pruett could not have discovered the contamination of the murder weapon before filing his [earlier] 2015 motion to file a successive habeas petition."); *United States v. Jones*, 796 F.3d 483, 485 (5th Cir. 2015) ("[H]abeas applications are defined in relation to the judgment that they attack[.]" (citing *Magwood v. Patterson*, 561 U.S. 320, 332 (2010)).

As mentioned above, White intends to follow the path laid by Dexter Johnson. ECF No. 109 at 1. To do so, White would be required to show *Atkins* was previously unavailable "as to him," despite it having been decided almost a decade before this Court denied his initial federal petition.[5] *See In re Johnson*, 935 F.3d at 292. Concededly, White's case is similar to Johnson's in that each had initial federal habeas proceedings that postdated *Atkins*, both were represented by McCann in state and federal court, and neither raised an *Atkins* claim until long after *Atkins* was decided. *See id.* at 288. But there are significant differences between the two.

Johnson was convicted of capital murder in 2007 and sentenced to death. *In re Johnson*, 935 F.3d at 287. Six years later, the DSM-5 was released, "which

---

[5]     This assumes *In re Cathey* and *In re Johnson* remain good law. The Fifth Circuit recently granted the Director's request in *In re Johnson* for an interlocutory appeal. Unpublished Order, *Lumpkin v. Johnson*, No. 23-90003 (5th Cir. May 31, 2003), ECF No. 2-1. The appeal seeks review of, among other issues, whether there can be judicially created exceptions to § 2244(b)(2)(A), which, if answered in the negative, would bar White's attempt to file a successive petition.

changed the focus [of an assessment for intellectual disability] from specific IQ scores to clinical judgment." *Id.* at 293. Johnson's proposed successive *Atkins* claim relied on the updated standards in the DSM-5, *id.* at 292, as well a current full-scale IQ score of 70, *id.* at 293, which was within the *Atkins* range.[6] The Fifth Circuit explained, "[w]hat opens the door for Johnson is the *Cathey* decision, which has precedentially determined that it is correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at 294; *see In re Soliz*, 938 F.3d 200, 203–04 (5th Cir. 2019) (discussing *In re Johnson*). The same cannot be said for White.

Critically, White filed a motion for authorization in January 2015 seeking permission to file a successive petition raising a claim related to his "limited intellectual capacity" and his purported invocation of his right to counsel. *In re White*, 602 F. App'x at 957–58. That motion for authorization postdated the issuance of the DSM-5 by almost two years as well as the Supreme Court's decision in *Hall*.[7] *See In re Johnson*, 935 F.3d at 293. Therefore, it simply cannot be said that the DSM-5—the "change in diagnostic

---

[6]    White has not proffered a current IQ score or one within the *Atkins* range.

[7]    White's motion for authorization discussed *Hall* and its rejection of firm IQ cut-offs when assessing for intellectual disability. Mot. for Authorization 10–11, *In re White*, No. 15-20022 (5th Cir. Jan. 15, 2015).

standards" that allowed Cathey and Johnson to proceed with their *Atkins* claims, *id.*—was unavailable when White filed his "prior application," 28 U.S.C. § 2244(b)(2)(A). *See In re Swearingen*, 935 F.3d 415, 417–18 (5th Cir. 2019) (listing the movant's prior motions for authorization and explaining the parties conceded his "claims were not raised in previous federal habeas *petitions*" (emphasis added)); *In re Pruett*, 711 F. App'x at 736.

Further, White's *Atkins* claim that was denied by the state court relies on the Flynn Effect to produce an actionable IQ score. Sixth Sub. Appl. for Writ of Habeas Corpus Pursuant to Tex. Code of Crim. Proc. Art. 11.071 9–10, *Ex parte White*, No. 07238470101 (180th Dist. Ct. Harris Co., Tex.). However, unlike in *In re Cathey*, 857 F.3d at 230, it cannot be said that the Flynn Effect was previously unavailable to White at the time his initial federal petition was denied in 2011 or when he filed his motion for authorization in 2015. Cathey's initial federal habeas petition was denied in 2004, before Texas courts began in 2006 to recognize the Flynn Effect. *Id*. Nor does White allege, as Cathey did, that evidence of an actionable IQ score was withheld by the State. *Id*. at 232–33.

