IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARCIA GLENN WHITE, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:02-CV-1805 |
| | § | ECF |
| BOBBY LUMPKIN, Director, | § | *DEATH PENALTY CASE* |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| *Respondent*. | § | |

**RESPONDENT'S OPPOSITION TO PETITIONER'S MOTIONS FOR
RELIEF FROM JUDGMENT AND A STAY OF EXECUTION**

Petitioner Garcia Glenn White was properly convicted and sentenced to die for the murders of sixteen-year-old twin sisters Annette and Bernette Edwards. He committed three killings during that criminal transaction, and he has killed two others. *White v. Thaler*, No. H-02-1805, 2011 WL 4625361, at *1–2 (S.D. Tex. Sept. 30, 2011). **White is scheduled to be executed after 6:00 p.m. (Central Time) on October 1, 2024**. He has unsuccessfully challenged his conviction and death sentence in state and federal court. This Court entered final judgment in 2011. *See id*. White now seeks relief from that judgment via Federal Rule of Civil Procedure 60(b). ECF No. 120. He asserts he has new evidence that supports claims this Court previously rejected on their merits, and he argues this Court should consider whether he is innocent of the death penalty. ECF No. 120. The Court should deny White's motion

because it is an impermissible successive habeas petition in the guise of a Rule 60(b) motion, it is untimely, and it fails to justify his request for relief from judgment. For the same reasons, the Court should deny White's request for a stay of execution.

## PROCEDURAL HISTORY

### I.    Facts of the Crime

In late November 1989, Annette, Bernette, and their mother Bonita Edwards were found inside their apartment, one just inside the front door, one in the dining area, and one in a bedroom. 15 RR 60.[1] Annette was lying face down semi-nude with her head on a pillow and a blanket partially covering her. 15 RR 75–76. Her twin sister Bernette had a towel wrapped around her neck and shoved into her mouth. 15 RR 85. Bonita was clothed but had blood on her shirt. 15 RR 78, 83. The three women had sustained multiple stab wounds to the neck and chest and had been dead for several days. 15 RR 83–84, 146–47. Although there was no sign of a forced entry into the apartment, the telephone was off the receiver, and it appeared the bedroom door had been forced open. 15 RR 70, 73, 91, 151. It appeared that Annette, who was found in

---

[1]    "RR" refers to the "Reporter's Record," the transcribed proceedings of White's trial, preceded by the volume number and followed by the page number(s) cited. "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "SX" refers to the State's Exhibits admitted at White's trial. "SCHR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte White*, No. WR-48,152-01.

the bedroom, may have been sexually assaulted. 15 RR 153. Moreover, blood was found on the walls and on numerous items in the apartment, including the bathtub and kitchen sink. 15 RR 76–78, 83, 88–100, 109–10, 151.

The initial interviews of witnesses proved to be fruitless, and the crime remained unsolved for nearly six years. 15 RR 153–56. However, in July of 1995, the police finally received a break in the case. During an interview regarding an unrelated murder of a convenience store owner involving White, Tecumseh Manuel, a close friend of White's, told the police that White admitted to killing the Edwards family. 16 RR 185–86, 189–90. Officer Todd Miller took a statement from Manuel on July 20, 1995, and arrested White the following day. 15 RR 190. Miller contacted Sergeant Rudolph because he had been involved in the original investigation of this case, and Rudolph questioned White for several hours during the early morning of July 22, 1995. 15 RR 157–59; 16 RR 193–94. White denied involvement in the murders during the interview and believed the police were lying to him about Manuel implicating him in the crime. 15 RR 161. Miller showed White a portion of the taped statement from Manuel. 15 RR 161; 16 RR 195. Afterwards, Miller asked White if he was ready to tell the truth, and White said he was. 16 RR 195–96.

White then gave a videotaped statement of his version of the murders. 15 RR 162; 16 RR 196. The gist of White's statement was that he and Terrence Moore went over to Bonita's apartment to do drugs and have sex with her. SX

3

55A. They both tried to have sex with Bonita and, after they failed, Bonita got mad because they would not share the drugs with her. *Id.* A fight ensued, and Moore ended up stabbing all of the women. *Id.* White acknowledged during the interview that Terrence Moore was no longer alive. *Id.*

The police investigated Moore's death and discovered Moore had been killed on July 25, 1989, four months before the Edwards were murdered. 16 RR 205–06, 224. Miller and Rudolph confronted White with this discrepancy, and then White gave another taped statement. *Id.* at 206–09. In this brief statement, White admitted that he made up the story involving Moore, and he confessed to killing all three women himself. SX 56A. Further, serology and DNA testing revealed that semen found on a beige sheet in one of the bedrooms was consistent with White's DNA, and blood found on the same sheet was consistent with the DNA of either Annette or Bernette. 16 RR 240–41; 17 RR 381–384. DNA retesting conducted in 2006 further incriminated White. *See* ECF No. 70-1 at 8–9.