Importantly, the Fifth Circuit in *In re Johnson* did not rely on the allegation regarding McCann's conflict of interest in finding Johnson's *Atkins* claim was previously unavailable "as to him." 935 F.3d at 292. The Fifth Circuit instead relied entirely on the "change in diagnostic standards" to find Johnson

26

could not have raised an *Atkins* claim in his initial federal petition. *Id.* at 293; *see In re Soliz*, 938 F.3d at 203–04; *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020); Mem. & Order 15, *Johnson v. Lumpkin*, No. 4:19-CV-3047 (S.D. Tex. Oct. 28, 2022), ECF No. 78 ("The futility of raising an *Atkins* claim ended for Johnson when the DSM-V was published on May 18, 2013."). But again, those updated diagnostic standards were indisputably available to White when he filed his motion for authorization in 2015. *See In re Pruett*, 711 F. App'x at 736. Therefore, not only is White's substitution request significantly more dilatory than Johnson's, but he also fails to identify any basis on which the Fifth Circuit might grant him authorization to file a successive federal petition raising an *Atkins* claim. *See* ECF No. 109 at 14–15 ("[B]ecause White was previously barred from [intellectual disability] diagnosis by an IQ cut-off that has since been abolished, White might be able to satisfy the gatekeeping standard for authorization to file a successive petition."); *In re Soliz*, 938 F.3d at 204 (rejecting the petitioner's reliance on *In re Johnson* and *In re Cathey* where he filed his amended federal petition in 2016, "years after the DSM-5 was published," and after the *In re Cathey* decision, so "any claim similar to what we discussed in *Johnson* and earlier in *Cathey* was available to Soliz at the time of his earlier application for a writ of habeas corpus"). Therefore, this Court should deny White's motion for substitution of counsel. *See Clair*, 565 U.S. at 663–66.

27

### 2.    White's proposed *Atkins* claim would be time barred.

Substitution of counsel would be futile also because a successive *Atkins* claim would be time barred. The Fifth Circuit has "the authority to deny a motion to authorize based on timeliness." *In re Campbell*, 750 F.3d 523, 532 n.9 (5th Cir. 2014); *see also In re Jones,* 998 F.3d 187, 189 (5th Cir. 2021). White's claim is plainly time barred, and he could not justify a decade's worth of equitable tolling to make it timely.

Section 2244(d)(1) applies a one-year limitations period to any application for writ of habeas corpus. In this case, the limitations period begins running from the latest of either:

> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1); *In re Jones,* 998 F.3d at 189. White cursorily suggests his limitations period accrued no later than 2019 when the Supreme Court decided *Moore II*. ECF No. 109 at 15 (citing *In re Burton*, 111 F.4th at 666). But the Fifth Circuit in *In re Burton* did not hold *Moore I* or *Moore II* are the appropriate accrual dates for claims like White's; it merely assumed they were and found the claim untimely. *In re Burton*, 111 F.4th at 666; *see In re Sparks,*

28

939 F.3d at 632; *see also In re Jones,* 998 F.3d at 189–90 (even considering *Moore II*, decided in 2019, petition filed in 2021 was still untimely). As discussed above, neither *Moore I* nor *Moore II* has been made retroactively available, so White's successive *Atkins* claim would be plainly untimely under § 2244(d)(1)(C). The claim would also be untimely under § 2244(d)(1)(D) based on a factual predicate date of May 2013, when the DSM-5 was published.[8] In either case, White's claim would be significantly untimely.