## II.    Evidence Pertaining to Punishment

### A.    Evidence presented by the State

During the punishment phase, the State proved White had committed two prior murders, including one capital murder. With regard to the capital murder, Hau Pham, a sixteen-year-old immigrant from Vietnam, testified that on July 13, 1995, two men came into his father's convenience store and robbed

it. 19 RR 33–34. Around 3:00 p.m. that day, Hau heard a scream, and then one of the men grabbed him by the neck and told him to open the register. 19 RR 34–35. Hau recognized the men because they had been in the store earlier in the day. 19 RR 34. One man was "fat," and the other had a medium build. 19 RR 35–36. Hau saw his father, Hai Pham, lying on the floor with blood on him. 19 RR 37. The men took some cigarettes and walked out of the store. 19 RR 38. Hai died several days later from multiple blunt traumas to the head with skull fractures, brain contusions, and associated complications. 19 RR 47, 83–84. Hau was shown photographs of possible suspects and identified White as the "fat" man. 19 RR 46–47, 62–64. Officer Miller then obtained a warrant for White's arrest, and White gave a videotaped statement admitting his involvement in the crime. *Id.* at 64–69. In the statement, White said he grabbed Hai Pham, threw him to the floor, hit him several times, and kicked him in the chest when he tried to get up. SX 98. White was charged with capital murder. 19 RR 65.

With regard to the second offense, several Houston police officers testified that, on November 1, 1989, they were dispatched to an abandoned house. 20 RR 114, 121–22. When officers arrived, White and Raymond Manuel were at the scene. 20 RR 121. Officer Philip Clark pulled away plywood from one of the windows and saw a body lying in a back room. 20 RR 116. When homicide officer Wayne Wendel arrived, he found the body of a black female,

5

Greta Williams, beaten to death and covered in carpet. 20 RR 122–23, 134. Greta's body was in the early stages of decomposition, and there was evidence of head trauma. 20 RR 129. Broken teeth were by her neck, and blood spatter on the walls indicated that she sustained repeated blows. 20 RR 131–32. An autopsy revealed that Greta had been struck by a blunt object at least ten times and died from trauma to the head, face, chest, and abdomen. 20 RR 189–95.

When White was initially questioned about the incident, he gave a statement in which he admitted seeing Greta walking down the street but denied having anything to do with her murder. 20 RR 178–79. White was charged with the murder, and the case was presented to a grand jury on November 29, 1989. 20 RR 141–42. At that time, however, White was "no billed" because there was insufficient evidence for the grand jury to present the indictment. 20 RR 142. But when the police questioned Tecumseh Manuel about his knowledge of the Hai Pham murder, Manuel told the police that White told him about his involvement in both the instant case and Greta Williams's murder. 19 RR 67.

The police confronted White with this new information, and White agreed to give another statement regarding his involvement in Greta's death. 20 RR 207–08. White stated that he approached Greta and offered to pay her for sex. SX 116A. They went to the abandoned house and had sex. *Id.* Afterward, White believed that Greta had taken some of his money. *Id.* When

6

he started to walk away, Greta pulled his shirt and started hitting him. *Id.* White hit her hard about three times, and Greta fell to the ground. *Id.* White then rolled Greta up in carpet and left. *Id.* White further stated that he and Manuel came back to the house two weeks later and noticed a foul odor coming from the house. *Id.* Although White knew it was Greta's body that was causing the smell, he told Manuel that it was probably a dead dog, and they ended up calling the dog pound. *Id.* According to White, the health department contacted the police when they found Greta's body inside. *Id.*