Indeed, White essentially admits his claim would be untimely and that he would require the benefit of equitable tolling, ECF No. 109 at 15–16, but White cannot show he is entitled to it. A habeas petitioner is entitled to equitable tolling of the limitations period if he shows (1) that he has pursued his rights diligently and (2) extraordinary circumstances prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 649 (2010). Even assuming Dexter Johnson could justify enough equitable tolling to make his claim timely, White cannot.

As discussed above, White expressed dissatisfaction with McCann's performance ten years ago. Pet'r's App. 236–38. White has not suggested he made any further attempt to secure new counsel or made any effort to notify

---

[8]      *See* Mem. & Order 18 n.14, *Johnson v. Lumpkin*, No. 4:19-CV-3047 (S.D. Tex. Oct. 28, 2022), ECF No. 78 (noting the Fifth Circuit "has not yet decided whether to measure an inmate's compliance with the limitations period from the publication of the [DSM-5] or from *Moore I*").

this Court of his dissatisfaction prior to or soon after his previously scheduled execution in 2015. *Cf. In re Lewis*, 484 F.3d 793, 797 (5th Cir. 2007) (rejecting argument for equitable tolling based on the withdrawal of the petitioner's appointed counsel on the day the petitioner "became eligible to raise his *Atkins* claim"). Indeed, it appears White took no further action during the intervening decade until his execution was scheduled a second time when White, himself, wrote to outside counsel. Pet'r's App. 234.

To the extent White relies on his purported intellectual disability as reason not to require him to exercise the diligence needed to receive equitable tolling, such an argument would be undermined by the fact that he has exhibited an ability to seek assistance from outside counsel. Pet'r's App. 234–39; *see Jones v. Stephens*, 541 F. App'x 499, 505 (5th Cir. 2013) ("Although mental illness may warrant equitable tolling, a petitioner (i) must make a threshold showing of incompetence and (ii) must show that this incompetence affected his ability to file a timely habeas petition[ ]."), 505 n.34 (collecting cases); *Smith v. Kelly*, 301 F. App'x 375, 377 (5th Cir. 2008) ("[W]hile mental illness *may* [equitably] toll AEDPA's statute of limitations, it does not do so as a matter of right." (emphasis in original)); *see also Holland,* 560 U.S. at 653 (Holland wrote his attorney numerous letters; repeatedly contacted the state courts, clerks, and the Florida State Bar Association to have attorney removed from his case; and upon learning counsel had missed AEDPA deadline,

prepared his own habeas petition *pro se* and filed it with the District Court); *Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012) (a counseled petitioner "seeking to establish due diligence must exercise diligence even when they receive inadequate representation"); *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (Sotomayor, J.) ("[T]he act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition.").

In light of White's demonstrated willingness and ability to seek assistance from outside counsel, and his lack of diligence in doing so, he could not show an entitlement to sufficient equitable tolling to make his successive *Atkins* claim timely. Therefore, this Court should deny White's futile motion for substitution. *See Clair*, 565 U.S. at 663–66.

### 3.   White does not have a prima facie claim for relief.

To obtain authorization to raise a successive *Atkins* claim, White would also be required to make a prima facie showing that he is intellectually disabled. *See In re Campbell,* 750 F.3d at 530. White has presented an *Atkins* claim in state court, which the CCA has rejected. Order, *Ex parte White*, No. WR-48-152-09 (Tex. Crim. App. Sept. 18, 2024). That adjudication was on the merits. *Busby v. Davis,* 925 F.3d 699, 709 (5th Cir. 2019) (citing *Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)). Therefore, the CCA's *Atkins* ruling would be ultimately subject to AEDPA's relitigation bar. *Id.* at 710–11.