### B.    Evidence presented by the defense

White's first two witnesses were his mother and sister, who testified regarding White's childhood, character, family, problems related to injuries and work, and drug use. 21 RR 230–78. White's mother, Lizzie White, testified that White was a poor student in school but had good conduct records, was only disciplined once, and got along well with his siblings. 21 RR 230–37. White was a starter on the Wheatley High football team, wanted to play college and pro football, and got accepted to Lubbock Christian College to play football. 21 RR 237–39. However, White injured his knee during his first semester, which terminated his football career, and he dropped out of school. 21 RR 239–40. White came back home and, after working several jobs, he got a job with Clean America sandblasting buildings. 21 RR 240–44. Eventually, he was promoted to crew leader. 21 RR 244. However, in March of 1988, he sustained a serious

fall on the job and was hospitalized. 21 RR 245–46. The injury resulted in pain and drug use, and White started hanging around drug abusers. 21 RR 246–49. Although White's medical records were not available, records were produced showing White had been admitted and discharged from the hospital around that time. 21 RR 283. Further, although White had three children whom he loved and was separated from his common-law wife, he was a poor provider and was behind on his child support payments due to his drug use. 21 RR 249–53. Lizzie asked the jury to spare her son's life. 21 RR 254.

Monica Garrett, White's sister, testified to similar effect as her mother. She stated White was a nice brother who got along well with his siblings. 21 RR 271. White had difficulty in school. 21 RR 271. She tried to help White with his grades but to little avail. 21 RR 271–72. Monica and her siblings considered White to be a football hero. 21 RR 272–73.

White then presented two expert witnesses. Robert Yohman, a clinical neuropsychologist, testified that he conducted a battery of tests on White and reviewed records provided by White's attorneys. 21 RR 308–13. Yohman's examination showed, among other things, that White had an IQ of 76, which was in the borderline range of intellectual functioning but not in the range of intellectual disability. 21 RR 315–16. Dennis Nelson, a psychologist, testified that he examined White and conducted various tests on White's intellectual and emotional functioning, as well as his personality. 21 RR 387, 390.

8

According to screening tests, White had an estimated IQ of 85 or 87. 21 RR 391.

On rebuttal, the State presented a probation officer, John Thomas, who stated that on March 20, 1995, White received a probated three-year sentence for theft. 21 RR 451–52. As part of his alcohol and drug evaluation, he was referred to a program but did not follow through. 21 RR 454–55. Further, although White admitted to using drugs on his personal data sheet, he denied being a drug abuser. 21 RR 453–54.

## III.   Direct Appeal and Postconviction Proceedings

White was convicted and sentenced to death for the murder of Annette and Bernette Edwards. CR 5, 222, 233–36, 242–43. The Texas Court of Criminal Appeals (CCA) upheld White's conviction and death sentence on direct appeal. Op., *White v. State*, No. AP-72,580 (Tex. Crim. App. June 17, 1998).

White then filed a state application for a writ of habeas corpus in the trial court. SHCR-01 at 2–109. The trial court entered findings of fact and conclusions of law recommending that White be denied relief. *Id.* at 259–290. The CCA adopted the trial court's findings and conclusions and denied relief. Order, *Ex parte White,* No. WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001). White also filed a second state habeas application, which the CCA dismissed

as an abuse of the writ. Order, *Ex parte White,* No. WR-48,152-02 (Tex. Crim. App. Apr. 24, 2002).

White then filed a federal habeas petition. ECF No. 27. This Court granted White an administrative stay pending the outcome of DNA retesting. ECF No. 53. White later filed two additional state habeas applications, which the CCA dismissed pursuant to Art. 11.071, § 5(a) of the Texas Code of Criminal Procedure. Order, *Ex parte White*, Nos. WR-48,152-03, -04 (Tex. Crim. App. May 6, 2009). Following DNA retesting and the state court's dismissal of those applications, the Court lifted the stay. ECF No. 63. White filed an amended petition on December 31, 2009, ECF No. 64, after which the Director filed a motion for summary judgment, ECF No. 70. This Court then granted the Director's motion for summary judgment, denied White's petition, and denied White a certificate of appealability (COA). *White v. Thaler*, 2011 WL 4625361, at *15. Next, White filed an application for a COA in the Fifth Circuit, which was denied. *White v. Thaler*, 522 F. App'x 226, 236 (5th Cir. 2013), *cert. denied*, 571 U.S. 1133 (2014).