To demonstrate he is intellectually disabled and thus ineligible for execution, White must show: (1) he has deficits in intellectual functioning; (2) he has deficits in adaptive functioning; and (3) the onset of these deficits occurred during childhood or adolescence. *Moore I*, 581 U.S. at 7; *Petetan v. State*, 622 S.W.3d 321, 333 (Tex. Crim. App. 2021). In support of his claim in state court, White presented IQ scores of 76 and 78, which were obtained prior to his 1996 trial and in support of his 2009 subsequent habeas application, respectively. Sixth Sub. Appl. for Writ of Habeas Corpus Pursuant to Tex. Code of Crim. Proc. Art. 11.071, *Ex parte White*, No. 07238470101 (180th Dist. Ct. Harris Co., Tex.), App. C (Hupp Affidavit); 21 RR 315–16; SCHR-04 at 11–16. He also presented a report by Dr. Gregg Hupp who stated application of the Flynn Effect to White's score of 78 would adjust the score downward at least to 75, and the score could be, accounting for the lower end of the standard error of measurement, possibly as low as 68. Hupp Affidavit at 5. Dr. Hupp also concluded White exhibited adaptive deficits during the developmental period. *Id*.

White's evidence does not present a prima facie claim for intellectual disability. According to the DSM-5-TR, individuals with intellectual disability have scores approximately two standard deviations or more below the population mean, including a margin for measurement error, or a score of 65– 75. DSM-5-TR at 42; *see In re Cathey*, 857 F.3d at 236. According to Dr. Averill,

32

applying the standard error of measurement to White's unadjusted IQ score of 78 produced a range of 74–83 (or 71–85 if applying a seven-point error of measurement as applied by Dr. Hupp, Hupp Affidavit at 5). Based on the Supreme Court's decision in *Moore I*, the low end of the range of error does not fall within the range of intellectual disability sufficient to trigger an analysis of adaptive deficits. *See Moore I*, 581 U.S. at 14 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning.").

The Fifth Circuit has held the CCA reasonably determined that a petitioner could not demonstrate subaverage intellectual functioning when the lowest IQ score he provided was a 74 on the WAIS-IV (yielding a range from 70–79), which the test's administrator described as "Borderline." *Busby*, 925 F.3d at 716–20. The Court reached a similar conclusion in another case, where the petitioner's score, considered with the range of error, did not fall at or below 70. *Green v. Lumpkin*, 860 F. App'x 930, 940 (5th Cir. 2021) (per curiam) (holding that where lowest IQ score submitted was 78, the state court was not unreasonable for determining the petitioner was not intellectually disabled because petitioner could not satisfy the first *Atkins* prong). The Fifth Circuit stated that reason alone was enough to foreclose relief on the *Atkins* claim. *Id.* The same is true here.

As for the Flynn Effect, adjustment of IQ scores is not required. The Flynn Effect posits that over time, IQ scores of a population rise without corresponding increases in intelligence and, thus, the test must be re-normed. *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The Flynn Effect "may affect" a test score. DSM-5-TR at 38; *see Ex parte Cathey*, 451 S.W.3d 1, 12–14 (Tex. Crim. App. 2015). Importantly, though, the DSM-5-TR does not require adjusting a score downward for the Flynn Effect. DSM-5-TR at 38. Additionally, Texas law holds that an IQ score "may not be changed" to adjust for the Flynn Effect. *Cathey*, 451 S.W.3d at 18.[9] Further, "the Fifth Circuit has not recognized the Flynn effect," *Brumfield v. Cain*, 808 F.3d 1041, 1060 n. 27 (5th Cir. 2015),[10] and the Supreme Court has called it a "controversial theory." *Dunn v. Reeves*, 594 U.S. 731, 736–37 (2021) (per curiam). Without this adjustment, White cannot make a prima facie showing on the first criteria for intellectual disability, making it unnecessary to assess his adaptive behavior.

---

[9]    The CCA has noted that practice effects and the Flynn Effect "may affect test scores," *Petetan*, 622 S.W.3d at 338 (citing DSM-5 at 37), and courts "may consider the Flynn Effect and its possible impact on IQ scores generally" *only* "[w]hen it is impossible to retest using the most current IQ test available." *Ex parte Cathey*, 451 S.W.3d at 5, 18. And even then, courts "may consider that effect only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of concentration, and so forth." *Id.* at 5.