Thereafter, the convicting court scheduled White's execution for January 28, 2015. On January 8, 2015, White filed in the CCA a Motion for Leave to file an Original Petition for a Writ of Habeas Corpus, a Motion for Leave to file a Petition for a Writ of Prohibition, and a Motion for a Stay of Execution. SHCR-05, -06. The CCA denied White's motions on January 15, 2015. *Id*. White then

10

filed in the Fifth Circuit a Motion for Authorization to File a Successive Federal Habeas Petition, which was denied. *In re White*, 602 F. App'x 954, 958 (5th Cir. 2015).

Subsequently, White filed in state court, on January 19 and January 20, 2015, respectively, a Motion for Leave to File a Petition for Writ of Prohibition and his fourth subsequent state habeas application. SHCR-07, -08. The CCA denied the Motion for Leave to File a Petition for a Writ of Prohibition on January 21, 2015. SHCR-07. The United States Supreme Court ultimately denied certiorari review. *White v. Texas,* 135 S. Ct. 1510 (2015). The CCA issued an order staying White's execution based on the subsequent habeas application. *Ex parte White*, 2015 WL 375733, at *1. The CCA ultimately dismissed the application pursuant to Article 11.071, § 5. *Ex parte White,* 506 S.W.3d 39, 52 (Tex. Crim. App. 2016), *cert. denied*, 583 U.S. 850 (2017).

The state trial court then scheduled White's execution for October 1, 2024. White's appointed counsel, McCann, filed in state court an application for a writ of habeas corpus and a motion to withdraw the trial court's execution order. On September 3, 2024, the state trial court denied White's motion to withdraw the execution order. The CCA dismissed White's state habeas application and denied his motion for a stay of execution on September 18, 2024. Order, *Ex parte White*, No. WR-48,152-09 (Tex. Crim. App. Sept. 18,

11

2024). On September 18, 2024, White filed in the CCA a motion for leave to file a petition for a writ of prohibition. The motion remains pending.

On September 13, 2024, outside counsel filed a motion in White's concluded federal habeas proceedings for substitution of counsel and a stay of execution. ECF No. 109. This Court denied both motions. ECF No. 121.

On September 23, 2024, White filed motions for relief from judgment and for a stay of execution. ECF No. 120. The instant opposition follows.

## ARGUMENT

### I.   White's Motion Is a Successive Habeas Petition.

White's Rule 60(b) motion should be dismissed because it is an impermissible second-or-successive habeas petition. Construing Rule 60(b) in accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Supreme Court has explained that the rule cannot be used to circumvent the statute's proscriptions against successive petitions. *Gonzalez v. Crosby*, 545 U.S. 524, 531–32 (2005). "Because of the comparative leniency of Rule 60(b), petitioners sometimes attempt to file what are in fact second-or-successive habeas petitions under the guise of Rule 60(b) motions." *In re Edwards*, 865 F.3d 197, 203 (5th Cir. 2017) (per curiam). Given that tendency, a federal court must determine whether the motion either: "(1) presents a new habeas *claim* . . . or (2) 'attacks the federal court's previous resolution of a claim *on the merits.*'" *Id*. (citing *Gonzalez*, 545 U.S. at 530, 532); *see also Balentine v.*

12

*Thaler*, 626 F.3d 842, 846 (5th Cir. 2010) ("A Rule 60(b) motion should be denied if it challenges on the merits an earlier denial of habeas relief." (citing *Gonzalez*, 545 U.S. at 532)). If it does either, it must be treated as a second-or-successive petition. *In re Edwards*, 865 F.3d at 203–04. For the same reason, a Rule 60(b) motion seeking to present new evidence is a successive petition. *See Gonzales*, 545 U.S. at 531 ("The same is true of a Rule 60(b)(2) motion presenting new evidence in support of a claim already litigated."); *In re Coleman*, 768 F.3d 367, 371–72 (5th Cir. 2014).

The statute governing successive petitions, as well as Supreme Court decisions, make clear that a "claim" is "'an asserted federal basis for relief from a state court's judgment of conviction.'" *Crutsinger v. Davis*, 929 F.3d 259, 265 (5th Cir. 2019) (quoting *Gonzalez*, 545 U.S. at 530); 28 U.S.C. § 2244(b). A claim has been resolved on the merits when a federal court has determined that there are no "grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d)." *In re Edwards*, 865 F.3d at 204 (quoting *Gonzalez*, 545 U.S. at 532 n.4). This contrasts with an allegation "'that a previous ruling which *precluded* a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar.'" *Id.* (quoting *Gonzalez*, 545 U.S. at 532 n.4) (emphasis added). That is, a district court only has jurisdiction to consider a Rule 60(b) motion when it "'attacks, not the substance of the federal court's resolution of a claim on the

merits, but some defect in the integrity of the federal habeas proceedings.'"
*Crutsinger*, 929 F.3d at 265 (quoting *Gonzalez*, 545 U.S. at 532).