[10]    Unlike *In re Cathey*, White does not have other evidence—i.e., purported evidence that Cathey's IQ was below 73—to support an inference raised by the Flynn Effect that his score of 78 was artificially inflated. 857 F.3d at 236–37. Importantly, neither *In re Cathey* nor *In re Johnson* contradict *Brumfield* because they do not resolve the issue regarding application of the Flynn Effect.

34

*See Moore I*, 581 U.S. at 15 ("[W]e require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits."). In light of this, White cannot make out a prima facie *Atkins* claim, and substitution of counsel would be futile. Therefore, his motion for substitution of counsel should be denied.

### III.   White Is Not Entitled to a Stay of Execution Under *McFarland v. Scott*[11] or *Nken v. Holder*.[12]

Even if this Court found appointment of supplemental or substitute counsel appropriate, the Court would lack jurisdiction to grant a stay of execution under 28 U.S.C. § 2251(a). That is because White's federal habeas proceedings have concluded, there is no pending federal habeas proceeding, and this Court would lack jurisdiction over a successive habeas petition. *See Rosales v. Quarterman*, 565 F.3d 308, 311 (5th Cir. 2009) (citing *Teague v. Johnson*, 151 F.3d 291 (5th Cir. 1998) ("[O]nce the appellate mandate issues, a habeas petition is no longer pending before the court of appeals, and we have no jurisdiction to stay proceedings under § 2251.")); 28 U.S.C. § 2244(b)(3)(A); 28 U.S.C. § 2251(a)(3) (if an inmate sentenced to death applies for counsel under § 3599(a)(2), "a court that would have jurisdiction to entertain a habeas

---

[11]     512 U.S. 849 (1994).

[12]     556 U.S. 418 (2009).

corpus application" may stay the inmate's execution); *but see* Order, *Gutierrez v. Davis*, No. 18-70028 (5th Cir. Sept. 10, 2018) (concluding the district court had jurisdiction to enter a stay of execution under 28 U.S.C. § 2251(a)(3)); *Battaglia*, 824 F.3d at 475; Order 7, *Johnson v. Lumpkin*, No. 4:11-CV-2466 (S.D. Tex. Apr. 30, 2019), ECF No. 84. In *Gutierrez*, the Fifth Circuit found there was authority to enter a stay of execution, but that case involved appointed counsel who had been disqualified from CJA appointment. *See* Order 2, *Gutierrez v. Davis*, No. 1:09-CV-22 (S.D. Tex. Aug. 22, 2018), ECF No. 79. No similar circumstance exists here where McCann continues to actively litigate on White's behalf, and White does not seek to raise a newly arisen claim such as one alleging incompetency for execution. This Court should deny White's motion for a stay of execution for lack of jurisdiction.

Nonetheless, White must still demonstrate an entitlement to a stay of execution. 28 U.S.C. § 2251(a)(3) (a court "may" stay an execution if an inmate applies for appointment of counsel, "but such stay shall terminate not later than 90 days after counsel is appointed"). In determining whether White is entitled to a stay, a court might apply the standard under *McFarland* or *Nken*. *See Battaglia*, 824 F.3d at 475 (noting a lack of clarity as to whether a motion for a stay is governed by *McFarland* or *Nken*). Under either standard, White fails to establish an entitlement to a stay of execution.