Here, White seeks to re-raise claims challenging the admissibility of his
confession and alleging he is innocent of the death penalty.[2] ECF No. 120. He
does not assert any defect existed during the initial proceedings in this Court
or that a procedural ruling precluded a merits review of his claims. Indeed, this
Court rejected White's claims regarding his purported innocence of the death
penalty and invocation of his right to counsel on the merits. *White v. Thaler*,
2011 WL 4625361, at *4–5, *12–14. The Fifth Circuit denied a COA as to these
claims in 2013. *White v. Thaler*, 522 F. App'x at 230–33. The Fifth Circuit also
denied his request for authorization in 2015 to file a successive federal petition

---

[2]     White claimed in his federal petition that he was innocent of the death penalty,
his constitutional rights were violated because he was questioned after he invoked
his right to counsel, and he was not competent to waive his rights to silence and
counsel due to his cocaine abuse, severe intellectual impairments, and organic
damage to his higher functions. ECF No. 64 at 16–30, 86–89, 94–95. White relied on,
among other things, a report by Dr. Patricia Averill regarding his purported limited
intellectual functioning. ECF No. 64-3 at 78–83. Importantly, though, whether a
suspect has invoked his right to counsel is an objective inquiry. *Davis v. United
States*, 512 U.S. 452, 459 (1994). White does not identify any new law requiring
application of a different, lower standard to a purported invocation of the right to
counsel. Nor does he show how his "new" evidence regarding his subjective state of
mind could bear on the objective *Davis* inquiry. Similarly, a "totality of the
circumstances" test has long been applied to claims regarding the validity of a waiver
of a suspect's rights. *Cooper v. Griffin*, 455 F.2d 1142, 1144–46 (5th Cir. 1972); *see
Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986) ("[W]hile mental condition is surely
relevant to an individual's susceptibility to police coercion, mere examination of the
confessant's state of mind can never conclude the due process inquiry."). Again, White
does not identify any new law with respect to that analysis.

14

re-raising his claim regarding his purported invocation of his right to counsel. *In re White*, 602 F. App'x at 958. Therefore, White's Rule 60(b) motion is plainly a successive habeas petition in disguise and should be dismissed as such. *See Will v. Lumpkin*, 978 F.3d 933, 938 (5th Cir. 2020) (a 60(b) motion implicitly challenging a prior merits determination presents a habeas claim); *Fratta v. Lumpkin*, No. 21-70001, 2022 WL 44576, at *2–3 (5th Cir. Jan. 5, 2022).

## II. White's Motion Is Untimely.

This Court should also deny White's Rule 60(b) motion because it is untimely. The motion primarily rests on White's assertion that new evidence exists that undermines this Court's prior rejection of his claims. ECF No. 120 at 2–3. Therefore, White's motion arises under Federal Rule of Civil Procedure 60(b)(2). Because the motion arises under Rule 60(b)(2), the catchall provision of Rule 60(b)(6) is inapplicable. *See Kemp v. United States*, 596 U.S. 528, 533 (2022) (Rule 60(b)(6) "is available only when Rules 60(b)(1) through (b)(5) are inapplicable"); *United States v. Williams*, 56 F.4th 366, 373 (4th Cir. 2023); *United States v. Fernandez*, 797 F.3d 315, 319 (5th Cir. 2015). A strict one-year deadline applies to Rule 60(b)(2) motions. Fed. R. Civ. P. 60(c)(1). This Court entered judgment in 2011. ECF No. 82. Therefore, White's motion should be denied as untimely. *See Kemp*, 596 U.S. at 533.

The motion is also untimely to the extent it arises solely under Rule 60(b)(6). A motion under Rule 60(b)(6) must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). As the Fifth Circuit has explained,

> Reasonableness turns on the particular facts and circumstances of the case. We consider "whether the party opposing the motion has been prejudiced by the delay in seeking relief and . . . whether the moving party had some good reason for his failure to take appropriate action sooner." "[T]imeliness . . . is measured as of the point in time when the moving party has grounds to make [a Rule 60(b)] motion, regardless of the time that has elapsed since the entry of judgment."