36

### A.     White is not entitled to a stay under *McFarland*.

The Supreme Court in *McFarland* stated that permitting a petitioner's execution without affording appointed counsel the opportunity "meaningfully to research and present" an initial habeas petition would be clearly improper. 512 U.S. at 858. But a court would not abuse its discretion where the petitioner "inexcusably ignores this opportunity and flouts the available process." *Id.*

Under this standard, White plainly fails to show an entitlement to a stay of execution. White, with the continuous representation by McCann for more than two decades, undeniably had the opportunity (and did) fully litigate his state and federal habeas challenges, including the filing a motion for authorization to file a successive federal petition and obtaining a stay of execution in 2015. *In re White*, 602 F. App'x at 958; *Ex parte White*, 2015 WL 375733, at *1. Consequently, neither substitution of counsel nor a stay of execution is necessary to make White's statutory right under § 3599 effective where he has enjoyed that right for decades. Moreover, as discussed above, White expressed dissatisfaction with McCann in 2014, but after the stay of his execution in 2015, White waited idly for a decade until another execution date was scheduled. Under *McFarland*, White is disentitled to a stay. *See McFarland*, 512 U.S. at 858 ("[I]f a dilatory capital defendant inexcusably ignores [the opportunity to request counsel and file a federal habeas petition] and flouts the available processes, a federal court presumably would not abuse

37

its discretion in denying a stay of execution."). Therefore, his motion for a stay of execution should be denied.

### B.   White is not entitled to a stay under *Nken*.

In considering whether to grant a stay under *Nken*, a court considers (1) whether the petitioner has made a strong showing that he is likely to succeed on the merits, (2) whether the petitioner will be irreparably injured absent a stay,[13] (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. *Charles v. Stephens*, 612 F. App'x 214, 218 n.7 (5th Cir. 2015) (citing *Nken*, 556 U.S. at 425–15). As discussed below, White fails to show an entitlement to a stay under the *Nken* factors.

As discussed above White cannot make a strong showing that he is likely to succeed on a motion for authorization to file a successive federal petition. Moreover, in *Battaglia*, the Fifth Circuit granted a stay of execution because the petitioner was not meaningfully represented by counsel due to appointed counsel's abandonment of him, appointed counsel's abandonment precluded the development of evidence that the petitioner was incompetent to be executed, the possibility of irreparable harm to the petitioner weighed in his

---

[13]     As the Fifth Circuit has explained, the merits of the petitioner's "case are essential to [the court's] determination of whether he will suffer irreparable harm if a stay does not issue." *Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008).

favor, and the petitioner's dilatory filing was due to the late-developing nature of a *Ford*[14] claim and appointed counsel's abandonment. 824 F.3d at 475–76.

Such circumstances do not exist here. As discussed above, White has been continuously represented by appointed counsel who have never abandoned him, and there is nothing late developing about the nature of White's proposed *Atkins* claim. For the same reasons, White cannot show he will suffer irreparable harm if denied a stay. *See Walker*, 287 F. App'x at 375. Consequently, White fails to show he is entitled to a stay.

Finally, the State, the victims of White's numerous murders, and the public have a strong interest in carrying out White's sentence. White has challenged his capital murder conviction and death sentence for more than twenty years during which he has been ably represented by McCann. As discussed above, White fails to show an entitlement to reinitiate his federal habeas proceedings, that McCann's representation of him has been inadequate, or that he is intellectually disabled. Considering the circumstances in this case, a stay of execution should be denied.

## CONCLUSION

For the above reasons, the Director respectfully requests that this Court deny White's motions for substitution of counsel and a stay of execution.

---

[14]    *Ford v. Wainwright*, 477 U.S. 399 (1986).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

<u>s/ Jay Clendenin</u>
*JAY CLENDENIN
Assistant Attorney General
Criminal Appeals Division
Texas Bar No. 24059589
Southern District No. 920324

*Counsel of Record

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1600
Fax: (512) 320-8132
e-mail: jay.clendenin@oag.texas.gov

ATTORNEYS FOR RESPONDENT

40

## CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, September 18, 2024, I filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Patrick McCann
700 Louisiana Street, Suite 3950
Houston, Texas 77002
writlawyer@outlook.com

Julia Bella
503 FM 359, Suite 130
Richmond, Texas 77406
julia@jbellalaw.com

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General

41