*Clark v. Davis*, 850 F.3d 770, 780 (5th Cir. 2017) (footnotes and citations omitted). Even assuming the timeliness of White's motion should be measured by some date later than this Court's denial of his petition—which Respondent vigorously disputes—White fails to show the evidence of his adaptive behavior could not have been discovered earlier. Indeed, White's submission shows he has had the assistance of a mitigation investigator since 2018. ECF No. 120 at 20–21. All the supportive affidavits from White's friends and family were executed within days of each other in late August this year. ECF No. 120 at 33–43. There is simply no reason to conclude that same information could not, with reasonable diligence, have been discovered long ago.[3] White's assertion

---

[3]    Notably, White presented a report of Dr. Patricia Averill in support of a subsequent state habeas application in 2009. SHCR-04 at 11–16. The report included discussion of White's purported adaptive deficits, which Dr. Averill obtained from White. *Id.* Moreover, the report was supported by an affidavit of White's sister, Monica Garrett, stating White struggled in junior high school and high school and that she helped him with his homework. *Id.* at 17. Further, White's 2009 federal

that he could not have sought to raise his claims earlier is also belied by the fact that he sought authorization in 2015 to raise a claim challenging the admissibility of his confession based on his intellectual deficits, *In re White*, 602 F. App'x at 958. *See In re Garcia*, 756 F. App'x 391, 395 (5th Cir. 2018). Moreover, to the extent White argues no time limitation can apply to claims regarding intellectual disability, the Fifth Circuit has held to the contrary. *Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010) (declining to create an exception to AEDPA's statute of limitations based on actual innocence of the death penalty).

White also argues his claims are based, in part, on a three-year-old declaratory judgment in *Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 910 (S.D. Tex. 2021), that has been vacated.[4] *See Gutierrez v. Saenz*, 93 F.4th 267, 275 (5th Cir. 2024). But *Gutierrez* is inapplicable because it is a civil-rights action involving a challenge to Texas's postconviction DNA testing statute, which is not at issue in White's case. *See id*. Moreover, the Supreme Court's stay of execution in *Gutierrez* involved only the issue of whether the plaintiff in that case had standing to bring suit, which again is inapplicable here because White

---

habeas petition was accompanied by affidavits of his family members that discussed, among other things, White's addiction to drugs. ECF No. 64-1 at 26–39.

[4]     The district court in *Gutierrez* held Texas's postconviction DNA testing statute, Chapter 64, was irreconcilable with Texas's abuse-of-the-writ statute, Article 11.071 of the Texas Code of Criminal Procedure. *Gutierrez*, 565 F. Supp. 3d at 910–11.

has filed no such suit. *See id*.; *Gutierrez v. Saenz*, 144 S. Ct. 2718 (2024). Nothing in *Gutierrez* speaks to whether this Court's previous rejection of White's claims about his purported innocence of the death penalty was erroneous. As noted above, the district court in *Gutierrez* found Texas's postconviction DNA testing statute, Chapter 64, irreconcilable with Texas's abuse-of-the-writ statute, Article 11.071 of the Texas Code of Criminal Procedure, *Gutierrez*, 565 F. Supp. 3d at 910–11, and neither provision is at issue in White's case.

But even if the declaratory judgment in *Gutierrez* was relevant, White's motion is nonetheless untimely because it comes more than three years after the district court granted a declaratory judgment in that case, *Gutierrez*, 565 F. Supp. 3d at 910. *See Clark*, 850 F.3d at 782 ("In *Tamayo v. Stephens*, we affirmed the district court's judgment, which held that a Rule 60(b) motion, filed nearly eight months after the pertinent change in decisional law, was untimely."); *Pruett v. Stephens*, 608 F. App'x 182, 186 (5th Cir. 2015). White's Rule 60(b) motion should be denied as untimely.

## III.   White Fails to Justify Relief from Judgment.

Lastly, White fails to demonstrate the extraordinary circumstances required for relief. A final judgment may be lifted under Rule 60(b)(6) for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). However, the moving party must show "extraordinary circumstances," which the Supreme Court has

18

"explained . . . 'will rarely occur in the habeas context.'" *Buck v. Davis*, 580 U.S. 100, 112–13 (2017) (quoting *Gonzalez*, 545 U.S. at 535). White fails to prove entitlement to post-judgment relief.

White seeks to relitigate his claims that evidence of his cocaine intoxication and the purported presence at the crime scene of another person show he is innocent of the punishment he received, and that evidence of his intellectual deficits should have weighed in favor of a finding he adequately invoked his right to counsel. *White v. Thaler*, 2011 WL 4625361, at *4–5, *12–14. This Court extensively discussed the claims and denied them when it denied White's petition in 2011. *Id*. Specifically, this Court explained that DNA evidence proved "unequivocally" that White was at the victims' apartment. *Id*. at *5. The Court also rejected White's argument that evidence regarding cocaine intoxication would have changed the jury's punishment verdict. *Id*. at *4–5. Further, this Court held he failed to show his substance abuse rendered him incompetent to waive his rights. *Id*. at *14. In 2015, the Fifth Circuit declined to grant White authorization to raise a claim alleging his limited intellectual capacity supported his Sixth Amendment claim. *In re White*, 602 F. App'x at 958.

As discussed above, White has failed to show he could not have developed his evidence regarding his adaptive deficits earlier. There is nothing extraordinary about this Court's rejection of the claims White raised in his

19

federal habeas proceedings. The Supreme Court's stay in *Gutierrez* on a standing issue in a civil rights case is entirely inapposite here and is in no way an extraordinary circumstance warranting relief from judgment. *See Fratta*, 2022 WL 44576, at *3 n.3. This is particularly true where White has not filed a civil rights complaint alleging Texas's postconviction DNA testing statute is unconstitutional, and where postconviction DNA testing in White's case showed unequivocally that his DNA was found at the crime scene. *White v. Thaler*, 2011 WL 4625361, at *5. Even relevant changes in decisional law rarely qualify as extraordinary circumstances warranting Rule 60(b)(6) relief. *Fratta*, 2022 WL 44576, at *3 n.3. White cites to no relevant change in decisional law, much less an extraordinary one.[5] Therefore, White fails to justify Rule 60(b)(6) relief.

## IV.   White Is Not Entitled to a Stay of Execution.

White is not entitled to a stay of execution *See Hill v. McDonough*, 547 U.S. 573, 584 (2006). A stay of execution is an equitable remedy. "It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from

---

[5]   White cites to *Ring v. Arizona*, 536 U.S. 584 (2002), ECF. No. 120 at 5, but that opinion pre-dates this Court's final judgment in this case by almost a decade, and this Court discussed it when adjudicating White's petition, *White v. Thaler*, 2011 WL 4625361, at *5–6.

the federal courts." *Id.* (*citing Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)); *see Nken v. Holder*, 556 U.S. 418, 425 (2009).

As demonstrated above, White's motion for relief from judgment is a successive habeas petition. Consequently, this Court is without jurisdiction to grant a stay of execution. Further, the motion is untimely, and White fails entirely to show he is entitled to relief from judgment. Thus, White cannot demonstrate the likelihood of success on the merits of his claim, nor can he demonstrate that his claim amounts to a substantial case on the merits that would justify the granting of relief. For the same reasons, White cannot show he will be irreparably harmed absent a stay of execution or that the public interest favors a stay, particularly in light of the victims' interest in seeing the state court's judgment enforced. *See Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008). Under the circumstances of this case, a stay of execution would be inappropriate.

## CONCLUSION

For the above reasons, the Director respectfully requests that this Court deny White's motions for relief from judgment and a stay of execution.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

                                        JOSH RENO
                                        Deputy Attorney General for
                                        Criminal Justice
                                        EDWARD L. MARSHALL
                                        Chief, Criminal Appeals Division

                                        s/ Jay Clendenin
                                        *JAY CLENDENIN
                                        Assistant Attorney General
                                        Criminal Appeals Division
                                        Texas Bar No. 24059589
                                        Southern District No. 920324

*Counsel of Record

                                        P.O. Box 12548, Capitol Station
                                        Austin, Texas 78711
                                        Tel: (512) 936-1600
                                        Fax: (512) 320-8132
                                        e-mail: jay.clendenin@oag.texas.gov

                                        ATTORNEYS FOR RESPONDENT

### CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, September 24, 2024, I filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Patrick McCann                          Julia Bella
700 Louisiana Street, Suite 3950        503 FM 359, Suite 130
Houston, Texas 77002                    Richmond, Texas 77406
writlawyer@outlook.com                  julia@jbellalaw.com

                                        s/ Jay Clendenin
                                        JAY CLENDENIN
                                        Assistant Attorney General